**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.: 3:22-CR-19** |
| **v.** | : | |
| | : | |
| **MANFREDO MARTIN-MICHAEL MADRIGAL, III** | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO REVOKE THE MAGISTRATE'S ORDER GRANTING RELEASE**

## I. INTRODUCTION

The evidence developed in this case shows that the defendant, Manfredo Madrigal, III ("Madrigal"), has engaged in a multi-year pattern of threats, lies, and manipulation. The most difficult part of preparing this memorandum is that there is too much evidence of misconduct adequately to capture in a single filing. Madrigal's conniving behavior spans across his personal, professional, and financial life.

Madrigal's misconduct involves stalking and violent conduct toward two now-former romantic partners using firearms (including holding a gun to one victim's head), threats, denigrating messages, and online monitoring. It involves jeopardizing national security interests by telephoning the Russian Embassy potentially to seek retribution for his involuntary separation from the U.S. Army. It involves vindictively destroying military training modules through the purposeful, repeated entry of deletion commands and later concealing his misdeeds. It involves lies to an array of government agencies, including the Army, the Department of Commerce, the Department of Veterans Affairs, the Office of Personnel Management, and the FBI. It involves witness tampering after Madrigal was aware of the FBI's investigation and *before* his arrest on

federal charges. It involves attempted witness tampering *after* Madrigal's arrest and from jail. It involves dishonesty and omissions to the State Bar of Missouri.

The defendant's manipulation also extends to the court system. In January 2020, he prepared and submitted false witness declarations to pressure the dismissal of state assault charges and crafted an untruthful script for a witness. The investigation has uncovered evidence that the defendant's family—the very people proposed as his custodians—are unable to control him and will be witnesses at trial in this case. As detailed herein, Madrigal also presents a national security concern due to his former status as a clearance holder and overseas military operator.

In short, there are no conditions that can be fashioned to guard against the dangers presented by the defendant, and he cannot be trusted to comply with any conditions of release. The United States therefore moves the court, pursuant to 18 U.S.C. § 3145(a), to revoke the magistrate judge's release order and order the defendant's continued pretrial detention. Probation likewise recommends detention on the grounds that Madrigal poses risks of nonappearance and danger.

## II. PROCEDURAL BACKGROUND

In August 2022, the defendant was arrested in Boone County, Arkansas, after a romantic partner (hereinafter, "Victim 2") called police to report that he had held a pistol to her head, as shown below:

Ex. 1 (August 2022 Photograph)[1]. The defendant faces a state aggravated assault charge arising from the incident. ECF No. 15 (Pretrial Bail Report).

A few days after his state arrest, Madrigal was charged by complaint for cyberstalking a former romantic partner (hereinafter, "Victim 1"), in violation of 18 U.S.C. § 2261A(2). ECF No. 3 (Compl.). The Complaint alleged, inter alia, that the defendant threatened Victim 1's reputation, career, family, and pet; brandished a firearm and threatened suicide at her home when their relationship deteriorated; stole her property; sent disturbing messages about the his knowledge of her license plate, apartment access codes, and account passwords; made thinly veiled threats to disclose sexually explicit images or video recorded without Victim 1's consent; falsely told Victim 1 that Army officials disapproved of her conduct; accessed Victim 1's mobile phone health applications to monitor intimate details about her life and mock her purported infertility; and made chilling symbolic threats, e.g., by stabbing an image of a bear (a nickname used by Victim 1).

The defendant appeared for his arraignment and initial detention hearing on the federal cyberstalking charge in September 2022. At the hearing, the government detailed the defendant's extended and violent stalking efforts, the irrefutable evidence of his cyberstalking, the defendant's demonstrated deceitfulness, pattern of stalking and violent conduct, mental instability, witness tampering, the serious danger posed to the community, and flight risk. *See generally* ECF No. 17 (Gov't's Mot. for Detention). The magistrate found that "no condition or combination of conditions will reasonably assure the Defendant's presence as required (by a preponderance of the evidence) OR the safety of another person or the community (by clear and convincing evidence) if the Defendant is released at this time." ECF No. 24 (Detention Order at 1). The magistrate based his detention decision on his view that "the allegations against Defendant involve violent

[1] The government will provide its photographic, video, audio, and other Exhibits to the Court, Clerk, and defense counsel via a consolidated thumb drive containing the materials referenced in this Memorandum.

conduct, including threats of violence and use and threatened use of firearms.  The Defendant's military training and mental instability heighten the risk of potential harm.  Additionally, the Government alleges that Defendant has destroyed information on computers and coached a potential witness." *Id.*

On December 14, 2022, a grand jury indicted the defendant on the original cyberstalking charge, as well as seven other felony charges for willfully injuring or committing depredation against U.S. property, in violation of 18 U.S.C. § 1361; four counts of making false statements to a department or agency of the United States, in violation of 18 U.S.C. § 1001(a)(2); witness tampering, in violation of 18 U.S.C. § 1512(b)(3); and attempted witness tampering, in violation of 18 U.S.C. § 1512(b)(1).  ECF No. 45 (Indictment).

Over a month later, the defendant moved to reopen the detention hearing.  In particular, the defendant argued that he should be released because he was charged with purportedly "non-violent offenses," that his conduct does not "rise to the level of a breach of national security," that Victim 1 used an account for "Mr. and Mrs. Manny Madrigal" to book yoga sessions in February 2022, that his attempts to tamper with witnesses and threaten Victim 1 were primarily through email, text message, and voicemail, and that the defendant needed mental health treatment.  ECF No. 63 (Def.'s Mem. Supp. Mot. for Recons. at 6–8).  As custodians charged with monitoring his compliance with any release conditions, he proposed the family members who had enabled his continued attempt to witness tamper and monitor his cyberstalking victim from jail.

At the hearing on the motion, the magistrate asked whether there was any report or statement from a medical expert in the defendant's exhibits or any medical expert prepared to give testimony about the defendant's mental health issues.  ECF No. 82 (Tr. at 7–8). Defense counsel answered that there was none and instead proffered that the defendant met with a purported expert

by telephone about his Trazadone prescription, night tremors, "sleeplessness, insomnia, [and] night sweats." Tr. at 8. The defendant then presented a release plan in which he would complete an unidentified thirty-day treatment program[2] before living with the same problematic custodians mentioned above.

The government opposed the defendant's release, noting that—as the magistrate had already decided in this case—the defendant had engaged in violent conduct, including threats of violence, threats to use firearms, and actual use of firearms. To illustrate the grave, specific threats to the defendant's two former romantic partners, the government provided, inter alia, (1) a photograph of defendant holding a pistol to Victim 2's head shortly before his arrest in Arkansas in August 2022; (2) audio clips of conversations in which the defendant told Victim 2 that (a) if she was afraid he was going to kill her, "a protection order would do jack shit . . . . if I wanted to kill you, I would figure out a way to figure out when you're going to be home, and I would come and kill you, if that's what I wanted to do," Ex. 3 (Victim 2 Conversation A) at 00:47–6:00, and (b) that he is, in fact, "going to fucking kill you for what you did to me," Ex. 4 (Conversation B with Victim 2) at 1:48–2:05; and (3) descriptions of his explicit and implicit threats to Victim 1's life, family, career, reputation, and pet. The government also addressed the defendant's pattern of lies to various government and professional entities, use of family members to further his obstruction of justice *even while detained*, and national security threat posed by the defendant's release, as described below.

At the end of the hearing, the magistrate reversed his initial conclusion that no set of release conditions would reasonably assure the safety of the community and safeguard against risk of

[2] Later in the hearing, defense counsel proffered the name of a facility but provided no information about the content of a treatment program, had no scheduled appointment for such program, and provided no details about whether the program could comply with ordered release conditions. Tr. at 33–34.

flight, ordering the defendant released to an unidentified thirty-day inpatient treatment program, after which he would be released to the care of the family members.  Tr. at 67–71.

The government moved this Court to stay and revoke the magistrate's release order.  The Court granted the government's motion to stay on March 3, 2023.  ECF No. 74 (Order).

## III.   LEGAL STANDARD

"When the district court acts on a motion to revoke or amend a magistrate judge's pretrial [release] order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release."  *United States v. Stewart*, 19 Fed. App'x 46, 48 (4th Cir. 2001) (citing *United States v. Rueben*, 974 F.2d 580, 585–86 (5th Cir.1992)).

When seeking pretrial detention, the government bears the burden to establish that "no condition or combination of conditions will reasonably assure the appearance of [the] person as required and the safety of any other person and the community" if the defendant is released.  18 U.S.C. § 3142(e), (f).  The Court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  *Id.* § 3142(g).  The standard for proving risk of flight and danger to the community is by a preponderance and clear and convincing evidence, respectively. *Id.*  3142(f).  The rules concerning admissibility of evidence in criminal trials do not apply to a detention hearing and the government may present evidence by a proffer.  *Id.*; *see generally United States v. Winsor*, 785 F.2d 755 (9th Cir. 1986) (holding both parties may proceed by proffer and defendant has no right to cross persons not called to testify).

## IV. ARGUMENT

### A. The Weight of the Evidence is Strong

In evaluating detention, the court should consider the weight of the evidence. Here, the evidence of Madrigal's misconduct is strong and practically irrefutable. Much of it comes from Madrigal's own text messages, emails, video recordings, voicemails, photographs, and recorded written and verbal statements to government entities, as detailed below.

### B. The Defendant Demonstrates a Deceitful Character

The investigation has revealed a well-established pattern of deliberate deceit by Madrigal. This misconduct reflects negatively on the defendant's character and relates to the nature and circumstances of the charged offenses. Madrigal is charged with making false statements to the Army (Count Two), the FBI (Counts Three and Four), and the Office of Personnel Management (Count Six). *See generally* Indictment.[3] The defendant also made (presently uncharged) false statements or omissions to Army leadership, the Missouri State Bar, and the Department of Veterans Affairs.

*i. Lies to the U.S. Army*

Madrigal is an attorney and former military service member with an active security clearance. In early 2022, Madrigal was assigned to the Judge Advocate General's Legal Center and School (herein, the "JAG School"). Around this same time frame, the Army learned Madrigal omitted a DUI arrest in his application and moved to discharge Madrigal for his dishonesty. Indictment ¶ 5. While pending discharge, Madrigal remained assigned to the JAG School. He was given alternate duties, which included a grant of administrator access rights to update a

[3] The seventeen-page Indictment details the schemes related to Madrigal's false statements, as well as other charges. For sake of brevity, all of the factual allegations will not be repeated herein but will be relied upon at the hearing.

National Security training module.  Madrigal abused this access authority and took steps to delete the module during the overnight hours between February 6 and 7, 2022.  Madrigal filmed the deletion while narrating, "*I'm gonna fuck you*."  Compl. ¶ 11.   His desire for retribution against the United States was made clear when he further proclaimed, "*You people fucked with me one too many times*" and ominously remarked, "*Guess what I can do next.*"  *Id.* ¶ 23.

Madrigal's "next" move is now known.  He called the Russian Embassy, as evidenced by toll records.   As he told one witness, Madrigal possessed valuable information for Russia. Madrigal sent a text message to another witness stating, "The Russians in DC reached out to me, they would like to know what I know."  Compl. ¶ 25.  In fact, Madrigal had not yet called the Embassy, but foolishly bragged about it in advance.  Soon thereafter, toll records show Madrigal placed an approximately two-minute-and-twenty-six-second call to the Russian Embassy in the early hours of February 7, 2022.

The next morning, the JAG School tried to determine why its National Security Law Primer (NSL-P) training module was gone.  Madrigal reported to work and was included on internal email communications about the deletion.  Madrigal, however, did not admit his misconduct.

Soon thereafter, Madrigal was discharged from the Army and completed a security out-processing form on February 22, 2022.  On this form, Madrigal denied any contact with a foreign national while assigned to the JAG School.  Madrigal's attestation of no foreign contact was false. Madrigal signed the form beneath a banner warning him about criminal exposure for false statements, in violation of 18 U.S.C § 1001.  As an active-duty Army officer and security clearance holder, Madrigal had an affirmative obligation to report foreign contacts while assigned to the school.  He failed to do so.

Madrigal's deception continued further.  Madrigal lied to JAG School command staff about

his relationship with Victim 1, a fellow solider and attorney.  Madrigal claimed Victim 1 was his

fiancée.  This was untrue.  They were never engaged and were no longer intimately involved at

the time of his involuntary discharge.  This engagement falsehood had negative and potentially

dangerous ramifications for Victim 1.  When Madrigal showed signs of mental instability

following his discharge, the Army agreed to provide emotional support to Madrigal by arranging

a visit from his purported fiancée.  Meanwhile, Madrigal pressured Victim 1 via text to visit him.

Madrigal made the request at the purported behest of JAG School leadership:



Ex. 5 (Text Excerpt Regarding Victim 1 "Support"). Thus, Madrigal's false statements manipulated the Army into arranging for one of his stalking victims to fly into Charlottesville to "support" him, and he shamed Victim 1 into agreeing to it.[4]

To avoid Victim 1 discovering his false engagement claim, Madrigal told a high-ranking officer at the JAG School their status was not public and not to mention it. Madrigal also sent this same individual a photograph purporting to be from a recent "surprise" visit from Victim 1 and climbing excursion. The photograph was actually taken months ago; no surprise had visit occurred.

Months after his break-up with Victim 1, Madrigal attempted to denigrate Victim 1's reputation and continued to deceive high-ranking officials. Multiple military witnesses informed the FBI that Madrigal shared unsolicited screenshots of Victim 1's fertility tracking app activity or information gleaned therefrom. In these exchanges, Madrigal falsely told the witnesses that Victim 1 forwarded or otherwise pushed update notifications through the application to taunt him. This was untrue. The application provider confirmed that it does not offer push-notification features. In reality, Madrigal was logging into Victim 1's Modern Fertility App to track her. These instances are but a few examples of Madrigal's manipulative behavior toward Army leadership.

*ii. Lies to the FBI*

Madrigal also crafted nonsensical stories riddled with lies during two interviews with the FBI. During those interviews, agents asked him about any contact with foreign entities and his knowledge regarding the deletion of the NSL-P training materials. Indictment ¶¶ 15–18. Madrigal initially claimed he *received* several missed calls from a 202-area code and called it back.

---

[4] Victim 1 felt uncomfortable about contravening the command's request and sharing details of Madrigal's prior erratic behavior during their then-defunct relationship. Madrigal's erratic behavior in December 2021, which led to their break-up, is described in Section IV.D.i, herein. *See also* Compl. ¶ 31 (describing Madrigal's alarming threats, use of a firearm, and destructive activities in Victim 1's apartment).

Madrigal then claimed he spoke to someone who had a Russian accent and asked for information relating to Ukraine. Madrigal stated he did not initiate the exchange with this caller. But his sequencing of events and provided details were false. Toll records show that he dialed the main number for the Russian Embassy. This number did not call him.

During the second interview, Madrigal continued to lie to agents, falsely claiming he did not know how the NSL-P was altered or deleted. Madrigal filmed himself deleting the modules and texted the video to Victim 1. These interviews were surreptitiously recorded, and the evidence of his lies is concrete.

*iii. Lies to the Office of Personnel Management*

Madrigal also submitted false statements in his SF-86 (a form completed for many government positions that require a background check). Indictment ¶¶ 39–43. These false statements will not be repeated here because they relate to his deletion of the training module and arrest in January 2020. These incidents are sufficiently detailed in the Indictment and elsewhere in this Memorandum. *Id.*

*iv. Lies to the Department of Veterans Affairs*

In mid-2022, Madrigal sought employment from the Department of Veterans Affairs (the "VA") as an Attorney Advisor. As part of this process, he falsely claimed to reside in Barrington, Illinois, to gain a higher cost of living adjustment (COLA) atop his base salary.[5] In reality, Madrigal moved into Victim 2's home in Arkansas and began remote work for the VA. Compl. ¶ 47 and n.4. The difference between his true and false address is established through his own paperwork. On June 9, 2022, Madrigal changed his address with the U.S. Postal Service from

[5] Barrington, Illinois has a significantly higher COLA compared to Harrison, Arkansas. Locality pay in Chicago is 29.18% versus 16.2% in all of Arkansas. *See* https://www.federalpay.org/gs/locality/chicago and https://www.federalpay.org/gs/2022/arkansas#:~:text=Arkansas%20has%20no%20cities%20or, Schedule%20jobs%20in%20the%20state.

Charlottesville to Victim 2's address in Arkansas. In his VA appointment affidavit completed on July 20, 2022, he falsely listed his residence as Barrington, Illinois.

The context of this false residency claim reveals Madrigal's premeditated manipulation. As part his initial communications with the VA's human resources representative, he sought information about COLAs. He was told that moving to a new state may affect annual salary due to locality pay (i.e, the COLA). Ex. 6 (Email Exchange with VA). Next, Madrigal emailed the representative on June 1, 2022, and claimed he was "viewing a townhouse" at 732 Derby Lane in Barrington, Illinois. *Id.* He later stated he "signed a lease" at the address, as shown below (emphasis added):

**From:** Manfredo Madrigal III
**To:** HR Employee
**Subject:** Re: [EXTERNAL] Fwd: Confirmation Job Offer: Manfredo Madrigal Atty-Advisor (Veterans) GS-0905-11 Request-91422445-26448-2022-04-14 CARX-11306755-22-KB-OCA
**Date:** Wednesday, June 1, 2022 4:54:02 PM

HR Employee,

They were able to let me view my new townhouse today and I signed a lease. As of today my address is 732 Derby Ln, Barrington, IL 60010.

> On Jun 1, 2022, at 13:01, Manfredo Madrigal III <manfredo.madrigal@gmail.com> wrote:
>
> I am viewing a townhouse this weekend at 732 Derby Lane, Barrington, IL 60010. If I end up moving there, will it be difficult to switch the pay to reflect that location?
>
> On Wed, Jun 1, 2022 at 12:28 PM HR Employee (WMC) <HR Employee> wrote:
>
> > Good morning Manfredo,
> >
> > My apologies for the delayed response.
> >
> > Yes moving to a new state could affect your annual salary amount as your pay may change based on locality.
> >
> > If you could provide me with the City, County and State, I can let you know if it affects it, I will also need to know if you plan on moving prior or after starting this position.

*Id.*

In fact, this address is his *family's home* and not some "new" real estate listing. Indeed, Madrigal's brother confirms as much. ECF 63-1 (Decl. of David Madrigal ¶ 5 ["I reside with my

family at 732 Derby Lane, Barrington, IL"]).  In an interview, Madrigal's father told the FBI that Madrigal visited their home prior to June 2022 and no one leased the property (or any portion) from them.  This deception makes Madrigal's father and brother potential witnesses to his false residency claim.

In August 2022, agents interviewed Madrigal's supervisor, an appeals board judge.  The judge reported that he believed Madrigal was working in Barrington, Illinois.  The sincerity of this understanding is evidenced by the fact that his employer sent someone to Madrigal's purported residence in Barrington for a welfare check when he failed to show for work following his arrest in Arkansas for assaulting Victim 2.

By comparison, Madrigal reported to U.S. Pretrial Services that his home address since June 2022 was Victim 2's residence in Arkansas.  *See* Pretrial Bail Report.  These conflicting claims cannot be reconciled.  His deception is undeniable.

  *v.*  *Madrigal's Family Covers for Him*

After Madrigal was arrested in Arkansas, the VA—under the impression that Madrigal lived in Illinois—sent police on a welfare check at his purported residence when he did not show up for work.  Per jail calls, his family scrambled to cover for Madrigal's absence and explain his presence in Arkansas.  His father offered to call the VA and Madrigal advised them to say he "went down to Arkansas to try to take care of some personal issues with my girlfriend." Ex. 7 at 1:47 (Family Jail Call Regarding VA Check-In).  In response, his father affirmed he would convey this story and "just tell them that."  *Id.*

After Madrigal's arrest, the FBI observed someone attempting to log into his cell phone from Illinois and photographed the home screen depicting such efforts, as shown hereafter.  At this time, the family was aware that Madrigal had been arrested.



Ex. 8 (Remote Login Notification). This login raises concerns that his family members will be witnesses at trial about their efforts to access Madrigal's devices and any instructions that he provided them.

*vi. Lies to the Missouri State Bar*

After passing the bar exam, the Missouri State Bar placed Madrigal in a probationary status due to concerns about his criminal history. He was placed under a monitoring agreement executed in April 2020. Ex. 9 (Monitoring Agreement); Ex. 10 (Quarterly Report) (demonstrating reporting obligations). This monitoring agreement detailed Madrigal's criminal conduct known to the Bar, as excerpted below from page one of the agreement:

> WHEREAS, Applicant submitted an Application for Bar Examination for the July 2018 bar examination and an Application for Character and Fitness Report on May 21, 2019; and,
>
> WHEREAS, the Board, upon carrying out its Character and Fitness investigation, identified concerns relating to Applicant's history of alcohol use. Specifically, Applicant has the following character and fitness concerns in Applicant's history: criminal damage to property & reckless conduct charges in 2006, driving under the influence charges in 2012, disorderly while intoxicated charges in 2016, driving under the influence and open container charges in 2019; and,
>
> WHEREAS, on its own motion, the Board did call an informal investigative hearing pursuant to Supreme Court Rule 8.12 at which Applicant appeared and gave testimony on January 8, 2020; and,

Ex. 9 (Monitoring Agreement). Noticeably absent from this list is Madrigal's January 2020 arrest for assault. In the records obtained from the State Bar, there is no indication that Madrigal ever

reported this arrest. The terms of the agreement required Madrigal to attend substance abuse program meetings no less than once per week and "remain abstinent from both alcohol and all illicit drugs." Ex. 9 ¶¶ 3, 5. Per witnesses, Madrigal did not abstain from alcohol consumption and falsified Alcoholics Anonymous attendance records. This is another example of Madrigal's willingness to deceive and manipulative history.

*vii. Summary of Manipulation*

Madrigal lied to the Army to bring his victim closer. He lied to the VA to claim income he was not entitled to receive. He lied on SF-86s to gain employment and maintain a clearance authorizing access to information that he cannot be trusted to maintain. He lied to the State Bar to become an attorney. He lied to the FBI about his contact with the Russian Embassy to conceal his contact with a foreign adversary.

Madrigal cannot be trusted to comply with conditions. And his family cannot be relied upon to monitor his conduct when they are also drawn into his criminal ambit.

**C. <u>Defendant's Efforts to Engage in Witness Tampering and His Family's Role</u>**

In addition to his own lies, the defendant has also attempted to persuade or intimidate others to lie on his behalf. Indeed, Madrigal's attempts to conceal his crimes extend back to the early 2000s.

For example, in 2008 the defendant was fired from his job as a Walgreens pharmacy technician because he reportedly stole Vicodin and money from the pharmacy. Madrigal used another employee's authorization code to alter inventory numbers and steal the underreported prescriptions. He was also caught on video stealing a $100 bill. When asked about the termination during his background check, Madrigal told investigators a very different story. Madrigal claimed that he had left his job by "mutual agreement" after twenty dollars was missing from the register

at the end of his shift.  When investigators followed up with other Walgreens employees, pharmacy management said that Madrigal reached out and attempted to coax him/her on what to say during the interview.  Ex. 11 (SF-86 Excerpt).  In his/her words, Madrigal is "sharp, witty, mentally aggressive, capable, and an opportunist."  *Id.*  Madrigal's behavior at Walgreens raised grave concerns about his honesty, integrity, judgment, and reliability.  This individual characterized him as "the type of person that 'you' have to keep an eye on."  *Id.*

Madrigal has also waged a years-long campaign of violence and intimidation against Victim 2, whom he repeatedly coerces to lie on his behalf.  In January 2020, Victim 2 and her mother called police from a barricaded upstairs bedroom after the defendant got into a physical altercation with another household member.  Victim 2 told police that Madrgial had gotten drunk, tried to flood her kitchen, thrown pots and pans, and shoved a household member.  Ex. 12 (Body-Worn Camera Footage).  When police tried to speak with him, he locked himself in a bedroom and refused to come out for several minutes.  When he did, he told police that Victim 2's mother is a "nightmare" and called the police because she had an argument with him.  He also stated that blood on the bedroom door was a result of Madrigal cutting himself "just very recently" and that "nobody touched me, I didn't touch anybody."  *Id.* at 16:08–31.  Fewer than ten minutes later, the defendant changed his story and told police that his hand was cut when he was "attacked by [the household member]."  *Id.* at 24:48–53.  Much like prior occasions, Madrigal's story shifted to meet his needs.

Victim 2 thereafter sought a temporary protection order against the defendant.  After Madrigal learned about the temporary protection order, he communicated to Victim 2 in no uncertain terms that he would hold a grudge against her if she did not drop her request for a protection order:

> If I were to get to a point where I got really drunk, I can absolutely guaran-fucking-tee you, I'm . . . will be thinking about this . . . . Just to let you know, maybe I shouldn't even say that, never mind . . . .

Ex. 3 (Conversation A with Victim 2) at 00:47–6:00.  He then tailed off before asking, "What is it you're afraid of, what do you think is going to happen?"  When Victim 2 answered "you're going to kill me," he told her:

> So with that said, just to let you know, if you think, if that's what you're afraid of, a protection order isn't going to stop that.  I know that's not probably the best comfort . . .  But if that is what I wanted to do, a protection order is not going to stop that.  A protection order is going to get me in trouble if I harass you and I call you nonstop.  A protection order is going to help you if I harass you and show up at your work without being invited.  A protection order is going to help you if show up to your door and keep ringing the doorbell.  A protection order is not going to help you if I decide when we get off the phone right now "that's it, I've had it with her."  And like I said, that's not the most comforting advice, or the most comforting comment . . . .  If I wanted to get in the car and come to you and do something, a protection order would do jack shit . . . .  [Victim 2,] if I wanted to kill you, I would figure out a way to figure out when you're going to be home, and I would come and kill you, if that's what I wanted to do.

*Id.*  Victim 2, her mother, and her mother's romantic partner later filed declarations which recanted their previous reports that the defendant had gotten into a physical altercation at Victim 2's house.  In fact, this recantation was orchestrated by the defendant himself.  Law enforcement agents have discovered an unsigned draft of Victim 2's declaration and copies of the declarations signed by Victim 2's mother and her romantic partner on Madrigal's electronic devices.  They also found a color-coded script for Victim 2 if she was questioned, as seen below:

Charge = creating apprehension of imminent physical injury

Red= say

Blue= only if asked

- I would like to know how I can go about dismissing the charges
- That evening I called the cops because we had a verbal argument and I was hoping they would just come and ask him to take a walk or to leave for the evening, I had no intentions on him being arrested and these charges following
- He never put his hands on me or attacked me in any way (if asked- only time he touched me was to brush my hands off him when I grabbed him)
- I told the officer I observed him throwing some stuff (magnets off fridge and one vase) around downstairs on the **first floor while I was upstairs on the second floor in my mother's room behind a locked door- with my mother and her boyfriend!**
- I **wasn't afraid he would cause me any physical harm**, I was just hoping for the cops to help decompress the situation—they told me to go get a protection order, at the time I didn't really understand what this was
- I became aware of the magnitude of all this when his lawyer contacted me to arrange for a 3rd party to pick-up of some of his clothes
- After realizing the seriousness of the situation, I **immediately** asked his lawyer how to drop the charges and filed a joint motion to dismiss protection order
- I am not interested in being a witness and taking part in a trial because he did not lay hands on me nor did I believe he would
- (If asked about job- currently unemployed, was student. Use to be in Army, now out).
- Please do not volunteer anything about law school bar etc.

Ex. 13 (Script). As evidenced by the documents found on his own devices, the defendant is willing and able to coach his victims and potential witnesses on how to answer questions—from investigators and courts—so that he can evade accountability for his crimes.

Indeed, the Indictment charges defendant with at least two attempts to coach and tamper with Victim 2's statements to law enforcement. The first charged attempt occurred before the defendant's arrest. After Madrigal provided Victim 2's name to the FBI, she travelled across state lines to meet him and he spent hours instructing her on what information to provide and omit

during her upcoming interview with the FBI.  For example, Madrigal told Victim 2 what he spoke about with the FBI and had her review his phone toll records to develop a plausible story regarding his foreign contact.  They spent hours talking and walking around outside a nearby mall and placed their cellphones and Apple watches in another room in the defendant's Charlottesville apartment to avoid being monitored.  Victim 2 later conveyed that she was "being coached, for sure" by Madrigal.  Prior to her FBI interview, she and Madrigal planned code words to communicate about whether her interview had gone well: the word "Sriracha" or phrase "melons in the garden" would be used to reflect a positive or negative outcome, respectively.  Compl. ¶ 48.

Madrigal's second charged witness tampering effort occurred while he was detained.  Since his arrest, the defendant has repeatedly discussed with family members ways in which to contact Victim 2.  As discussed in the Indictment, the defendant communicated about Victim 2 with his father (referred to as "Individual 1") during a telephone call on or about August 19, 2022.  Indictment ¶ 45; Ex. 14 ("Enlighten Her" Jail Call) at 00:16–02:40.  At the start of the call, Madrigal told Individual 1, "I can't be spelling everything out."  He referenced Victim 2 as "she" and "her."  Ex. 14 ("Enlighten Her" Jail Call).  He emphatically stated that "someone" needed to "enlighten" her so she would not be used against him.  *Id.*  Madrigal also described Victim 2's involvement in this case as a "huge thing with multiple matters."  *Id.*  Individual 1 agreed and responded that he had his "marching orders."  *Id.*  Madrigal's text messages from custody provide further evidence of his repeated efforts to direct others to contact Victim 2, namely via his father and state defense attorney (referred to below as "Jim"), about Victim 2 dropping charges in Boone County, Arkansas:



08/14/2022 3:05PM 275460: MANFREDO MADRIGAL Manny Madrigal
RE: Text Message
and pls [V2] about any updates just in general- bond- ankle-zoe- getting my stuff- what all was taken? why? why no notice? when will it be returned. anything re [V2] possibility of boone charges being dropped? how to go about getting them dropped (like jan 2020).

08/16/2022 1:59PM 275460: MANFREDO MADRIGAL Manny Madrigal
RE: Text Message
i take it [V2] hasnt called him back? as far as i know, today is her first day at washington regional, across town from me. near jim

Start of Email Chain
08/16/2022 2:02PM Manny Madrigal 275460: MANFREDO MADRIGAL
Text Message
I will follow up on that right now, [V2] thing

I just text him and ask him if he has any update on a warrant affidavit and any further conversation with the prosecutor there Washington County and he said
------
Im entering my appearance with this court right now. Which will let me see it all
-----
I will text him now about reaching [V2] and where she is at from your text

Start of Email Chain
08/16/2022 2:04PM Manny Madrigal 275460: MANFREDO MADRIGAL
Text Message
Me to Jim
---

Did u get a hold of [V2]?

as far as Manny knows today is her first day at washington regional, across town from him near your office.

Please track her please drive there is possible if she won't pu

Thank you sir

Ex. 15 (Jail Message Excerpts).

Relatedly, the FBI interviewed Madrigal's state defense attorney, who represents the defendant on the aggravated assault charge arising from the August 2022 firearm incident with Victim 2. During this interview, the attorney acknowledged that, absent his involvement, the Madrigals would have directly contacted Victim 2. These statements are corroborated by jail calls

and text messages wherein the defendant seeks information about Victim 2's knowledge of his status and whether his current Boone County case can be resolved similar to "January 2020"; i.e., where the defendant coerced Victim 2 to change her story and drop charges against him. Ex. 16 (Jail Call A Regarding Victim 2 Statements) at 00:41–01:47; Ex. 17 (Jail Call B Regarding Victim 2 Statements) at 1:00–2:05.

In short, Madrigal has manipulated Victim 2 and other potential witnesses against him for years. He tried to "coax" his former coworker to conceal his theft of Vicodin and money from Walgreens in the early 2000s, threatened Victim 2's life so that she and her family would drop the protection order against him, coached Victim 2 to lie to the FBI about his contact with the Russian Embassy, and—from jail—recruited his family to continue to "enlighten" Victim 2 about the impact of her allegations against him. His attempts to obstruct justice continue even in the face of continual monitoring of phone calls and text messages from jail. If released, he would be even more emboldened to obstruct justice and tamper with witnesses.

**D. Defendant's Violent Conduct and Safety Concerns for the Victims, Witnesses, and Community**

Madrigal's physically violent and threatening conduct establishes that his release poses a grave threat to the safety of the community, including Victim 1, Victim 2, potential witnesses, the public, and the defendant himself.

*i. Danger to Victim 1*

Madrigal is charged with stalking Victim 1 between late 2021 until June 2022. During that time, he sent her a barrage of disturbing text messages, voicemails, emails, photographs, and videos, in which he threatened her life, her family, her pet, her career, and her reputation. As the defendant's romantic relationship with Victim 1 soured, he became increasingly controlling, manipulative, and demeaning. When faced with his disintegrating romantic relationship with

Victim 1, Madrigal loaded a gun and threatened to commit suicide in her presence.  Victim 1,

fearing that Madrigal would kill her in a murder-suicide, pleaded with him to put down the gun.

He eventually agreed to place the gun in the garage but refused to relinquish control of the garage

door opener.  The next morning, Victim 1 left for work and refused to return to her home until

Madrigal left.  While he was in her home, he trashed her apartment, damaged her property, poured

water onto her carpet, ground a bottle of medicine into her cat's food dish, and symbolically

stabbed a knife through an image affiliated with her nickname:



Ex. 18 (Bear Threat).

In response to Victim 1's repeated requests and demands that he leave her home, Madrigal

taunted her about entries discovered in her diary, derogatorily called her white trash, refused to

leave, and baited her to "call the cops."  Ex. 19 (Text Message Excerpts).

On other occasions, Madrigal threatened Victim 1's father, stating that Victim 1 and her

father "did this" and "I'm coming after him and then you."  Compl. ¶ 34.

Still other messages to Victim 1 contain thinly veiled threats in the form of purported

conversations with Army officials, sexually explicit photographs, and photographs of weapons.

In several communications, Madrigal implied to Victim 1 that he was denigrating her reputation with Army higher-ups and she would suffer professional consequences if she angered him.  *See generally* Compl.

On another occasion, Madrigal sent Victim 1 a series of emails which contained compromising, explicit photos of Victim 1 from previous live video interactions and recorded without her knowledge or consent.  In connection with the photos, the defendant stated, "You tried so hard," and, "Nobody is going to know you like I do.  Don't let them fool you."  Compl. ¶ 46.

These foreboding communications are only a small sample of the overwhelming threats and harassment Madrigal has directed toward Victim 1.  He has threatened to have "fun" with Victim 1's coworker and sent threatening messages to a male friend from her phone.  He consistently monitored her social media presence and location, creating alias accounts to view her posts and covertly accessing her health accounts to investigate her sexual activity.  In short, Victim 1 has been the target of the defendant's obsessive threats and monitoring since their romantic relationship until his arrest.

*ii.    Danger to Victim 2*

Madrigal's release also poses a grave threat to Victim 2's safety.  To date, he has held a gun to Victim 2's head, thrown a case of beer and other objects at her, held a machete to her throat, choked her and pulled her hair, told her he is going to kill her, and told her he is going to kill her brother.  His threats have disturbingly invoked Victim 2's deceased husband (referred to below as "V2 H"), a soldier in one of the defendant's former units:

On Sat, Apr 1, 2017 at 7:39 AM, Manfredo Madrigal III
<manfredo.madrigal@gmail.com> wrote:

> like I told you I will fucking ruin you by showing every everyone the truth. the pictures you sent me months after [redacted] died are next unless you call
>
> On Sat, Apr 1, 2017 at 7:37 AM, Manfredo Madrigal III
> <manfredo.madrigal@gmail.com> wrote:
>
> > you lying whore
> >
> > On Sat, Apr 1, 2017 at 7:37 AM, Manfredo Madrigal III
> > <manfredo.madrigal@gmail.com> wrote:
> >
> > > going to call you out just like I just did your faggot ass lying brother

**From:** Manfredo Madrigal III
**To:** [redacted]
**Subject:** Re:
**Date:** Saturday, April 1, 2017 6:32:02 AM

I will fucking kill your your half ass faggot brother if he tries to talk to me again bitch

2017-04-01 3:29 GMT-05:00 Manfredo Madrigal <manfredo.madrigal@gmail.com>:

> Sent from my iPhone

Ex. 20 (Emails to Victim 2).

*iii.* *Danger to Others*

Victim 1 and Victim 2 are not the only ones with a personal fear of the defendant. At least two Army officers have reported concern about their personal safety when meeting with Madrigal, and one former colleague has indicated that he would consider moving if Madrigal was released. Finally, the defendant's conduct raises serious concerns about the safety of law enforcement or probation officers who might be required to confront him in the future due to noncompliance with pretrial release conditions, if granted.

**E. Defendant's Disdain and Disregard for the Justice System**

Madrigal's conduct clearly establishes his disdain and disregard for the criminal justice system and court authority. Indeed, he derides any form of authority when it gets in his way.

As already discussed, Madrigal has told Victim 2 that a protection order wouldn't stop him if he wanted to kill her and that, "If I wanted to get in the car and come to you and do something, a protection order would do jack shit . . . ." Ex. 3 (Victim 2 Conversation A). On at least one other occasion, he has told Victim 2 that a protection order is "only a piece of paper."

Time and time again, Madrigal mocked both Victim 1 and Victim 2's attempts to turn to law enforcement or the courts for help. He taunted Victim 2 to "go ahead and call your backwoods, hillbilly motherfucking cops and see what the fuck they do, bitch." Ex. 4 (Conversation B with Victim 2) at 2:54–3:04. When Victim 1 pled with him to leave her apartment after he brandished a loaded gun and threatened suicide, he texted her, "Call the cops." From jail, he called grand jury indictments a "fucking joke." Ex. 21 (Jail Call Regarding Indictments) at 07:25–36. He has coerced Victim 2, her family, and a family member's romantic partner falsely to submit affidavits so that charges against him are dropped. Madrigal has no respect for law enforcement or the courts. If past is precedent, court-ordered release conditions will not prevent him from doing whatever he believes will help him.

**F. Defendant's Family Members are Witnesses and Cannot Reasonably Be Custodians**

Madrigal should not be released from custody pretrial. Even if his proposed release plan were feasible and appropriate under the Bail Reform Act, his family is ill-suited to serve as custodians. As detailed herein, Madrigal's father and brother, David Madrigal, will be witnesses in this case. Madrigal cannot be granted the unfettered opportunity to pressure them to change their testimony, as he has done to others.

Madrigal's brother, David, is not a reasonable custodian for other concerning reasons. Recently obtained records indicate David set up a Strava[6] account in October 2022 to locate

---

[6] Strava is an application and internet service used for tracking physical exercise and included share features. A user (or "athlete") may post exercise information that includes revealing geolocation data.

information about Victim 1 after Madrigal directed him to do so. Ex. 22 (Screenshot of David's Strava Athlete Account) & Ex. 23 (Strava Jail Call). This is alarming for multiple reasons. First, it shows David—an attorney—is susceptible to the defendant's inappropriate requests even when made from jail. Second, it shows David is willing to use social media to locate (and potentially contact) a victim in this case. Further, this conduct gives rise to potential criminal liability for tracking Victim 1 at Madrigal's behest.

Most disturbingly, Strava records indicate David's account was used to search for multiple users with *Victim 1's name*. David's webpage shows no personal data, consistent with creating the account for the sole purpose of tracking Victim 1. David is aware of the allegations in this case. This makes his decision to establish an account and search for Victim 1 more alarming. David acknowledged that he reviewed the Complaint Affidavit and the Indictment and was physically present for the original detention hearing in September 2022. D. Madrigal Decl. at p. 46, ¶ 7. In each of these filings and at the detention proceedings, the government highlighted the defendant's use of social media as one of his means to stalk Victim 1.

**G. <u>Defendant's Harassment Not Limited to In-Person Conduct</u>**

There are no pretrial release conditions that would reasonably assure the safety of others in this case because geographic distance cannot protect Madrigal's victims. This investigation has revealed his systematic weaponization of phone calls, text messages, emails, and social media accounts psychologically to torture and threaten his victims and the people close to them. GPS monitoring of his whereabouts cannot assuredly prevent him from continuing to victimize others.

For example, Madrigal accessed Victim 1's health applications to monitor her sexual activity and mock her purported infertility. After accessing Victim 1's account without her knowledge or consent, he emailed her a screenshot of a recent entry and stated, "Sorry to see you

are still a failure." *See generally* Compl. ¶ 43–44. Madrigal has also communicated via text with Army command staff about Victim 1 to exert control over her career and reputation.

Madrigal's virtual manipulation is mirrored in communications with Victim 2, whom he has tormented with cruel messages about her sexual activity and her deceased husband's fatal encounter with an IED:

**From:** Manfredo Madrigal
**To:** [redacted]
**Subject:** Re: You did this BITCH
**Date:** Saturday, April 1, 2017 1:07:07 AM

Fuckn delete me again from everything? What you doing? Sending your tits and pussy out you whore? Still have delted you you fuckn slut. Fuck I would look for an ied to if I was married to you BITCH

Sent from my iPhone

> On Apr 1, 2017, at 00:05, Manfredo Madrigal <manfredo.madrigal@gmail.com> wrote:
>
>
>
> <IMG_2441.MOV>
>
>
>
> Sent from my iPhone

Ex. 24 (IED Email Thread to Victim 2).

Of course, the risks posed by Madrigal's release are not limited to serious virtual threats. As discussed above, the defendant has indicated that he will neither respect nor abide by court-ordered conditions if they limit his ability to evade accountability. In light of the grave risk to victims' and witnesses' safety, a GPS-monitoring condition is simply insufficient to assure the safety of the community. Such condition would—at most—provide only limited, after-the-fact information that the defendant (1) had left the Northern District of Illinois and/or (2) had already arrived at Victim 1's or Victim 2's homes. The defendant has already held both women in fear for

their lives while brandishing a gun; the only thing he has not yet done is pull the trigger. Indeed, even detention has not prevented his attempts to manipulate and "enlighten" at least one of the victims in this case. The Court must take the necessary steps to ensure the defendant cannot follow through on his threats. He must be detained.

### H. Defendant is Volatile and Presents a Potential National Security Threat

Madrigal was angry that he was involuntarily discharged from the Army. In his own words, he believed the military had "*fucked with me one too many times*" and taunted them to "*[g]uess what I can do next*." What he did next was call the Russian Embassy.

At the most recent detention hearing, defense counsel minimized their client's access to classified[7] material while working at the JAG School. But Madrigal *did* have access to classified and sensitive information during his time overseas. Ex. 25 (Decl. of P. Winnert [Director of Operations, USACIC].) He was previously assigned to the 75th Ranger Regiment during three combat tours in Afghanistan. *Id.* ¶ 4. During this time, the U.S. Army Counterintelligence Command (USACIC) "declares with **high confidence that Madrigal would have had access to at least one U.S. military classified Alternative Compensatory Control Measure** and would have knowledge of classified JSOC [Joint Special Operations Command] operations that occurred during his deployments to Afghanistan." *Id.* (emphasis added). Due to these assignments, Madrigal also knows "details of sensitive operations; capabilities of intelligence collection platforms and Human Intelligence sources providing information in support of such operations;

[7] Executive Order 13526 (2009) prescribes a uniform system for classifying national security information. "Top Secret" information is categorized as information where the unauthorized disclosure could reasonably be expected to cause exceptionally grave damage to national security. Secret information is categorized as information where the unauthorized disclosure could reasonably be expected to cause serious damage to national security.

and the tactics, techniques, and procedures of the 75th Ranger Regiment and other JSOC units." *Id.*

Relatedly, the FBI is conducting an ongoing search of Madrigal's digital devices and discovered suspected classified materials. Agents located at least four videos containing banner warnings identifying the material as secret. These videos are pending a classification assessment from multiple stakeholders with equities in such determination. Separately, agents identified videos and images depicting close-quarters combat and graphic violence. These materials show deceased enemy combatants and appear to list the names of operational objectives. A classification assessment of these items is also pending.

Madrigal's experience overseas dovetails with concerns about his call to the Russian Embassy, which is staffed by "[i]ntelligence officers" who are "often assigned to diplomatic establishments under both civilian and military cover." Ex. 26 (Decl. of SA S. Jett) ¶ 3. Here, Madrigal "contacted a location from where […] Russian Intelligence Officers target the United States." *Id.* Per toll records, Madrigal engaged in a two-minute-and-twenty-six-second call, which is "indicative of a substantive conversation occurring with a representative of the Russian Government." *Id.* ¶ 5. The number Madrigal dialed is the main line for the Russian Embassy, as indicated by Google search results. *See* Ex. 2 (Google search result).

Simply put, Madrigal has demonstrated a willingness to contact a foreign adversary, possesses information of potential value, and potentially unlawfully retained classified material. His release from custody poses a non-hypothetical national security risk, especially due to his volatile nature and self-professed animosity toward the Army. The Court should not release the defendant to see "what [he] can do next." Indictment ¶ 9.

## V. CONCLUSION

For the reasons stated above, Madrigal should remain detained pending trial. The United States has established that Madrigal presents a flight risk, his release jeopardizes the integrity of witness testimony, and he poses a danger to the community that cannot be reasonably mitigated by any conditions of release. He must be detained.

Date: March 14, 2023

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
United States Attorney

*s/Katie B. Medearis*________________
KATIE BURROUGHS MEDEARIS
Special Assistant United States Attorney
California Bar No. 262539
Katie.Medearis@usdoj.gov

*s/Jessica L. Joyce*___
JESSICA L. JOYCE
Special Assistant United States Attorney
Virginia Bar No. 96153
Jessica.Joyce2@usdoj.gov

United States Attorney's Office
255 West Main Street, Room 130
Charlottesville, VA 22902
(434) 293-4283

CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for Defendant.

s/Jessica L. Joyce
Special Assistant United States Attorney