**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 3:22-cr-00019-NKM-JCH |
| MANFREDO MARTIN-MICHAEL MADRIGAL III, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF THE COURT'S**
**AFFIRMANCE OF THE MAGISTRATE JUDGE'S CONDITIONAL RELEASE ORDER**

Defendant Manfredo Martin-Michael Madrigal III, ("Madrigal"), by and through the undersigned counsel ROYER CARAMANIS PLC and MAHER LEGAL SERVICES PC, respectfully requests the Court affirm the Magistrate Judge's March 2, 2023, $20,000 appearance bond and conditional release order. (ECF Docs. 68-69). In support, Madrigal respectfully requests the Court consider his Appendix of Exhibits ("App'x Exs.") filed contemporaneously this 17th day of March 2023, as well as the discussion below.

**PRELIMINARY STATEMENT**

Madrigal has spent over eight months in pretrial detention. On March 2, 2023, the Magistrate Judge presided over a lengthy hearing, after which he decided that the Government failed to meet its evidentiary burdens. The Magistrate Judge granted Madrigal's release, subject to thoughtful and well-measured conditions that were carefully tailored toward ensuring that the two mandates of the relevant statute were achieved: that Madrigal is neither a flight risk nor a threat to others.

1

As the Magistrate Judge expressed repeatedly during the hearing, part and parcel of the decision to release Madrigal from pretrial detention was to allow Madrigal to participate in medical and substance abuse treatment that is unavailable to him while in confinement. Yet the Government asks this Court to set aside the well-reasoned decision the Magistrate Judge has made, and the Government's reasons for doing so are entirely unconvincing.

The Magistrate Judge's conditional release decision is appropriate in light of the unrebutted fact that the jail has not been able to administer adequately to Madrigal prescribed medication to treat seventeen maladies for which the US Department of Veterans Affairs ("VA") awarded a 70% disability rating for combat service-connected psychological ailments, which persist.  The psychological ailments also relate to the VA's overall 100% disability award for additional physical maladies resulting from over 65 parachute jumps and repeated close quarter combat deployments over the course of three tours in Afghanistan with the renowned 82nd Airborne Division and the prestigious 75th Ranger Regiment.[1]

The Government has not met, nor can the Government meet, the statutorily required evidentiary burdens to lawfully justify pretrial detention – which  has been ongoing since August 12, 2022 – which impermissibly affronts constitutional due process, the presumption of innocence, and may be fairly seen as punishment before trial.

The Government's evidentiary shortcomings fall largely into three categories.

First, the Government's presentation falls short of meeting the high evidentiary burden to prove a discrete and articulable danger to any person by clear and convincing evidence. *United*

---

[1] The Government stopped giving Madrigal blood pressure medication (which began again after approximately six weeks of abrupt stoppage).  Madrigal's prescription for Trazodone is not given as prescribed, which exacerbates his psychological ailments and denies him necessary recuperative sleep.  Madrigal endured precipitous cessation of alcohol consumption, and has no access to professional psychiatric/behavioral health care providers.

*States v. Salerno*, 480 U.S. 739, 751 (1987) (if a bond hearing is appropriate pursuant to 18 U.S.C. § 3142(f), and if the Government seeks detention based on danger, then the Government must prove by clear and convincing evidence that an accused poses an actual, "identified and articulable threat").

Here, none of the eight charged offenses involves physical violence. Madrigal has surrendered his firearms and relinquished his Illinois Firearms Owners Identification Card or "FOID card." He will attend alcohol treatment in Illinois and reside with his parents and family members in their St. Charles, Illinois residence. He will wear a GPS monitor everywhere. He will reside over 1000 miles from alleged Victims 1 and 2.

Second, the Government has not met its burden to prove Madrigal is a flight risk by a preponderance of the evidence. Madrigal has obeyed every rule, regulation, and order since detainment in August 2022. He has built an undisputedly successful career as a combat Soldier in special operations, where obedience to orders literally involves life or death. He has agreed to remain in the geographic limitations of the Northern District of Illinois while wearing a GPS device and has been instructed by the Magistrate Judge to have no contact with any victim or witness. He will also wear a SCRAM alcohol bracelet should the Court require. He has been ordered not to talk about the case with his family, and he has surrendered his United States Passport, which contains zero foreign stamps.

In response to the Government's concern that Madrigal or the Madrigal family may disobey any release condition or court order, the Magistrate Judge observed in open court, "I tend to put some stock in the Court's admonitions to parties and also to other people who may be involved in executing the Court's orders." (Bond Hrg. Tr. Dated March 2, 2023, at 60).

Third, the Government has not proved by clear and convincing evidence "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §§ 3142(e), (f); "[c]lear and convincing evidence" is a heightened standard of proof under which the fact finder must "give the benefit of the doubt to the defendant." *United States v. Montague*, 40 F.3d 1251, 1255 (D.C. Cir. 1994); *see also Addington v. Texas*, 441 U.S. 418, 424 (1979). Instead, the Government points to Madrigal's distinguished combat service with some of the United States military's most elite units to raise the unreliable inference that Madrigal is a danger. The opposite is true.

Madrigal's charged offenses are non-violent. Madrigal has not harmed either Victim 1 nor Victim 2, and any evidence put forth by them that he did harm them in any way will be strenuously disputed. Madrigal's record during eight months of pretrial detention belies any reliability that military training and experience is clear and convincing evidence of danger. Arguably, without need for citation, thousands of combat veterans turn to alcohol to treat the symptoms of their combat-connected psychological traumas. Madrigal did so to the point of a VA diagnosis of alcohol abuse disorder. The Magistrate Judge, upon evaluating the evidence and speaking with Madrigal for the second time in open court, observed a difference between a "stable" and "unstable" Madrigal; essentially that with alcohol factored out, the toxicity of Madrigal's two consensual adult romances and intoxicant-induced braggadocio disappears and the conduct of which Madrigal stands accused does not happen (both Victim 1 and Victim 2 drank to excess with Madrigal over the course of their adult, consenting relationships, which resulted in toxic romances). (Bond Hrg. Tr. dated March 2, 2023, at 65-66).

The Magistrate Judge determined that a substantial combination of conditions, to include a "bed-to-bed" transition from detention to an inpatient alcohol treatment program in Illinois –

where Madrigal's nuclear family stands ready to support and care for him – and where Madrigal has significant ties to the community – militates sufficiently against any purported danger or risk of flight. (ECF Docs. 68-69).

Indeed, one need look no further than the jailing-authorities who have monitored Madrigal's conduct while completely sober over the last eight months since arrest. The Albemarle-Charlottesville Regional Jail authorities, as of February 24, 2023, informed that Madrigal's charges involve "low recidivism," and that Madrigal completed 46 *Edovo* courses, 56.84 education hours, 301 lessons, and has had no "institutional charges." His discipline, study-habits, and obedience, honed through years of military service in the most dangerous places on the Earth, as well as a 4.0 Grade Point Average ("GPA") for a Masters Degree in Homeland Security, and a 3.06 GPA for a Juris Doctor, underscore this point. By return email on March 13, 2023, the ACRJ reports to Madrigal's counsel no changes in their February 24, 2023, "adjustment letter." (App'x Ex. 5).

After eight months of pretrial detention, with trial likely not to occur for months, (affronting the traditional presumption of innocence, due process, and the prohibition against pretrial punishment), the Government seeks continued incarceration of this American hero who repeatedly contributed to our country's safety, as the Magistrate Judge observed while addressing Madrigal in-person:

> You've served in our country's military for many years, and you've had a number of tours in Afghanistan. And you've really been asked to do things that I don't -- I have never been asked to do; I don't comprehend; I never experienced. I mean, you've done so many things that have asked a great deal of you in service of our country.

(Bond Hrg. Tr. Dated September 28, 2022, at 25).

The Government discounts the evidentiary relevance and probative values of Madrigal's extraordinary combat service, resulting military-connected physical and psychological

manifestations, (VA awarded a 100% disability rating in July 2022), and strong academic and professional records.

At the same time, and equally if not more problematic, the Government turns a blind-eye to Madrigal's VA-diagnosed health and safety needs while disserving the constitutional presumptions of innocence, due process, and the prohibition against pretrial punishment as well as the statutory presumptions of pretrial liberty, bond, and conditional release – all in reliance on faulty inferences, evidentiary omissions, and misplaced, imprecise aspersions. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (prosecutors are subject to heightened ethical obligations due in part to their special position as acting on behalf of the public); ("[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

## ARGUMENT

### A.    Standard of Review

A district court reviews a Magistrate Judge's release or detention order under 18 U.S.C. § 3145(c) *de novo*, may receive additional evidence, and makes an independent determination of the proper pretrial conditions for release or detention. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). In reviewing the Magistrate Judge's order, the Court must ensure that the "order is consistent with the defendant's constitutional and statutory rights." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

### B.    The Law Presumes and Favors Madrigal's Pretrial Liberty

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755. The Supreme Court noted long ago:

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the
> present [1951] Federal Rules of Criminal Procedure . . . . federal law

> unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense and serves to prevent the infliction of punishment prior to conviction. *See Hudson v. Parker*, 156 U.S. 227, 285 (1895). Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

*Stack v. Boyle*, 342 U.S. 1, 5 (1951).

The Bail Reform Act or "Act," 18 U.S.C. §§ 3141 – 56, applies in "narrow circumstances" where "the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community." *Salerno*, 481 U.S. at 750. The Act is designed to grant judges the discretion to "deny release pending trial" of "a small but identifiable group of particularly dangerous defendants." It was anticipated that release—on personal recognizance, unsecured appearance bond, or under one or more conditions—would "continue to be appropriate for the majority of Federal defendants." S. Rep. No. 98-225, 98th Congress, at 12 (1983).

Title 18 U.S.C. § 3142(a), provides four alternatives from which a judicial officer must choose:

1. Release on personal recognizance or unsecured bond. § 3142(b).

2. Conditional release § 3142(c).

3. Temporary Detention, *i.e.*, to permit revocation of conditional release. § 3142(d).

4. Pretrial detention § 3142(e).

Specifically, a judicial officer ***shall*** order the release of a person on personal recognizance or unsecured appearance bond unless the judicial officer determines such release will: (i) not reasonably assure the appearance of the person; or (ii) will endanger the safety of any other person or the community. 18 U.S.C. § 3142(b) (emphasis added).

If so, a judicial officer must then consider whether release under any condition or set of conditions under 3142(c) will reasonably assure the defendant's appearance and safety of the community. Upon imposing conditions, the judicial officer "shall" impose the least restrictive of conditions that will meet the statutory appearance and safety concerns. § 3142(b).[2]

In some instances, a detention hearing is not authorized at all. Where none of the seven factors set forth in § 3142(f) exists, the Court must release an arrestee pursuant to § 3142 (b) or (c), *supra*. These factors include crimes of violence, terrorism, offenses with maximum of a life sentence or death, Federal drug offenses, recidivists, minor victims or "serious" risk of flight or witness/juror tampering. Dangerousness is not a factor authorizing a detention hearing. 18 U.S.C. § 3142(f).

"In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). In assessing public safety and flight risk, Federal courts consider four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. §§ 3142(g)(1)-(4).

"Detention cannot be based on a finding that the defendant is unlikely to comply with the conditions of release absent the requisite finding of dangerousness or risk of flight; otherwise, the scope of detention would extend beyond the limits set by Congress." *United States v. Munchel*,

---

[2] The legislative history of the Act states, "[t]he decision to provide for pretrial detention is in no way a derogation of the importance of a defendant's interest in remaining at liberty prior to trial... It is anticipated that **[pretrial release]** *will continue to be appropriate for the majority of Federal defendants*." S. Rep. No. 225, 98th Cong., at 7, 12. (emphasis added).

991 F.3d 1273, 1283 (D.C. Cir. 2021). The *Munchel* court cited *United States v. Alston,* 420 F.2d

176, 178 (D.C. Cir. 1969), quoting:

> [t]he law requires reasonable assurance[,] but does not demand
> absolute certainty that a defendant will comply with release
> conditions because a stricter regime would be only a disguised way
> of compelling commitment in advance of judgment. (internal
> quotations omitted).

*Id.*

### C.   The Magistrate Judge Correctly Found that a Combination of Bond & Release Conditions Reasonably Assures that Madrigal is Not a Flight Risk, Poses No Danger, and Release is Appropriate Pursuant to the Constitution and the Bail Reform Act

The Magistrate Judge conducted two § 3142 pretrial hearings, the first on September 28,

2022, and the second on March 2, 2023. Madrigal had different counsel at the initial detention

hearing, and as this court well knows, at that initial hearing, the defense can be at a severe

disadvantage, with access to very little information or discovery.  After the second lengthy hearing,

on a more fully developed record, the Magistrate Judge made extensive, well-reasoned findings

with respect to each of the four statutory factors set forth in 18 U.S.C. § 3142(g). (Bond Hrg. Tr.

dated March 2, 2023, at 66 – 75).

The first factor looks to both the "nature" and "circumstances" of the "charged" offense;

"the former refers to the generic offense while the latter encompasses the manner in which the

defendant committed it." *United States v. Singleton*, 182 F.3d 7, 12 (D.C. Cir. 1999).

The Magistrate Judge had before him evidence that the offenses were non-violent, satisfy

none of the seven factors in § 3142(f) authorizing a detention hearing, and that if alcohol were

removed from the equation, none of the alleged conduct occurs. The nature of the charged generic

offenses involves non-violent allegations that likely would not have arisen had Madrigal been

undergoing intensive treatment for his alcohol abuse disorder triggered largely, per the VA, by 17

psychological maladies the result of combat-related military service. The Magistrate Judge made this observation clear when repeatedly distinguishing between stability and instability due to alcohol and ordering alcohol abuse treatment. By all accounts, the effects of alcohol to self-medicate combat-service connected emotional and physical injuries can be seen as part of every Count in the present Indictment, providing insight as to the manner in which the alleged conduct may have occurred.

The weight of the evidence, the second factor, does not show that Madrigal poses an unmitigable future threat or flight risk. The Magistrate Judge imposed over twelve release conditions, to include: a requirement that Madrigal wear a GPS monitor at all times; enroll in treatment for alcohol abuse and mental health matters in an in-patient program in Illinois, and follow up rigorously on such treatment; an order not to contact either of the alleged victims, or their families; an order not to discuss the case with Madrigal's own family; and orders for Madrigal to surrender of his United States Passport, Illinois FOID card, not possess any firearms; and not access any computer or device with access to the internet. Moreover, Madrigal's residence in Illinois is approximately 1,000 miles from either Victim 1 or Victim 2's last known addresses.

Review of the actual words the Government attributes to Madrigal *vis-à-vis* Victims 1 and 2 reveals intoxicant-induced bluster among adult, consenting professionals under the influences of emotions inflamed by declining romances made worse by alcohol. Victim 1 is an attorney and military officer. Victim 2 is a traveling nurse. Words communicated in an alleged cyber stalk or threat certainly matter because they are the starting point in analyzing a possible threat. But words are used in context. Divorcing the words from their surroundings and their impact on the intended subject is illogical and unnatural. Legal analysis of a stalk and/or threat must take into account both the words used and the surrounding circumstances; without such a subtle examination, absurd

results might arise, defeating both the text and purpose of the communicating a threat offense. *See, e.g., United States v. Bagdasarian*, 652 F.3d 1113, 1120 (9th Cir. 2011); *see also United States v. Brown*, 65 M.J. 227 (C.A.A.F. 2007) (conditional threats not appropriate for prosecution).

Madrigal's history and character, the third factor, suggest release pending trial. The Magistrate Judge noted the years of selfless service over Madrigal's military career, close family relations, ties to the community, and related accomplishments, which include a Masters Degree in Homeland Security, a Juris Doctor, admission to the Missouri Bar after a detailed character and fitness investigation, as well as service with a former United States Senator and former United States Magistrate Judge. At all times, Madrigal lawfully possessed firearms (stored with the "upper assemblies" disassembled – the weapons could not fire unless re-assembled).

Victim 2 recanted any allegation of physicality in January of 2020 in a sworn affidavit. Regarding the Government's allegations that Madrigal coerced Victim 2 and her family to sign false affidavits, these allegations are blatantly false. However, for argument's sake, even if they were seen as true, then it is clear that Victim 2 committed perjury in a state court and is not a credible witness.   (App'x Ex. 3).

Even if Madrigal's comments, (most made from over 1,000 miles away), indicate some willingness to engage in future conduct, the Act permits detention only to prevent an "identified and articulable threat to an individual or the community." *Salerno*, 481 U.S. at 751. As the Magistrate Judge observed, as the factfinder, there is a substantial difference between an "unstable" Madrigal and a "stable" Madrigal, the latter being the mindset the Magistrate Judge found Madrigal to be in presently and sufficiently mitigating against any inferential threat. (Bond Hrg. Tr. dated March 2, 2023, at 75).

Where a defendant poses a danger, he must still be released if there is a "condition or combination of conditions [that] will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(e). The Bail Reform Act contemplates only that a court be able to "reasonably assure," rather than guarantee, the safety of the community." *See United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Undoubtedly, the safety of the community can be reasonably assured without being absolutely guaranteed. Requiring that release conditions guarantee the community's safety would fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention.").

The records maintained by the local confinement facility during Madrigal's eight-months of pretrial detention reveal no disciplinary infractions and a significant amount of time and devotion to self-improvement and self-study. But further, even when under the influence, the Counts alleged do not involve a present intention or capability to harm anybody, to include his prior romantic partners, Victims 1 and 2, and the United States's national security.

The Government's gesturing towards the possibility that Madrigal's military training and combat experience, coupled with his words to romantic partners in toxic personal, consenting, relationships, falls well short of any "identified and articulable threat." *Salerno*, 481 U.S. at 751. Madrigal presents no "identified and articulable threat to the community," *id.*, especially where Madrigal is subjected to the Court's conditions.

### D. The Government Relies on Misplaced Inferences, Omissions, and Faulty Assumptions Instead of Actual and Disclosed Evidence

Madrigal prepared an exhibit highlighting the Government's uncorrected misstatements and omissions in the Affidavit supporting the original charge and in the Indictment. (App'x Ex. 9). Although nearly one-half of the Government's March 14, 2023, memorandum discusses uncharged words/acts trying to paint Madrigal as a bad person of deceitful character, a critical

reading shows nothing the Government argues in its Memorandum in Support of Revocation ("Gov't Br.") furthers a case for pretrial detention.

Recognizing the Federal Rules of Evidence do not fully apply when conducting an 18 U.S.C. § 3142 bond hearing, the Government's tactic of offering numbers of specific instances of uncharged misconduct to raise the inference that Madrigal is a "bad actor" can be fairly seen as overly broad, imprecise, and an unfair blow.

And, to the extent the Government suggests the Court consider charged misconduct as probative of other charged misconduct, both of which Madrigal stands presumed innocent, the law is well-settled that such a practice is unconstitutional. *In re Winship*, 397 U.S. 358, 363 (1970). Case-in-point: the Government cites a part-time job Madrigal had over 15 years ago, when he was approximately 20 years old, (before the Army, military training, combat, college, graduate school, law school, and professional working positions), working as a clerk at a local Walgreens in 2008, as "evidence" of his "deceitful character." (Gov't Br. at 15-16). Whatever legitimate value the Government may have intended, the Court should attribute none.

Equally unfair and a prosecutorial overreach is the Government's unnecessary smearing of Madrigal's loyal, patriotic, attentive and retired parents, (married for 38 years and visible citizens of the community), and Madrigal's siblings, each of whom is highly educated and working among the professional ranks. As the Court is aware, prosecutors have a continuing interest in preserving the fair and effective administration of criminal trials, and, as such, among the duties of prosecutors is "to seek justice within the bounds of the law, not merely to convict." *A.B.A. Standards for Criminal Justice: Prosecution and Defense Function*, Standard 3-1.2(c) (4th ed. 2015).

Also consistent with the Government's overreaching, the Government continues to rely on a blurred image to support its incorrect claim that Madrigal pointed a firearm at Victim 2's head.

As presented to the Government and the Magistrate Judge on March 2, 2023, the image is not of a pistol, but rather, a cell phone Madrigal held up to Victim 2 to record her threats and chastisements while under the influence, in an effort to calm inflamed emotions. In what is a key piece of evidence related to this false claim, Victim 2 admitted to FBI agents, during an interview on August 11, 2022, that after Madrigal was arrested, she took his phone and deleted a video that he took of her. Conveniently, Victim 2 deleted the evidence that would show that Madrigal was holding a cell phone, and not pointing a gun.

Another example of Government omission of relevant contextual evidence: the Government offers "irrefutable evidence of cyberstalking." (Gov't Br. at 3). Madrigal, however, refutes the *allegations* of cyberstalking, by pointing mainly to Victim 1's having voluntarily traveled in February 2022 from her residence in Oklahoma to visit Madrigal in his apartment in Charlottesville, Virginia, as depicted in the following color digital image which does not connote fear or that Victim 1 is scared or being manipulated by Madrigal.



The text conversation cited by the Government as Exhibit 5 contains no statements in which Madrigal "pressures" Victim 1 to come visit him. Additionally, Victim 1 stayed in the same residence with Madrigal during this visit, was romantic with him, and went hiking with him in a

14

secluded area. That hardly shows the conduct of someone who was being "stalked." Nor does the Government share that Victim 1 and Madrigal attempted to conceive a child during their romance, used the *Modern Fertility App* together, and that Victim 1 did not change her login credentials which she shared with Madrigal until far after the end of the romance.

The Government did not mention that Victim 1 voluntarily took images of private, personal interactions with Madrigal, sent dozens of images of her tanning without clothing to Madrigal, gave him keys to her residence, and accepted *Venmo* transfers of money from Madrigal, as recently as February 2022. One of these *Venmo* transfers was sent in anticipation of his visit to her home in December 2021. Victim 1 claims that she told Madrigal not to come and that his visit was "over her objection." The *Venmo* transfer, sent to Victim 1 before Madrigal's visit so that she could buy supplies for his dog, refutes this claim.

Regarding the telephone call that the Government so heavily relies on in its memorandum, it occurred in January of 2020, over three years ago. (Gov't Br. At 17). At the time of that telephone conversation, Madrigal had not been served with any protective order. So, any allegation that he is in violation of a court order is false. If the Court reviews Government Exhibit 12, the body-word camera footage from the incident the night before this telephone call, the same recurring themes apply. Madrigal is intoxicated, which is admitted by both himself and Victim 2. Victim 2 also indicates that they have been engaged for six years, and that this behavior recurs when Madrigal is intoxicated. The only physical contact that is alleged that night is some "pushing and shoving" between Madrigal and Victim 2's step-father. This is the definition of Madrigal's argument regarding his alcohol problem, its effect on his behavior, and his need for alcohol treatment, especially as related to his combat disabilities. As the Magistrate Judge noted at the prior hearing, regarding Madrigal's comments in the telephone call about killing Victim 2, "…I

15

mean, the way he said it, it certainly could be understood that he's suggesting the opposite, that that's not what he wants. The suggestion is that if he wanted to, he could do it, and that he doesn't." (Bond Hrg. Trn. Dated March 2, 2023, at 36).

After January of 2020, Victim 2 continued to be in a romantic relationship with Madrigal, even going so far as to write a two-page love letter to him later that year, in December of 2020.  It was clearly, as has been stated, an alcohol-fueled, extremely toxic relationship.  Nothing underscores that more than Madrigal's Exhibit 1, which is a video of Victim 2 taken by Madrigal. The video is important, not because of what is seen, but because of what is heard.  In this video, which occurs in January of 2021, Victim 2 showed up at Madrigal's apartment unannounced and over his objection.  Victim 2 was extremely intoxicated.  Madrigal tells Victim 2 that she can stay there until the morning, but then she has to leave.  Victim 2 repeatedly refuses, in an angry and belligerent manner.  Victim 2 repeatedly states "I'm not going anywhere" and "you're stuck with me."  She then states, "You're stuck, you're stuck, or *I'll fucking ruin your God-damn life.*" (App'x Ex. 1, *emphasis added*).

Madrigal left the apartment, and when he returned, Victim 2 was gone.  Victim 2 stole several items from Madrigal's apartment, including clothing and electronic devices.  Madrigal's sister had to become his "negotiator" in order to retrieve his items, and finally, after some weeks, he got them back.  Victim 2 went through Madrigal's hard drive, without his permission, and deleted any memory of Madrigal with Victim 1.  As part of the jealousy-fueled behavior that ran throughout these toxic relationships, Victim 2 also logged into the United States Postal Service as Madrigal, without his permission, and re-directed his mail to another location.  There are many more examples of this behavior, including Victim 2 creating fake social media accounts of Victim

1, all of which was part of a campaign to divide Madrigal and Victim 1. Clearly the threats and bad behavior are not one-sided, as the Government portrays.

The Federal Government's involvement in an alleged minor domestic dispute that happened over three years ago is unjustified in this case, and it certainly does not meet the standard for pretrial detention. Moreover, the Government relies on other exhibits that are not age-relevant, such as Exhibit 4. The Government did not respond to an inquiry about the date of this recording, and it does not date the recording in its brief. The Government has not produced Madrigal's electronic devices or full phone records. However, Madrigal strongly believes that this conversation took place in 2017. This is the type of cobbling together of old, out-of-context statements that the law is meant to protect against in these cases.

The Government also mis-quotes Madrigal's counsel, wrongly relating that counsel responded with "none" when the Magistrate Judge asked about Madrigal's health care and prognosis on March 2, 2023. (Gov't Br. at 4). What the Government neglected to mention is Madrigal's having presented relevant portions of his July 2022, VA determinations of 100% disability – determinations made by several treatment providers in several fields, to include psychiatry, psychology, and physical medical challenges. Nor did the Government discuss the Magistrate's concerns about Madrigal's not receiving medicines as prescribed or alcohol treatment services while detained.

The Government claims that the Army advised and warned Madrigal on his TJAGCLS security out-processing form about the potential consequences of violating 18 U.S.C. § 1001. (Gov't Br. at 8). A cursory look at the document reveals no such advisement or warning degrading any legal sufficiency of Count II. (App'x Ex. 4). If there is such a document, it has not been produced in discovery, and it is unclear why it, and other documents, have not been produced in

discovery up to this point. This includes the summary interview with Madrigal's state attorney, which the Government cites in its brief. Declarations from Madrigal's family that are contained in the Appendix fully address that situation and other alleged concerns raised by the Government in its brief. (App'x Exs. 10, 11).

A predominant Government theme, which the Government asks this Court to accept as valid, is that nearly everybody falls prey to the whims of Madrigal's irresistible manipulations, to include: duping Madrigal's parents who have been married for 38 years having raised five children, his brother (an attorney), his other brother (a dentist), his sister (medical professional), his brother-in-law (a nuclear power plant executive), Victim 1 (an attorney and Army officer), Victim 2 (a physician's assistant), and even the U.S. Army (in this instance, comprised of numbers of veteran military attorneys and officers). (Gov't Br. at 10) (Madrigal "manipulated the US Army"). As the fanciful argument goes, no conditions of release militate against Madrigal's bent to hoodwink. The position is rightly discounted as a farfetched stretch of credulity.

Another fantastic suspension of reality: the Government's aspersion that Madrigal "psychologically [] torture[s] and threatens his victims and the people close to them." (Gov't Br. at 26). This argument is countered at length in prior paragraphs addressing the behaviors of Victim 1 and Victim 2 and their desires to stay romantically connected with Madrigal. One more example of that is the arrival of Victim 2 at Madrigal's apartment, in Charlottesville, almost exactly one year after the incident that is captured in Madrigal's Exhibit 1. Again, in this incident in February of 2022, Victim 2 is inebriated, refuses to leave, and Madrigal is compelled to visit the local police, who declined to accept a report and open a criminal case. Likewise, in an incident which goes unmentioned by the Government, Victim 1 asked Madrigal to stop contacting her in March 2022. Madrigal complied. Then, approximately six weeks later, Victim 1 re-engaged Madrigal on April

26, 2022, by sending him a video of a hockey game.  Madrigal is an avid hockey fan, and Victim 1 was well-aware of this.

The Government next attacks Madrigal's younger brother David, a recent law school graduate, former Captain of his University Hockey Team, and member of the Illinois Bar. In essence, the Government muses that David Madrigal cannot reasonably be Madrigal's custodian due to David Madrigal's having created a *Strava* account because "Madrigal directed him to do so," in order "to locate information about Victim 1." (Gov't Br. at 26).

The Government's argument must fail. Government Exhibit 23 is from a phone call that took place on October 9, 2022. David Madrigal's *Strava* account was created on October 4, 2022. This is five days prior to the phone call between Madrigal and his brother. Accordingly, there is "no evidence to support that David Madrigal criminally conspired with his brother, attempted any offense nor that David Madrigal is "willing to use social media to locate (and potentially contact) a victim in this case.

As made clear by David Madrigal with his conversation with two FBI agents, David Madrigal only wanted to obtain past history of Victim 1 to prove that statements made in the original complaint against Madrigal were false. This was surely a legitimate purpose and without criminal intent whatsoever. If anything, David Madrigal's actions indicate an intent to expose the truth – that his brother was embroiled in a complicated personal relationship, not any untoward criminal activity.  David Madrigal has never made any effort to contact Victim 1 or Victim 2 since Madrigal's arrest, nor has he done anything to attempt to find out their present or future activities or whereabouts.   Regarding the Government's allegations that Madrigal was attempting to manipulate his family to make contact with Victim 2 for some menacing purpose, again, context is key. Other than to try to figure out retrieval of Madrigal's belongings from Victim 2's apartment

(which ultimately took months due to Victim 2's game-playing), Madrigal's family took no affirmative action to "tamper" with Victim 2.

The Magistrate Judge hit the nail on the head at the prior hearing, when he asked "…some of the statements that the defendant has made talking about violence, killing, violating court orders and things, are there some particular actions that he has taken beyond these statements that we talked about a lot that are of real concern for the government that you would point me to?" (Bond Hrg. Tr. dated March 2, 2023, at 43).

The Government's response is to point to Madrigal's contact with Victim 2 after she filed a protective order, but we know that Madrigal was not served with a protective order at the time of this contact. Further, because this was a telephone conversation, Victim 2 was not forced by anyone, including Madrigal, to continue speaking to him. She could have hung up the phone at any time. The other conduct that the Government refers to in order to bolster its point is the same innuendo and allegations of past conduct that will be refuted and that cannot be relied on for pretrial detention.

The Government points to an attempted log-in to Madrigal's phone after his arrest as another way that his family fell prey to his superpowers of manipulation and committed some wrongdoing, at his instruction.  The attempted log-in was on August 12, 2022, three days after Madrigal was arrested.  It is obvious that the Government has gone to great strides to listen to many of Madrigal's jail telephone calls, however they have presented no call in which Madrigal gave instructions to his family to access his phone or log-in to his phone for any improper purpose. That is because it was his family, who, not having heard from Madrigal for three days after his arrest, decided unilaterally to log-in to his phone so that they could lock the phone and prevent

Victim 2 from accessing its contents. It turns out that this lock action was too late, as Victim 2 had already deleted evidence from Madrigal's phone.

Finally, for purposes of Madrigal's security clearance, that the Army granted him access when Madrigal was serving in the Ranger Regiment and/or the 82nd Airborne Division, is of no moment in 2022 and 2023. Madrigal's distinguished service in those elite units before college, graduate school, and law school, between seven and twelve years ago – approximately a decade before the Russian invasion of Ukraine – guts the Government's position that Madrigal possessed anything of value relating to the Ukraine *vis-à-vis* the Russian Federation, especially when the Government's own documents reveal that at the time of the charged offenses, Madrigal had a "Secret," as opposed to "Top Secret – SCI" clearance.

To state the matter more simply, the Government's allegations that Madrigal is somehow posing a national security risk is nonsense. The Government is grasping at straws here. The questions that were brought up by Madrigal at the March 2, 2023, bond hearing regarding the substance of Madrigal's alleged contact with the Russian Embassy and the identity of the alleged foreign national remain unanswered. The Government has not disputed that Madrigal was intoxicated. Further, the Government's statement that Madrigal's conduct "involves vindictively destroying military training modules" is another exaggeration. It is clear from the video that Madrigal is extremely intoxicated when this alleged conduct is occurring. Even more to the point, the Government's bare allegations regarding these national security matters relate in no way to the two factors relevant to the Magistrate's conclusion that the conditions imposed upon Madrigal's release will ensure that he is not a flight risk, and that he will pose no danger to anyone.

21

**CONCLUSION**

After having visited with Madrigal twice in open court, and, having considered a more fully developed record, the Magistrate imposed strict release conditions, to include a $20,000 bond, inpatient substance abuse treatment ("bed-to-bed"), GPS monitoring, no internet access, no alcohol, no case related discussions with family, no contact with any alleged victims, (who reside over 1000 miles from Madrigal's family residence in Illinois), no firearms, surrender of his Illinois FOID card, surrender of his United States Passport, an order to remain within the Northern District of Illinois, (but for appearances in the Western District of Virginia), random testing for substances to include alcohol, and that Madrigal will follow all instructions of law enforcement personnel.

These stringent conditions and Madrigal's proven obedience to orders, reasonably ensure public safety and Madrigal's court appearances as required. Madrigal built a highly successful career in an organization that demands instant obedience to lawful orders. There is no evidence that Madrigal ever disobeyed any order – even orders during combat when life, grievous bodily injury, or death were the consequences. Madrigal's military service to the United States of America is not rightly held against him, as the Government speculates. The Bail Reform Act requires far more to detain Madrigal lawfully and constitutionally, as each day of unlawful pretrial detention affronts the presumption of innocence, due process, and constitutes unlawful pretrial punishment.

For the reasons provided above, Madrigal, through his counsel and with support of Madrigal's family, respectfully requests that this Court affirm the Magistrate Judge's March 2, 2023, bond and conditional release order and discharge Madrigal from pretrial detention.

DATED: March 17, 2023.                Respectfully submitted,

                                       **/s/Jessica F. Phillips**
                                       Jessica F. Phillips (VSB #65953)
                                       Royer Caramanis PLC
                                       200-C Garrett Street
                                       Charlottesville, Virginia 22902

Tel: (434) 260-8767
Fax: (434) 710-4061
E-mail: jphillips@rc.law

**/s/ John N. Maher**
John N. Maher (IL Bar #6237599)
MAHER LEGAL SERVICES, PC
17101 71st Avenue
Tinley Park, Illinois 60477
Tel: (708) 781-9212
Fax: (708) 781-9693
john@maherlegalservices.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certified that on this 17th day of March 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

**<u>/s/Jessica F. Phillips</u>**
Jessica F. Phillips (VSB #65953)
Royer Caramanis PLC
200-C Garrett Street
Charlottesville, Virginia 22902
Tel: (434) 260-8767
Fax: (434) 710-4061
E-mail: jphillips@rc.law
