# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA

v.

MANFREDO MARTIN-MICHAEL
MADRIGAL, III,

*Defendant.*

CASE NO. 3:22-cr-00019

MEMORANDUM OPINION
& ORDER

JUDGE NORMAN K. MOON

This matter is before the Court upon the Government's Motion to Revoke the Magistrate's Order Granting Release. For the reasons set forth below, the Court finds that the Government has demonstrated by clear and convincing evidence that: Madrigal poses a danger to the safety of several persons, especially Victim 1 and Victim 2, as well as the community more broadly and indeed to national security; and further, that no condition or combination of conditions would reasonably assure their safety if he were to be released. Accordingly, the Court will revoke the Magistrate's Order Granting Release, and Madrigal therefore will be detained pending trial.

## Background

On the record before the Court, the Court determines the following facts relating to Madrigal's history and characteristics and this case, for purposes of this motion.

*Professional Background*

1.      Madrigal served as an active-duty enlisted member of the United States Army.

1

During Madrigal's assignment in the 75th Ranger Regiment, he completed three combat tours of duty in Afghanistan: from July to October 2010; May to August 2011; and March to July 2012. He was trained in the use of a variety of weapons and combat tactics, including sniper training. He then served in the 82nd Airborne Division from March 2013 to October 2015 at Fort Bragg, North Carolina. Dkt. 3-1 ("Compl.") ¶ 8; Stafford Decl. ¶ 4.

2.     Madrigal was discharged from active duty in 2016, and between 2016 and 2020, he was a member of the National Guard in Kansas. During this period, Madrigal attended law school and was admitted to the Missouri bar in 2020. Dkt. 45 ("Indict.") ¶¶ 2–3; Compl. ¶ 7; Dkt. 97 Exs. 6–7.

3.     In 2020, Madrigal attended the Officer Basic Course (a program for entry-level judge advocates) at the Judge Advocate General ("JAG") Legal Center and School located on the grounds of the University of Virginia in Charlottesville. Indict. ¶ 5; Stafford Decl. ¶ 6.

*Security Clearances*

4.     During Madrigal's assignment with the 75th Ranger Regiment from approximately June 2010 to July 2012, he held a Top Secret / Sensitive Compartmented Information ("SCI") Security Clearance. Stafford Decl. ¶¶ 4–5.

5.     An FBI Supervisory Special Agent has attested "with high confidence" that Madrigal had access to "at least one Alternative Compensatory Control Measure program,"[1] and "had knowledge of classified [U.S. Army Special Operations Command ("USSOC")] operations

---

[1] The Department of Defense Manual has explained that "[A]lternative Compensatory Control Measures" or "ACCM," may be employed when a classifying officer "determines that the standard security measures … are insufficient to enforce need to know for classified information and SCI or [Special Access Programs ("SAP")] protections are not warranted." Department of Defense ("DOD") Manual 5200.01, Volume 3 (Feb. 24, 2012) at 29.

occurring during his deployments to Afghanistan." In addition, he further attested that "Madrigal was aware of details of sensitive operations; capabilities of intelligence collection platforms and providing information in support of such operations; and the tactics, techniques, and procedures of the 75th Ranger Regiment and other USASOC units." Stafford Decl. ¶ 5.

6.    During Madrigal's assignment as a JAG Officer, he held a Secret Security Clearance. Stafford ¶ 6.

*Discharge from Army*

7.    In June 2019, authorities in Lawrence, Kansas, arrested Madrigal for driving under the influence ("DUI"). Dkt. 97, Ex. 9 at 3.

8.    On December 7, 2020, Madrigal's orders were amended to permanently assign him to the JAG School pending separation from active duty on account of Madrigal's failure to report the DUI arrest which had occurred before his acceptance to the JAG School. Compl. ¶ 9; Stafford Decl. ¶ 6.

9.    Madrigal was ultimately discharged from the Army on or about February 24, 2022. Compl. ¶ 9.

*Deletion of Army Training Materials*

10.    The JAG School's National Security Law Primer was a training course and interactive program that was the product of 10 months of work by Army legal personnel. Compl. ¶ 11.

11.    Madrigal had administrator rights to the JAG School computer system that stores its training materials, including the National Security Law Primer course. Compl. ¶ 24; Def. Ex. 9 at 3.

12.     Approximately two weeks before the Army discharged him, between 11:00 p.m. on February 6, 2022, until 2:00 a.m. on February 7, 2022, Madrigal logged into the JAG School network and deleted the JAG School's National Security Law Primer training course, without permission. Compl. ¶ 20; Gov't Ex. 31 (Deletion Video).

13.     Madrigal recorded a video of himself deleting the training course. Gov't Ex. 31.

14.     While Madrigal was systematically deleting the training course, he narrated:

> This is kinda funny. Um, I don't even know how to … explain this. ***You fuck me, and I'm gonna fuck you.*** Like it's [laughter] … this is kinda funny. I own this [unintelligible]. This is my bitch. … I own you all. I don't understand why you guys don't understand this.  Like I own you, you are my little fucking cunts. Like I made this. This is my bread and my butter. And then you guys decide you're going to throw me to the wayside? Yeah no, I don't think so.  I think I'm going to continue to own every single bit of you. ***You people thought you could fuck me? You thought you could easily remove me? You're not going to take my knowledge and use it against me. There you go. You have nothing.***  You fucking cunt.

Gov't Ex. 31 (emphases added).

15.     Around the same time as Madrigal was deleting the training course, he also told Victim 1 the following:

> I am tearing down all of nsl-p. … I am teaching them a lesson … Actions have consequences … I am going to bring their house down on them … They have no idea what I can do to them … ***Ya, Russia has reached out to me*** … Your people went to betray me … It is done … There is no more NSL-p … Do you see the power I have … I … Own … Everything … I control it all … I say jump you say how high? … There is no longer a national security law primer … ***You people have fucked with me one too many times*** … Try to use me and my knowledge again … I deleted it all … You should probably teach your people to not fuck work [sic] with me … I just single handily [sic] … Brought an entire system down … ***Guess what I can do next*** …

Gov't Ex. 30 (emphases added).

16.     In the early morning hours of February 7, 2022, Madrigal left a voicemail for

Victim 1, in which he stated that he was "going to Russia tomorrow." Compl. ¶ 25.

17.     On February 17, 2022, Madrigal texted Victim 1, stating, "The Russians in DC reached out to me, they would like to know what I know." Compl. ¶ 25.

*Communication to Russian Embassy*

18.     On February 7, 2022, at approximately 12:29 a.m., Madrigal's toll records show that he dialed the main line of the Russian Embassy in Washington, D.C. The call lasted for about 2 minutes and 26 seconds. Compl. ¶ 26; Jett Decl. ¶ 5; Gov't Ex. 2.

19.     A Special Agent of the FBI assigned to conduct counterintelligence investigations has attested that, based on his experience, "the duration of the call is indicative of a substantive conversation occurring with a representative of the Russian Government." Jett Decl. ¶ 5.

20.     The Embassy of Russia is in part staffed by Russian intelligence personnel, operating under civilian and military cover. This is a location from which Russian intelligence officers target the United States. No Americans are permitted to work at the Russian Embassy in D.C. Jett Decl. ¶¶ 3, 4.

21.     Madrigal was never authorized to have any type of contact with the Russian Embassy or any Russian Diplomatic or Government Officials. Stafford Decl. ¶ 6.

*False Statements to Army and FBI*

22.     On February 22, 2022, prior to his being discharged from the Army, Madrigal completed a JAG School Security Out-Processing form. Compl. ¶ 27; Def. Ex. 4.

23.     A section of the form entitled "Foreign Contact Debriefing," asks: "Have you had any contact with a foreign national while assigned to [the JAG School]?" Notwithstanding Madrigal's call to the Russian Embassy on February 7, Madrigal marked "NO" in response. The

next section of the form states: "I acknowledge that it is a crime to knowingly make any materially false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of the Executive Branch of the United States, per 18 U.S.C. 1001." Madrigal signed and dated the form. Compl. ¶ 27; Def. Ex. 4.

24.     The FBI interviewed Madrigal on April 18 and May 10, 2022. Compl. ¶ 28.

25.     During these interviews, Madrigal stated to the FBI that he had never initiated contact with a representative of the Russian Government for any reason, notwithstanding his telephone records showing that he placed a call to the Russian Embassy on February 7, 2022. Compl. ¶ 28.

26.     In the interview with the FBI on May 10, 2022, Madrigal stated that he did not know how the JAG School's National Security Law Primer training course was deleted. Madrigal claimed that he only learned the module was deleted from a coworker at the JAG School, when Madrigal came to work on February 7, 2022. Compl. ¶ 24. In fact, Madrigal had systematically deleted the training course on the evening of February 6 until the early morning hours of February 7, 2022. Compl. ¶ 20; Gov't Exs. 30, 31.

*Threats Toward Victim 1 and Her Family*

27.     Madrigal and Victim 1 met when they were both assigned to the JAG School. Their relationship began professionally, but their relationship became intimate prior to Victim 1 relocating to another duty station. In late 2021, Victim 1 sought to end her relationship with Madrigal. Compl. ¶ 30.

28.     In December 2021, Madrigal traveled to Victim 1's residence in another state, though Victim 1 had directed him not to do so. After an argument, "Madrigal pulled out a pistol,

placed it to his head, and threatened to commit suicide while Victim 1 was in the same room."

Victim 1 feared "Madrigal would kill her in a murder-suicide." Victim 1 tried to "deescalate the

situation" and convinced Madrigal to place his pistol in the garage, but he refused to relinquish

the garage door remote. Compl. ¶ 31; Dkt. 84 at 22.

29.      Victim 1 left the residence and refused to return until Madrigal left the residence.

Victim 1 repeatedly told Madrigal by text message to leave her residence, and for some time he

refused. Compl. ¶ 31; Gov't Ex. 19.

30.      Before Madrigal left the residence, he tried to poison Victim 1's cat by grinding

up nearly a bottle of medication and placing it under the cat's food inside the dish. He also

stabbed a knife into a food container with an image of a bear on it atop the counter. Victim 1's

nickname, which Madrigal used, was "Bear." When Victim 1 returned, she took photos of what

Madrigal had done and shared them with the FBI, including the following:



Gov't Ex. 18; Compl. ¶¶ 30–31, 46.

31.      Madrigal texted a series of numbers and letters to Victim 1, including codes and

passwords that Victim 1 had used to access her accounts and apartment complex, as well as her license plate number. Madrigal stated: "I remember all things" and "I like numbers." Victim 1 understood these messages to be threatening. Compl. ¶ 32.

32.     In a February 6, 2022 voicemail, Madrigal stated that Victim 1 and Victim 1's father "did this" and "***I'm coming after him and then you***." Victim 1 understood these messages to be threatening and made her fear for their safety. Compl. ¶ 34 (emphasis added).

33.     On around March 15, 2022, Victim 1 told Madrigal not to contact her, verbally and via text message. She then blocked his phone number on her cell phone, on Instagram, and made numerous application profiles "private" to prevent him from continuing to contact her. Compl. ¶ 42.

34.     Nonetheless, on June 4, 2022, Madrigal emailed Victim 1 screenshots of information he accessed from Victim 1's fertility-tracker application account, which showed that Victim 1 had recently had sexual intercourse and had a negative pregnancy test. According to Victim 1, she had changed the password on her account and did not know how he had accessed the account. Madrigal then sent another email stating, "sorry to see you are still a failure." Compl. ¶¶ 43–44.[2]

*Threats Toward Victim 2 and Others*

35.     Victim 2 is a nurse and former romantic partner of Madrigal. They were in a

---

[2] According to Madrigal, he and Victim 1 had previously attempted to conceive a child together during their romance and had used the fertility-tracking application together, and that "Victim 1 did not change her login credentials which she shared with Madrigal until far after the end of the romance." Dkt. 88 at 15. He does not deny, however, that he continued to access Victim 1's account after having been told to discontinue contacting her, nor that he emailed her the information and message.

relationship for a number of years until they separated in December 2020. Compl. ¶ 17; Dkt. 88 at 10.

36.     Madrigal has threated violence to Victim 2 and others on numerous occasions, including multiple death threats. *See, e.g.*, Gov. Exs. 3, 4, 20, 27.

37.     In a series of emails in April 2017, Madrigal emailed Victim 2 threatening a shootout and stating that he would kill guys Victim 2 had been talking to. Madrigal wrote to Victim 2 and his family, stating "send someone here you and will give me what I want. Trust me, I am better than [Victim 2's] lying brother. ***I will kill mother fuckers***. And they will eventually kill me." Later, he said "I'm fucking serious. ***If you are going to send anyone, send one of the guys [Victim 2] has been talking to. So at least I can get one or two good kills before I get blasted***. Because I am waiting … go ahead send someone. … I just need somebody to come thought [sic] that door. …" Gov't Ex. 27 (emphases added).

38.     In another email to Victim 2 in April 2017, Madrigal threatened Victim 2's brother writing: "I will fucking kill your half ass faggot brother if he tries to talk to me again bitch." Gov't Ex. 20.

39.     In another email in October 2018, Madrigal emailed Victim 2, writing: "Tomorrow, I will be there and if [Individual A] resists I will defend myself, and he will die." Gov't Ex. 28.

40.     In an undated recording of a conversation between Madrigal and Victim 2, after Victim 2 told him "goodbye," she then said, "get off of me," Madrigal whispered: "***I am going to find you, and I am going to fucking kill you for what you did to me. Just so you know*** …." Gov't Ex. 4 at 1:45–2:05 (emphasis added).

41.     In August 2022, Madrigal was arrested after Victim 2 called law enforcement to report that Madrigal had held a pistol to her head, following a dispute over their dogs. Victim 2 showed law enforcement an image from a security camera of the incident, set forth below.



Compl. ¶ 47; Gov't Ex. 1.

42.     Aggravated assault charges arising out of the August 2022 incident with Victim 2 are pending in Boone County Circuit Court of Arkansas. Dkt. 15 at 4.

43.     Madrigal has disputed that this image shows him holding a firearm to Victim 2's head, but rather that he was holding up a cell phone to record Victim 2 alleged "outbursts while under the influence of alcohol." Def. Ex. 9 at 2; Dkt. 88 at 13–14. Nonetheless, there appears little dispute that Victim 2's account that it was a pistol Madrigal held to her head was relayed in her 911 call as well as to law enforcement when they arrived, and she provided details about the appearance and location of the firearm to law enforcement, which were confirmed when they discovered the firearm. By contrast, Madrigal's account that it was a cell phone was apparently only first conveyed months later. *See* Dkt. 90 at 4; *see also* Dkt. 88 at 13–14; Dkt. 105 at 44–45. Further still, Madrigal's stance in the image—with his hand and arm outstretched mere inches from Victim 2's face—and Victim 2's frozen stance, are more consistent with Madrigal's

holding a pistol to her head than a cell phone.[3]

*Efforts to Influence, Intimidate, Coach, Track or Follow Witnesses / Victims*

44.     Following a dispute at Victim 2's residence in January 2020, in which Victim 2 called the police to report a physical altercation between Madrigal and a household member, Victim 2 sought a restraining order against Madrigal. Gov't Exs. 3, 12; Dkt. 88 at 15–16.

45.     In a conversation between Madrigal and Victim 2 from early 2020, concerning the restraining order she was seeking against him, Madrigal asked: "What is it you're afraid of, what do you think is going to happen?" Victim 2 responded "you're going to kill me." Madrigal responded as follows

> So with that said, just so you know, if you think, if that's what you're afraid of, a protection order isn't going to stop that. I know that's probably not the best comfort. But if that is what I wanted to do, a protection order is not going to stop that.
>
> A protection order is going to get me in trouble if I harass you and I call you nonstop. A protection order is going to help you if I harass you and I show up at your work without being invited. A protection order is going to help you if I show up to your door and keep ringing the doorbell.
>
> ***A protection order is not going to help you if I decide when we get off the phone right now, "That's it, I've had it with her."*** And like I said, that's not the most comforting advice, or the most comforting comment …
>
> ***If I wanted to get in the car and come to you and do something, a protection order would do jack shit. …***
>
> ***[Victim 2], if I wanted to kill you, I would figure out a way to figure out when you're going to be home, and I would come and kill you, if that's what I wanted to do.***

Gov't Ex. 3 at 4:10–6:00 (emphases added, spacing added).

---

[3] Even if Madrigal were holding a cell phone to Victim 2's head rather than a pistol (which the Court does not so find), his conduct vis-à-vis Victim 2 would still be threatening, though not to the same extent.

46.     Victim 2, her mother and her mother's romantic partner filed declarations which recanted their previous reports that Madrigal had gotten into a physical altercation at Victim 2's house. Dkt. 84 at 17; Def. Ex. 3 (Victim 2 affidavit).

47.     Law enforcement agents subsequently found a color-coded script on Madrigal's laptop for Victim 2 if she was questioned, concerning how Victim 2 "can go about dismissing the charges." Included on the script were items for Victim 2 to "say," others that she should say "only if asked." Included in bold-face font was the statement: "I **wasn't afraid [Madrigal] would cause me any physical harm**, I was just hoping for the cops to help decompress the situation." Elsewhere, Victim 2 was to say "[Madrigal] never put his hands on me or attacked me in any way," but only "if asked – only time he the touched me was to brush my hands off him when I grabbed him." Victim 2 was not to "volunteer anything about law school bar etc." Gov't Ex. 13; Dkt. 84 at 17–18.

48.     The FBI interviewed Victim 2 in May and August 2022. In the latter interview, Victim 2 told the FBI that she had first received a call from the FBI agents in Arkansas seeking to interview her at the time she was visiting Madrigal. Victim 2 stated that she and Madrigal looked at his telephone records "to develop a plausible story for the FBI regarding his foreign contacts," and that he had admitted to Victim 2 that he deleted the JAG School National Security Law Primer. Victim 2 stated to the FBI that she and Madrigal then spent three hours walking and talking outside a nearby mall to avoid being monitored, and they placed their cell phones and Apple watches in another room in Madrigal's Charlottesville apartment to avoid being monitored. In advance of Victim 2's May 2022 interview with the FBI, they planned code words to communicate whether her interview had gone well, the word "Sriracha" or phrase "melons in

12

the garden," would be used to reflect a positive or negative outcome respectively. Victim 2 conveyed that she was "being coached, for sure," by Madrigal, about what she was to say in response to the FBI's questions. Compl. ¶¶ 48–49.

49.     After Madrigal was arrested in Arkansas and when he was in custody, his then employer, the Department of Veterans Affairs, sent police on a welfare check at his purported residence when he did not show up for work. Madrigal's father offered to call the VA and Madrigal advised him to say he "went down to Arkansas to try to take care of some personal issues with my girlfriend …." His father responded, "I'll just tell them that." Gov't Ex. 7 at 1:30–2:15; Dkt. 84 at 13.

50.     While Madrigal has been detained, he has discussed with his family ways in which to contact Victim 2. In a phone call from August 19, 2022, Madrigal told his father, "I can't be spelling everything out." Madrigal then said "someone" should "enlighten" "her" that she "was being strongly used against me to keep me in here." Madrigal's father responded, "I got my marching orders." Gov't Ex. 2 at 0:18–2:40.

51.     On another phone call to his family in October 2022, while Madrigal was incarcerated, he and his brother talked about phone applications used by Victim 1. Madrigal then asked his brother, "Do you know what Strava is?"[4] His brother replied "No."  Madrigal continued, "S-T-R-A-V-A.com. Please go and make a free trial account and see what you can see on Strava. Quickly." His brother replied, "I'm going to do that right now then." Gov't Ex. 23 at 12:35–13:20. His brother created a Strava profile, which remained a blank profile without any added information. Gov't Ex. 22. The Government has represented that his brother's Strava

---

[4] Strava is an application and internet service used for tracking physical exercise, allowing for sharing of such information. Dkt. 84 at 25 n. 6.

records "indicate [his] account was used to search for multiple users with *Victim 1's name*."

Dkt. 84 at 26. Madrigal's brother has submitted a declaration in which he attested that he actually

set up his Strava profile about a week before he talked to his brother, and that he did so because a

promotion that Strava was running. Def. Ex. 10 ¶ 5. His brother did not dispute that he searched

for Victim 1's name. Rather, he attested that he "did not search for [her] name to track her in any

form," but instead was "attempting to find evidence showing that Victim 1 made false statements

to the FBI." *Id.* ¶ 6.

<u>Procedural History</u>

In August 2022, Madrigal was arrested in Boone County, Arkansas, after Victim 2 called

the police to report that he had held a pistol to her head. Dkt. 84 at 2. Madrigal faces an

aggravated assault charge arising from the incident in Arkansas state court. Dkt. 15 at 4. A few

days later, Madrigal was charged by complaint in federal court with one count of cyberstalking

Victim 1, in violation of 18 U.S.C. § 2261A(2). Dkt. 3.

The Magistrate Judge held an initial detention hearing on September 28, 2022. The

Magistrate Judge found, "[b]ased on the evidence presented … no condition or combination of

conditions will reasonably assure" Defendant's presence or the safety of another person or the

community if the Defendant were to be released at the time. Dkt. 24. While the Magistrate Judge

concluded that cyberstalking is not a crime of violence, he continued that "the allegations against

Defendant involve violent conduct, including threats of violence and use and threatened use of

firearms." *Id.* at 1. The Magistrate Judge further concluded that "[t]he Defendant's military

training and mental instability heighten the risk of potential harm," and further found significant

that "Defendant has destroyed information on computers and coached a potential witness." *Id.*

14

On December 14, 2022, a grand jury indicted Madrigal in an eight-count indictment, including: (Count One) Willfully Injuring or Committing Any Depredation Against Any Property of the United States, in violation of 18 U.S.C. § 1361; (Counts Two, Three, Four and Six) Making a False Statement or Representation to a Department or Agency of the United States, in violation of 18 U.S.C. § 1001(a)(2); (Count Five) Tampering with a Witness, Victim, or Informant by Intimidation, Threats, Corrupt Persuasion, or Misleading Conduct, with respect to coaching Victim 2 in communications with the FBI, in violation of 18 U.S.C. § 1512(b)(3); (Count Seven) Attempted Witness Tampering, with respect to seeking to have his father contact Victim 2 to influence, delay, or prevent her testimony in connection with related criminal proceedings, in violation of 18 U.S.C. § 1512(b)(3); and (Count Eight) Cyberstalking Victim 1, in violation of 18 U.S.C. § 2261A(2). *See* Dkt. 45 (Indictment).

On January 26, 2023, Madrigal moved for reconsideration of his pretrial detention. Dkt. 61. He filed a brief in support of the motion on February 27, 2023. Dkt. 63. Therein, he argued that he suffered from significant mental health issues and some physical infirmities as a result of which the Department of Veterans Affairs ("VA") determined he had a 100% disability rating. *Id.* at 3. He argued that the nature and circumstances of the offenses charged weighed in favor of release from detention, saying they were "non-violent felonies," and that he was not a real national security risk. *Id.* at 6–8. He further contended that the photo in which the Government alleged he held a firearm to Victim 2's head was blurry, and that he would dispute that he was brandishing a firearm. *Id.* at 8. In addition, Madrigal contended that his substantial military service and professional accomplishments demonstrate his good character, and that his mental health condition further warranted release because he asserted that he was "not receiving

the help he needs." *Id.* at 10–12. Accordingly, Madrigal asserted that he should be released to the care of his parents and brother, that he would reside approximately 1,000 miles away from Victims 1 and 2, and that other conditions could reasonably ensure his presence at trial and the safety of the public and any individual. *Id.* at 13–14.

The Government opposed the motion, filing its brief on March 1, 2023. Dkt. 64. The Government argued that "Madrigal has engaged in a multi-year pattern of misconduct involving lies, threats, and violence." *Id.* at 1. And it further contended that evidence had been developed that "affirms previously expressed concerns about Madrigal's willingness to manipulate his family members—the proposed custodians—and threaten others." *Id.* The Government's first main argument contended that no new information had been presented to justify reopening the issue of pretrial detention. *Id.* at 5–6. The Government's second main argument was that he "presents a grave danger to the safety of others and national security." *Id.* at 7. The Government wrote that he has demonstrated "willingness to make grave threats against the victims and witnesses in this case," which "presents a serious threat to their safety." *Id.* Further, the Government contended that he "will not be dissuaded by court-ordered conditions," and that his "conduct reveals a contempt for law enforcement and the judiciary's efforts to protect his victims." *Id.* In addition, the Government argued that "the nature and circumstances of the charged offenses also raise safety concerns related to witness tampering and obstruction of justice." *Id.* at 8. In view of Madrigal's statements concerning Russia and the call to the Russian Embassy, the Government also wrote that he poses a danger to national security. *Id.* at 13. The Government addressed other relevant factors and evidence in its argument that "[n]o set of conditions can reasonably mitigate the threat he poses to the justice system, government entities,

16

victims, and witnesses," and that "[n]o set of conditions reasonably assures his appearance if released." *Id.* at 17.

The Magistrate Judge reversed his initial decision that no set of conditions would reasonably assure the safety of the community and against risk of flight. *See* Dkts. 68, 69. The Magistrate Judge concluded that "potentially there are conditions that would allow" Madrigal to be "stable," which included, among other things: a "bed-to-bed" transfer to an "inpatient treatment" facility approved by the probation office; an "aftercare plan that's approved by the probation office"; GPS monitoring; and that Madrigal would not use any devices capable of accessing the internet. Dkt. 82 at 67–69. The Magistrate Judge "emphasiz[ed] to Mr. Madrigal and his family that one of the conditions is going to be that there is no contact, directly or indirectly, with anyone who is a victim or a witness in the case." *Id.* at 69. And noting that the Government indicated "some family members are witnesses or potential witnesses," the Magistrate Judge further directed that "there be no case-related communication between the defendant and any family members, other than talking about logistics for getting him to and from court." *Id.* On March 2, 2023, the Magistrate Judge memorialized his order setting conditions of release. Dkt. 68.

That same day—March 2, 2023—the Government filed a motion to stay the Magistrate Judge's order granting release, and also filed a motion to revoke the Magistrate Judge's order. Dkts. 65, 66. Upon consideration of the Government's motion to stay and Madrigal's opposition thereto, Dkt. 72, the Court granted the Government's motion and stayed the Magistrate Judge's order granting release, until the Court considered and ruled upon the Government's motion to revoke on the merits. Dkt. 74.

The Court subsequently entered the parties proposed agreed briefing schedule. The Government filed its brief in support of its motion to revoke on March 14, 2023; Madrigal filed his opposition thereto on March 17, 2023; and the Government filed its reply in further support of its motion to revoke on March 20, 2023. Dkts. 84, 85, 90. The Court heard argument on the Government's motion to revoke on March 27, 2023. Dkt. 100.

Applicable Law

Ordinarily, a defendant should not be detained pending trial. *United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").

The Bail Reform Act, which governs release or tension pending trial, is one such exception. *Id.* The Act provides that "[i]f, after a hearing … the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). The Court must consider "the available information concerning" the following factors to determine whether the pretrial detention standard has been satisfied:

(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) The weight of the evidence against the person;

(3) The history and characteristics of the person, including

    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or

18

> alcohol abuse, criminal history, and record concerning appearance at
> court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on
>   probation, on parole, or on other release pending trial, sentencing,
>   appeal, or completion of sentence for an offense under Federal, State,
>   or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that
>   would be posed by the person's release.

*See* 18 U.S.C. § 3142(g).

For pretrial detention to be imposed on a defendant, "the lack of reasonable assurance of either the defendant's appearance or the safety of others or the community is sufficient; both are not required." *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) (citing *United States v. Reuben*, 974 F.2d 580, 586 (5th Cir. 1992)) (per curiam). The burden of proof is different though. While the government may establish risk of flight as a basis for detention by a preponderance of the evidence, *Stewart*, 19 F. App'x at 48, regarding community safety, "the Bail Reform Act requires that 'clear and convincing evidence' support the district court conclusion that no conditions other than detention will reasonably assure the safety of any other person and the community." *United States v. Simms*, 128 F. App'x 314, 315 (4th Cir. 2005) (quoting 18 U.S.C. § 3142(f)(2)) (per curiam). "The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." 18 U.S.C. § 3142(f).

"When the district court acts on a motion to revoke or amend a magistrate judge's pretrial [release] order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release." *See Stewart*, 19 F. App'x at 48 (citing *Reuben*, 974 F.2d at 585–86); *see also United States v. Perez*, No. 2:22-cr-6, 2022 WL 3701174, at *1

19

(W.D. Va. Aug. 26, 2022) ("Regardless of the magistrate judge's decision, on review this court determines the issue of detention de novo."). The United States has filed a motion to challenge the Magistrate Judge's Order Granting Release, filed pursuant to 18 U.S.C. § 3145(a), which provides that: "If a person is ordered released by a magistrate judge … the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release." 18 U.S.C. § 3145(a)(1).

<u>Analysis</u>

    1. *Nature and Seriousness of the Danger*

The Court will consider the last factor first—"the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). The Court finds this factor to be the most significant. It weighs very heavily in the Government's favor.

Madrigal has consistently and over a period of years made numerous death threats to Victims 1 and 2 and their friends and families—showing extreme seriousness of the danger to multiple persons and the community if he were released. To Victim 2, he wrote "***I will kill mother fuckers***. And they will eventually kill me." He continued: "***If you are going to send anyone send one of the guys [Victim 2] has been talking to. So I can get one or two good kills before I get blasted. …*** I just need somebody to come thought [sic] that door." *Supra* ¶ 37. In another email to Victim 2, he wrote: "***I will fucking kill your half ass faggot brother if he tries to talk to me again bitch***." *Id.* ¶ 38; *see id.* ¶ 39 (threatening to Victim 2 that if Individual A "resists I will defend myself, and he will die").

In a recording, Madrigal whispered to Victim 2, "***I am going to find you, and I am going***

*to fucking kill you for what you did to me. Just so you know* ..." *Supra* ¶ 40. When Victim 2 was seeking a protection order against Madrigal, he told her that it "would do jack shit," and "*if I wanted to kill you, I would figure out a way to figure out when you're going to be home, and I would come and kill you, if that's what I wanted to do*." *Id.* ¶ 42.

The death threats or threats of physical harm were not limited to Victim 2 and her family. In a recent voicemail to Victim 1 in February 2022, Madrigal said her father "did this," and "*I'm coming after him and then you*." *Supra* ¶ 32. Madrigal also threatened Victim 1 by stabbing a box with a knife and leaving the knife in for her to see, stabbing an image of a bear—which was Victim 1's nickname. *Id.* ¶ 30.

Madrigal has also taken steps to act on such threats. In December 2021, for instance, he traveled to Victim 1's residence in another state, and after an argument, pulled out a pistol, placed it to his head, and threatened to commit suicide while Victim 1 was in the same room—causing Victim 1 to fear he would kill her in a murder-suicide. *Supra* ¶ 28. In August 2022, Victim 2 called law enforcement to report Madrigal held a pistol to her head after a dispute over their dogs—law enforcement arrested Madrigal and aggravated assault charges remain pending over the incident. *Id.* ¶¶ 41–43.

Madrigal's attempt to minimize or explain away these many threats as "intoxicant-induced braggadocio," made in the context of "the toxicity of [his] two consensual adult romances" with Victims 1 and 2, is unpersuasive. Alcohol abuse, or allegations of a "toxic" relationship are no excuse for any threat of harm—much less explicit, repeated death threats made over the course of years terrorizing Victims 1 and 2.

The nature and seriousness of the danger posed by Madrigal's release extends beyond

these victims and their families and friends—though that itself would be enough to doom his request for release. Further still, the record demonstrates a substantial risk of harm to broader national security if he were released.

The Government argues that Madrigal was angry that he was involuntarily discharged from the Army, and that he believed the Army had "*fucked with me too many times*" and taunted them to "*[g]uess what I can do next*." Dkt. 84 at 28. As the Government argues, "[w]hat he did next was call the Russian Embassy." *Id.*  In the Government's view, "Madrigal has demonstrated a willingness to contact a foreign adversary, possesses information of potential value, and potentially unlawfully retained classified material." *Id.* at 29. According to the Government, "[h]is release from custody poses a non-hypothetical national security risk, especially due to his volatile nature and self-professed animosity toward the Army." *Id.*

Madrigal counters that his prior security clearance access while he was serving in the Ranger Regiment and/or the 82nd Airborne Division "is of no moment in 2022 and 2023," considering that was "between seven and twelve years ago." Dkt. 88 at 21. He further notes that "at the time of the charged offenses, [he] ha[d] a 'Secret,' as opposed to 'Top Secret – SCI' clearance." *Id.* Madrigal also faults the Government for not identifying any foreign national with which he was alleged to be in contact with. *Id.* And he believes he could not have "possessed anything of value related to the Ukraine *vis-à-vis* the Russia Federation," and considers it "nonsense" that he poses a national security risk. *Id.*

The Court finds that the Government has demonstrated that Madrigal's release would present an intolerable risk to national security. He has held a Top Secret/SCI Security Clearance, more recently a Secret Security Clearance. *Supra* ¶¶ 4, 6. He has knowledge of classified U.S.

Army Special Operations Command operations in Afghanistan, the capabilities of intelligence collection platforms, and tactics and techniques of the 75th Ranger Regiment. *Id.* ¶ 5. The Government has further asserted that he has retained materials with classification markings on his electronic devices as well as unmarked materials that are also potentially classified, currently undergoing a classification review. Dkt. 84 at 29. Madrigal has repeatedly expressed in private correspondence that Russia, a hostile foreign government, reached out to him; wanted to know what he knows, and that he imminently intended to travel to Russia. *Supra* ¶¶ 15–17. His telephone records also show he initiated contact with the Russian Embassy, a location known to contain Russian intelligence officers. *Id.* ¶¶ 18–20. Further still, as the Government argues, he "lied to government officials about his contact with Russia and coached others to lie on his behalf." Dkt. 90 at 11; *see also supra* ¶¶ 23–25, 48.

There is instructive precedent in *United States v. Mallory*, wherein the defendant charged with espionage had obtained national defense information through his years of government employment and had an "apparent desire to sell those secrets to a foreign government," as a result of which the court found that "he poses a grave risk of endangering not only one person, but the U.S. itself." 268 F. Supp. 3d 854, 866 (E.D. Va. 2017). That court concluded that "[t]hese are risks that the Bail Reform Act does not tolerate." *Id.* Moreover, significantly, that court found that no condition or combination of conditions could reasonably assure the safety of the community, writing as follows:

> Even if the Court was to impose the most onerous conditions imaginable, individuals could still visit the defendant at his home and he could find clandestine ways to access unmonitored telephones or computers. He could also simply pass information to Chinese intelligence officers using a seemingly innocuous third-party intermediary. Consequently, there are simply no conditions that can reasonably assure the defendant would not pass national security

information to a foreign adversary.

*Id.* at 866 n. 26.

Similarly, given his knowledge of classified and other sensitive information, his animosity toward the Army and the Government, his expressed intent to go to Russia and that Russia wants information he knows; his communication with the Russian Embassy, and perhaps most significantly, given Madrigal's repeated and concerted efforts over the course of months to hide and obfuscate his contact with the Russian Embassy from the Army and later the FBI, the evidence before the Court demonstrates that Madrigal's release would present an intolerable risk to national security.

### 2. *Nature and Circumstances of the Offenses Charged*

The Court will next consider "the nature and circumstances of the offense[s] charged." 18 U.S.C. § 3142(g)(1). Much of the information drawn from the above section is also relevant to this factor. This factor, and specifically the circumstances of the offenses charged also weighs in favor of the Government and Madrigal's continued detention.

First, Madrigal is charged with cyberstalking Victim 1 in violation of 18 U.S.C. § 2261A(2). There is some dispute over whether cyberstalking is a "crime of violence." Dkt. 64 at 4–5 (Government memorandum, citing cases in support of argument that "grave concerns arise in cyberstalking cases"); *see also United States v. Grooms*, No. 3:15-mj-25, 2015 WL 1982097, at *2 (S.D. W. Va. Apr. 29, 2015) (concluding that it is a crime of violence for purposes of the Bail Reform Act).

Even were it not, the circumstances of the offense charged demonstrate a disturbing, concerted effort to terrorize Victim 1 through a multitude of means including: Madrigal's threat

24

to commit suicide in front of her by holding a gun to his head, making her fear he would follow through with a "murder-suicide"; voicemail threat that he was "coming after [Victim 1's father] and then you [Victim 1]"; texting Victim 1 a series of her passwords and codes to her accounts, apartment complex, and her license plate number, saying "I remember all things" and "I like numbers"; symbolically stabbing the picture of the bear (Victim 1's nickname) on a food box and leaving it for her to see; crushing up nearly a whole bottle of medicine and putting it in Victim 1's cat's food; sending Victim 1 screenshots of information from her fertility tracker application, after she had blocked him on social media and applications, saying "sorry to see you are still a failure," *i.e.*, "mocking her purported infertility." *Supra* ¶¶ 27–34. There are many other threatening communications. *See* Dkt. 64 at 7–8; Compl. ¶¶ 30–46; *see also, e.g.*, Compl. ¶ 40 (sending photo of painted assault rifle, followed by "I probably should not have sent that"); *id.* ¶ 41 (Madrigal left voicemail from March 2022 with Victim 1 stating, "This is your last opportunity to answer the fucking phone and talk to me before I let everybody know exactly who you are").

Second, Madrigal has been charged with one count of witness tampering, by coaching Victim 2 to lie to the FBI in her interview about him. And he has been charged with one count of attempted witness tampering, for conduct *since he has been incarcerated*, on account of Madrigal's attempt to enlist his father to have someone "enlighten" Victim 2. *See* Dkt. 45 (Counts Five, Seven). Facts relevant to Count Five demonstrate Madrigal's efforts to cover up Madrigal's extensive "coach[ing]" of Victim 2 before her interview with the FBI, including the use of code words, trying to avoid detection or surveillance, and spending three hours rehearsing potential questions from the FBI and her answers. *Supra* ¶ 48. And those efforts were

themselves an attempt by Madrigal to provide a false narrative concerning his contact with the Russian Embassy. *Id.* Similarly, facts relevant to Count Seven demonstrate another attempt by Madrigal to seek to stop Victim 2 from testifying and again trying to do so in a covert manner—telling his father, "I can't be spelling everything out," but that "someone" should "enlighten" Victim 2 about her key role in the case. *Id.* ¶ 50. Of course, in addition to the cyberstalking and witness tampering charges are charges of destroying Government property, and four counts of making false statements.

Madrigal argues that these "offenses were non-violent" and speculates that such offenses "likely would not have arisen had Madrigal been undergoing intensive treatment for his alcohol abuse disorder." Dkt. 88 at 9. But this argument carries limited weight for a number of reasons. For one, as described above, the circumstances of the cyberstalking offense belies that "non-violent" characterization. Next, there does not appear to be any indication that alcohol played any role in a number of the charged offenses, such as the witness tampering offenses, or making false statements to the FBI and Army. Indeed, Madrigal was in custody when he directed his father to have someone "enlighten" Victim 2. Third, even if the charged offenses themselves may not be "violent" in the same manner as his Aggravated Assault charge is pending in Arkansas, for example, they still demonstrate a multitude of concerted efforts to impede official investigations and escape accountability for his conduct. The nature and circumstances of his witness tampering and attempted witness tampering charges are a particular concern, were he to be released. And part and parcel with those charges are myriad false statements Madrigal made to the Army, the FBI, and other agencies, separately charged. *Supra* ¶¶ 22–26. Nor can they be viewed in isolation of the circumstances of Madrigal's cyberstalking charge. *See, e.g.*, ¶¶ 28–34.

Even the circumstances of Madrigal's charged offense of destroying Government property, a generic offense that would not on its own support continued incarceration, reflects a continuing intent to harm the United States and Army, and to do so by conveying information to Russia—circumstances that militate in favor of continued detention.[5]

At bottom, the nature and circumstances of the charged offenses similarly weigh in favor of Madrigal's continued detention.

3. *The Weight of the Evidence*

Next, the Court considers "the weight of the evidence against the person." 18 U.S.C. § 3142(g)(2). In this case, the weight of the evidence against Madrigal is substantial. For instance, regarding Count One (destruction of Government property), Madrigal took a video of himself systematically deleting the JAG School's National Security Law primer, narrating what he was doing while he was deleting it. *Supra* ¶¶ 12–14 ("You fuck me, and I'm gonna fuck you. … There you go. You have nothing."); Gov't Ex. 31. The record contains texts he sent to Victim 1 further describing what he did and why. *Supra* ¶ 15 ("I am tearing down all of nsl-p … I am teaching them a lesson. … I just single handily [sic] brought an entire system down … Guess what I can do next"). The counts for false statements to the Government (Counts Two, Three, Four, and Six) are supported by documentary evidence as well as audio evidence. *Id.* ¶¶ 22–26; *see also id.* ¶¶ 12–15; Dkt. 64 at 13.

Regarding Count Seven, attempted witness tampering, the record contains the audio recording from his facility of incarceration. *Supra* ¶ 50. And regarding Count Five, the witness tampering account, substantial evidence of his attempts to threaten, intimidate, or coach Victim 2

---

[5] That threat remains even if Madrigal no longer has access to the same Government systems as he did before while serving at the JAG School.

is contained in audio recordings, *e.g.*, *id.* ¶¶ 40, 45; as well as in the statements of Victim 2 to the FBI, *id.* ¶ 48. Lastly, photos, emails, voicemails, and text messages underlie the cyberstalking count (Count Eight) against Madrigal, *see, e.g.*, *supra* ¶¶ 30, 31, 32, 33, and 34; Gov't Exs. 18, 19; as well as statements from Victim 1 and others.

The weight of the evidence is substantial, and it supports Madrigal's continued detention.

4.     *The History and Characteristics of the Person*

The last factor the Court considers is the "history and characteristics of the person." 18 U.S.C. § 3142(g)(3). Much of the information about Madrigal's history and characteristics is already recounted above, with respect to the nature and seriousness of the danger factor. The Court need not recount again his many death threats and other threats. This factor also weighs heavily in favor of Madrigal's continued detention. Some additional discussion is also warranted on this factor.

Specifically, pretrial detention and a defendant's compliance with the court-ordered terms of supervision relies upon a certain amount of trust, verified in part by the terms of the conditions themselves. However, the Court finds that the facts and record before the Court establish that Madrigal cannot be trusted to accurately report compliance with the terms of supervision. On this record the Court finds Madrigal has made false statements to the Army, *supra* ¶¶ 22–23, the FBI, *id.* ¶¶ 24–26, and to his last employer, the VA, relating to his residence and salary he would get with a cost-of-living adjustment, though he had in fact moved into Victim 2's home in Arkansas, Compl. ¶ 47 & n . 4; Gov't Ex. 6; Dkt. 84 at 11–12. The Government has also made substantial arguments that Madrigal also lied to the OPM, Indict. ¶¶ 39–43, and to the Missouri State Bar, Dkt. 84 at 14–15, Gov't Exs. 9, 10.

Substantial evidence shows that Madrigal has engaged in numerous, concerted efforts to attempt to threaten, intimidate, harass, or coach witnesses or victims to the effect of impeding a full official investigation. He did this when he coached Victim 2 for hours about what to say to the FBI, establishing code words for post-meeting discussion of the interview. *Supra* ¶ 48. Previously, he had drafted a script for Victim 2 toward getting her to try to have criminal charges against him dropped in 2020. *Id.* ¶¶ 45–47. And when he told Victim 2 that the protective order would be meaningless to stop him from harming her. *Id.* ¶ 45. And again when he tried to, surreptitiously and through others, "enlighten" Victim 2 so that she would not support this criminal case against him. *Id.* ¶ 50.

Moreover, an especially troubling characteristic of Madrigal, and of apparently long-standing, is his belief that law enforcement and court orders cannot stop him from doing what he wants to do. To Madrigal, a protective order would do "***jack shit***" to stop him from harming Victim 2, because as he told her, "***if I wanted to kill you, I would figure out a way to figure out when you're going to be home, and I would come and kill you, if that's what I wanted to do***." *Supra* ¶ 45 (emphases added). Elsewhere, Madrigal told Victim 2 after she tells him to leave and he threatened to kill her, "Why don't you go ahead and call your backwoods, hillbilly motherfucking cops and see what the fuck they do, bitch." Gov't Ex. 4 at 2:54–3:04. On another occasion, he threatened Victim 2 (and his family) that if "you are going to send anyone, send one of the guys [Victim 2] has been talking to. So at least I can get one or two good kills before I get blasted. … I just need somebody to come though [sic] that door …" *Supra* ¶ 37. For somebody in that mindset, even certain conditions of supervision like GPS tracking and a requirement to live in Illinois (far removed from the Victims' residences) and a no-contact order, would not

suffice to reasonably assure their safety. Other conditions like Madrigal's inability to use devices with internet access require a certain amount of trust, lacking under the facts of this case. And the anticipated efficacy of any such conditions are still further decreased given evidence that Madrigal stored Victim 1's passwords and access codes; accessed her accounts after she told him not to contact her; and tried to enlist his brother to search for information about Victim 1 using a social media application he was at best unfamiliar with, all while Madrigal was in custody.

Madrigal argues that certain of his characteristics support release. Notably, he contends that without alcohol, these allegations likely would not have arisen. Dkt. 88 at 9–10. But again, alcohol abuse is no excuse for threats of violence or other criminal behavior. Moreover, and significantly, the Court notes that numerous of the offenses at issue do not appear to have any relation to his alcohol abuse, such as the false statements charges or the witness tampering charges.

Madrigal also argues that his substantial service to the military and his Country support release pending trial. *Id.* at 11. In another case and on different facts, this argument would carry more force. Here, however, where Madrigal is charged with cyberstalking, witness tampering, and other serious felonies, and where he has a demonstrated history of making years of death threats to Victims 1 and 2 and their families, has held a firearm to his own head in Victim 1's presence, and he has been arrested on Aggravated Assault charges for holding a firearm to Victim 2's head last year, his past military service cannot counterbalance the serious and present risk of harm that would be occasioned by his release. Nor within this context can the Court ignore that Madrigal's military training including sniper training, which would render his death threats and use of firearms to threaten Victims 1 and 2 even more dangerous.

30

The Court notes Defendant's arguments and supporting evidence that he has taken numerous classes during his incarceration and has bettered himself, without corresponding BOP institutional disciplinary infractions. *See* Dkt. 88 at 5; Def. Ex. 5. While positive, these facts do not counterbalance the corresponding aspects of his history and characteristics demonstrating substantial safety risks were he to be released.

The Court also notes Madrigal's arguments that he has not received some needed alcohol abuse treatment and other mental health treatment, and that his proposed home release plan following a bed-to-bed transfer would assist him in treating these mental health issues. *See, e.g.*, Dkt. 88 at 3, 10–11. The Court finds his argument unpersuasive for a number of reasons, including that it lacks evidentiary support with respect to specific medical treatments he is prescribed and/or should be receiving but is not presently, following requests for the same. The record contains unresolved questions about his medical record, including what he has requested, under what circumstances, and how he was denied such legitimate requests. *See* Dkt. 105 at 55 (noting Government's assertion that there is no evidence provided by defendant "about the jail's actual response to defense counsel's inquiry about whether the defendant was receiving his prescription"). Any such requests could be more appropriately handled at least in the first instance in requests to the jail rather than seeking pretrial release. If there were legitimate arguments concerning conditions of treatment, the record does not establish this is a material, much less an overriding consideration. This factor, like the others, supports Madrigal's continued pretrial detention.

Lastly, the Court notes that the factual record establishes that Madrigal's family cannot be effective third-party custodians. The Court notes evidence submitted that they intend to abide

by court instructions. Def. Exs. 10, 11. They very well may earnestly intend to do so. And the Court notes their assertions of family support, which the Court does not and need not doubt. However, they are likely witnesses to several counts. Moreover, substantial evidence in the record establishes that Madrigal has already attempted to coopt his father into witness tampering, while incarcerated, *supra* ¶ 50 (response, "I got my marching orders"), prompting Count Seven in the Indictment. On another occasion, his father agreed to pass along incorrect information to Madrigal's then employer, saying effectively that he was out of town, rather than in custody. *Id.* ¶ 49. And, notwithstanding a pending cyberstalking charge, Madrigal attempted to secure his brother's assistance using social media applications to search for and access Victim 1's accounts, and his brother then searched for Victim 1's profile on the application. *Id.* ¶ 51.

*         *         *

The Court has considered the factors set forth in 18 U.S.C. § 3142(g). In so considering such factors, in light of the argument and evidence presented, the Court **FINDS** that the Government has demonstrated, by **clear and convincing evidence**, that Madrigal presents an unreasonable risk of danger to any person, specifically Victims 1 and 2, as well as to the community as a whole. And the Court further **FINDS**, by **clear and convincing evidence**, that no condition or combination of conditions will reasonably assure the safety of any other person and the community. Accordingly, the Court shall order the detention of the person before trial. *See* 18 U.S.C. § 3142(e).

Accordingly, it will be and hereby is **ORDERED** that the Government's Motion to Revoke the Magistrate Judge's Release Order is hereby **GRANTED**. Dkt. 66. The Magistrate Judge's Release Order is hereby **REVOKED**. Dkt. 68.

Madrigal will be **DETAINED** pending trial.

It is further **ORDERED** that Madrigal is committed to the custody of the Attorney General or his designated representative for confinement in an appropriate corrections facility and, to the extent practicable, separate and apart from persons awaiting or serving sentences or being held in custody pending appeal.

It is further **ORDERED** that Madrigal shall be afforded a reasonable opportunity for private consultation with his counsel.

It is further **ORDERED** that upon an order of a court of the United States or on request of an attorney for the Government, the persons in charge of the designated corrections facility shall deliver Madrigal to the United States Marshal for the purpose of appearing in connection with a court proceeding.

It is so **ORDERED**.

The Clerk of the Court is hereby directed to send this Memorandum Opinion & Order to all counsel of record, and to the U.S. Marshal's Service.

Entered this  7th  day of April, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

33