**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal No. 3:22-cr-00019-NKM |
| MANFREDO M. MADRIGAL III, | |
| Defendant. | |

## DEFENDANT'S SENTENCING MEMORANDUM

Manfredo M. Madrigal, III ("Mr. Madrigal"), by and through the undersigned counsel of record, and having served 28 months pretrial detention without incident, respectfully requests the Court determine a total base offense level of "6," a criminal history category of "I," an imprisonment range between 0 – 6 months per Zone A, and order Mr. Madrigal's supervised release immediately via a seamless transfer from pretrial detention to an intensive inpatient substance abuse treatment in Illinois near his family and support network. Mr. Madrigal should be given credit for the 28 months pretrial detention he has served.

While in pretrial detention, Mr. Madrigal has put the time to good use. He voluntarily sought and secured acceptance into the Sun Cloud Health Treatment Center and the U.S. Department of Veterans Affairs' ("VA") intensive, inpatient programs for treatment for alcohol use disorder ("AUD"), post-traumatic stress disorder ("PTSD"), traumatic brain injury ("TBI"), major depression moderate recurrent disorder, anxiety disorder, substance use disorder, sleeplessness as well as anger management, cognitive behavioral therapy ("CBT"), and treatment

for the symptoms of the numerous traumas Mr. Madrigal sought to self-medicate through excessive drinking which compromised his otherwise sound judgment.[1]

These traumas and their stubborn, lingering, and often debilitating symptoms are largely the result of the horrors of war, such as over 200 "kill/capture" missions in Afghanistan with the 82nd Airborne Division and the 75th Ranger Regiment. The triggering events include Mr. Madrigal's having survived two improvised explosive device ("IED") detonations, witnessed the killing of close friends in combat by foreign enemies, over 70 parachute jumps (two with life-threatening malfunctions requiring resort to his reserve parachute), surviving an Osprey crash/hard landing, and the deleterious stresses associated with the requirement to "kill or be killed."

These ongoing reverberations of war have adversely affected not only Mr. Madrigal, but also those he has loved and cared for deeply. Mr. Madrigal did not choose to have these medical health conditions, but he has come to terms with them. Defendant's Objections to the Initial Presentence Investigation Report ("Madrigal's Objections") (Doc. 188), Objections (1), (8), (10), (11). These largely service-connected maladies have contributed in varying degrees to upending what was previously a productive and positive life that Mr. Madrigal enjoyed and earned through his admirable characteristics of compassion for others, perseverance, dedication, loyalty, and hard work.

To be sure, Mr. Madrigal wishes to assure all concerned that he fully understands the wrongfulness of his conduct, and while he may hope to explain his conduct, it is not his intent to

---

[1] https://suncloudhealth.com/programs/residential-treatment-center/. Sun Cloud explains "[a] residential treatment center is an in-person, therapeutic setting where patients stay overnight to receive an intensive level of care for an extended period of time. This extended treatment program allows individuals to deeply immerse in trauma recovery and learn skills that set the foundation for a journey to a more well-balanced and self-fulfilled life."

in any manner excuse or rationalize his misconduct. Mr. Madrigal wishes to express his sincere remorse and offer his profuse apologies to all for his conduct.

Mr. Madrigal recognizes that the behavior that has led him to this point is inextricably woven with his struggle with alcohol. In fact, every offense charged by the Government has involved excessive use of alcohol. Factor alcohol abuse out, and Mr. Madrigal most likely would not have committed the offenses to which he pleaded guilty.

Mr. Madrigal has not only acknowledged the root causes of his wrongdoing, but he has also taken it upon himself to engage in affirmative steps to address these underlying concerns by way of correctional treatment in order to prevent any recurrence of any type of criminal conduct whatsoever. *Id*. Mr. Madrigal is doing everything in his power to forge a new life.

Mr. Madrigal has served 28 months pretrial detention, taken every programming course available, sought out other courses to complete, continued robust physical fitness and spiritual development efforts throughout, and pursuant to the Classification Officer's "adjustment" letter dated November 20, 2024 is "low risk" for recidivism and "received no Major or Minor Institutional Rule Violations" throughout pretrial detention. He is no threat to anybody, demonstrated direct steps toward alcohol abuse and mental health recovery, and has shown his ability to lawfully abide by any and all rules, regulations, and laws. Weighing in favor of supervised release, the Probation Officer determined Mr. Madrigal lacks any substantive criminal history and assigned him Category I.

But what remains clear in the medical evidence before the Court is that dedicated alcohol abuse treatment and intensive mental health counseling are required, not only pursuant to the Probation Officer's recommendation, but also to follow the guidance of three medical

professionals Mr. Madrigal consulted, including Sun Cloud (inpatient substance abuse center), Dr. Richard P. Benson, Ph.D., P.A., a licensed clinical psychologist, and the VA.

Upon supervised release, Mr. Madrigal has a stable home in suburban Illinois to return to, several employment offers, available religious, medical, and physical fitness facilities, and a Veterans Affairs medical center that is nearby. Mr. Madrigal is humbled by his prosecution and is motivated to continue to improve himself, not only for his family and any potential employer, but also for the benefit of all in the community.

Mr. Madrigal suggests that a sentence to time served for these *nonviolent* offenses amidst substantial mitigating circumstances and a criminal history category of I, is sufficient, but not greater than necessary, to serve the purposes of sentencing. *United States Sentencing Guidelines* ("USSG"); 18 U.S.C. § 3553(a); Madrigal's Objections.

For all of the reasons in this sentencing memorandum, and in accordance with the factors set forth in 18 U.S.C. §3553(a), this Court should adopt Mr. Madrigal's arguments in his Objections (Doc. 188) and adjudge a sentence between 0 – 6 months, with Mr. Madrigal's immediate release and his transition to supervised release in the Sun Cloud residential treatment facility.

## <u>BACKGROUND OF THIS PROSECUTION</u>

The Government commenced this prosecution as a national security, classified information, counterintelligence, and espionage case. In open court at various times, the Government noted that classified information would be located on Mr. Madrigal's electronic devices, that Mr. Madrigal was a national security threat, and that superseding indictments would issue charging the "conceived" espionage. The Government went so far as to surveil Mr. Madrigal at his home in Charlottesville, Virginia and orchestrated a "sting," by writing a letter in English,

but with European-style penmanship signed by "Natasha," baiting Mr. Madrigal to determine if he was truly a spy or traitor to the United States. Mr. Madrigal received the letter the FBI covertly had delivered to his home, read the letter in which "Natasha" offered to accept vital national security information about Russia and the Ukraine from Mr. Madrigal, and invited him to take further steps towards meeting.

Rather than responding, Mr. Madrigal tore up the letter immediately and tossed its pieces into his rubbish bin. The FBI then surreptitiously recovered the shredded pieces and taped them back together.

As it turns out, none of the Government's early concerns about espionage materialized, and there is no dispute that Mr. Madrigal did not commit any national security offenses. Instead, the case boils down to four distinct misdeeds, each of which involved a compromised mindset from untreated Diagnostic and Statistical Manual ("DSM") – V diagnoses, self-medicated by alcohol abuse as Mr. Madrigal himself acknowledges, and turned him into "a raging alcoholic." As the case progressed, there are no longer any treason or espionage concerns, and Mr. Madrigal has not had a drink since August 9, 2022, twenty-eight months ago.

## SUMMARY OF THE COUNTS OF CONVICTION

Mr. Madrigal has pled guilty to one count of Willfully Injuring or Committing Depredation Against Any Property (Count One), and three counts of Making a False Statement or Representation to a Department or Agency of the United States (Counts Three, Four, and Six).

In Count One, during the overnight hours from February 6, 2022 to February 7, 2022, after having been notified of the Army's decision to separate him honorably, Mr. Madrigal deleted a version of a *Blackboard* online learning platform *PowerPoint* slide training module consisting of 10 modules of 10 – 15 slides each. He had been drinking a significant amount of alcohol. A short

time later, the slide deck was quickly and easily recovered by school personnel at the minimal expense of $1,131.

As to Count Three, on April 18, 2022, the defendant provided false statements to agents with the FBI regarding calls to or from the Russian embassy, one of which was reported to last less than three minutes (PSR ¶ 33). Before this voluntary interview with the FBI, Mr. Madrigal stopped at the Virginia *ABC* liquor store, purchased *Tito's* vodka, drank a portion of a can of *Budweiser* seltzer to create room in the can, then poured the vodka into the can, which he then consumed the equivalent of several rounds before meeting with the FBI.[2]

In Count Four, on May 10, 2022, Mr. Madrigal has admitted that he provided false statements to the FBI regarding his having received a call from the Russian embassy, and with no suggestion the call was of any significant duration, as well as falsely denying he deleted the version of the online course referenced in Count One. Like the April 18, 2022 FBI interview, before this voluntary meeting, Mr. Madrigal visited the *ABC* store, purchased more *Tito's* vodka, drank a portion of the can of *Budweiser* seltzer to create room in the *Budweiser* can, then poured the vodka into the can, which he drank, again, several rounds before meeting with the FBI.

Four Counts Three and Four, Mr. Madrigal's drinking rose to unprecedented levels. He drank the *Budweiser* seltzer and *Tito's* drinks early in the morning, in order to stave off the effects of being hungover from the prior evening's drinking. On each occasion, April 18, 2022, and May 10, 2022, SA Rader called Mr. Madrigal at home asking for a meeting within an hour. Mr. Madrigal voluntarily agreed to meet each time but requested an additional hour each time before the meetings so that Mr. Madrigal could consume *Budweiser* and *Tito's* to cure his hangovers.

---

[2] https://www.titosvodka.com/ and https://www.budlight.com/seltzers

In Count Six, on May 24, 2022, Mr. Madrigal has admitted that he falsely denied his late-night sudden deletion of the *PowerPoint* slides. Mr. Madrigal did not plead to any facts contained in paragraphs 61, 62c, and 63 of the First Superseding Indictment.

All of this conduct occurred when Mr. Madrigal was in an elevated emotional state, given that the Army he loved and had served in lethal combat in over 200 "kill/capture" missions over the prior 13 years, determined to administratively separate Mr. Madrigal from the Army with an Honorable Discharge. The identity-degrading administrative separation tumult triggered excessive drinking to self-medicate. Mr. Madrigal's symptoms of PTSD, TBI, depression, and other afflictions converged simultaneously resulting in intrusive and insidious emotional and psychological distress. Mr. Madrigal attempted to mask those symptoms associated with his mental illness(es) by resorting to alcohol abuse, which severely impaired his otherwise sound judgement.

## DISCUSSION

### I.    The Guidelines Suggest Immediate Supervised Release to Sun Cloud.

The Probation Officer, over Mr. Madrigal's objections, *see* Dkt. 190, pp. 46-57, and based upon the late-filed evidence inflating the amount of loss based on some deleted *Powerpoint* slides from just over $1,000 *to over $1 million*, has recommended a base offense level of "21," and a criminal history category of "I." The total recommended guideline sentencing range, according to the Probation Officer, pursuant to these determinations, is between 37 – 46 months. Dkt. 190, p. 47.

This is unreasonable, as it is a result of the "after-the-fact" eleventh-hour disclosure that the purported loss to the Government had jumped from just over $1,000 to over $1 million. Accepting this valuation, for the reasons Madrigal has described previously, *see* Dkt. 190, pp. 36-

37, would require the Court to conclude that each slide Madrigal deleted cost the U.S. Government over $5,000. Such a result is unreasonable and untenable. The amount of loss to the Government should remain within a reasonable range of where the Government stated it was during the first 24 months of this litigation – just over $1,000. *Id.* Doing so, in terms of sentencing calculations, would (and should) result in a total offense level of 6, and a sentencing range of 0 to six months imprisonment. Madrigal should be released immediately, based on the significant time he has already served.

But even accepting the Probation Officer's amended PSR, Dkt. 190, Mr. Madrigal has already served 28 months pretrial detention without incident, suggesting conditional release to Sun Cloud's residential treatment program is appropriate and reasonable to secure treatment for Mr. Madrigal's untreated medical conditions. It is the best and just result, for the reasons elucidated more fully below.

> ### A. The Valuation of the *PowerPoint* Slides is Outrageously Excessive, Unreliable, a Surprise, and the Court Should Decline to Adopt the Government's Unreasonable Eleventh-Hour Changing Valuations.

Mr. Madrigal filed 17 objections to the PSR. (Doc. 188). The most problematic is the assignment of 10 and then 14 points for the value of the loss pertaining to Count I. The Government's late breaking disclosures of varying and precipitously increasing valuations of the slide deck loss implicates the Government's sacrosanct duties to engage in good faith plea negotiations and to timely disclose evidence favorable to the defense at a time when the defense could use it. *See United States v. Lee*, 653 F.3d 170 (2d Cir. 2011) *quoting United States v. Eschman*, 227 F.3d 886, 890 (7th Cir. 2000)).

Indeed, had Mr. Madrigal known the Government sought to assess $1.2 million for 150 *PowerPoint* slides, which were never irreparably deleted, he may not have entered into the plea

agreement on the present terms. There are at least 15 reasons why the Court should adopt the actual loss of $1,131 as reliable and trustworthy and reject the Government's *post-hoc,* shifting-sands conjecture.

First, the Government repeatedly disclosed to the defense documents reflecting the actual loss to be $1,131. For example, FBI Special Agent Rader's April 10, 2023 email disclosed to the defense reflected damages as $1,131. *See* Madrigal's Objections, Ex. B; *United States v. Petties*, 42 F.4th 388, 397 (4th Cir. 2022) ("It is 'axiomatic' that a guilty plea must be 'knowing, intelligent, and voluntary.'"). The email contains various valuations by numbers of US Army Officers and civilian personnel around the $1,131 range. *Id*. Likewise, Mr. Jeffery P. Sexton's July 20, 2022 memorandum concludes the damage for the slides is $1,131. *Id*.

Mindful of these numbers, disclosed several times to the defense, and without the Government ever having mentioned any values more than hovering around the $1,000 range during plea negotiations, the parties mutually agreed to the phrase "in excess of $1,000."

The FBI's June 28, 2022 interview with US Army Personnel reflected in a Memorandum dated September 12, 2022, and disclosed to the defense, states that the *PowerPoint* training was comprised of 10 modules with between 10 – 15 slides within each module; that is, the entire training was between 100 – 150 slides. And, in the same memorandum, Army personnel noted that the outdated version of the training slide deck was directly uploaded, and personnel made edits to make the slides available. *Id*., Ex C.

Upon these material representations to the defense, Mr. Madrigal signed the plea agreement, signed the Statement of Facts, waived his trial rights, and pled guilty before this Court in July 2024, believing in good faith and in reliance on the Government's representations, the valuation associated with Count I was approximately, but in excess of, $1,000.

But in November 26, 2024, the Government first disclosed that it intended to value Count I's damages "to be approximately $1,004,500 to $1,209,500." These numbers and the methodologies used to achieve them are unrecognized, engineered, complete stretches, defy credulity, and are accordingly unreliable. This results in a loss to the Government that is roughly 1,000 times higher than the amount discussed as the parties were in plea negotiations, and which Madrigal relied upon when he entered into the plea agreement.

This type of gamesmanship is not consistent with due process, good faith negotiations, and a prosecutor's solemn duties as the sovereign's representative dealing with the sovereign's citizen, especially where Mr. Madrigal relieved the Government of its burden to prove his guilt beyond a reasonable doubt and eliminated the need for the Government to expend its resources on a full criminal trial. *United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005). Mr. Madrigal has not received the benefit of the bargain the Government induced him to make on this material term.

The $1 million-plus valuation unfairly and substantially exaggerates Mr. Madrigal's criminal conduct as to Count I, on either an actual or intended loss valuation, as reflected in SA Rader's April 10, 2023 email and Mr. Sexton's July 20, 2022 findings discussed above. As the Justice Manual counsels, "[p]lea agreements should honestly reflect the totality and seriousness of the defendant's conduct," and prosecutors should embrace "only [] facts that accurately represent the defendant's conduct." *Justice Manual*, United States Department of Justice 9.16-300.

Moreover, the Justice Manual suggests these numbers should have been disclosed at a time when Mr. Madrigal could have made a knowing, voluntary, and intelligent waiver of his trial rights. *Justice Manual*, United States Department of Justice, 9-5.002 Criminal Discovery; *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1997) (due process requires Government

disclosures be made in sufficient time to permit the defendant to make effective use of that information); *Petties*, 42 F.4th at 397.

All of this is to say that by failing to disclose this valuation earlier, even as the result of a U.S. Government agency's failure to compile its calculations timely, these delayed disclosures substantially and unfairly prejudice Mr. Madrigal's "due process right to be sentenced on the basis of reliable information" and the prosecutor's obligation of "good faith and fair dealing" in plea bargaining. *See Lee*, 653 F.3d at 170 ; *Eschman*, 227 F.3d at 890.

The extraordinary amount of loss to the Government proposed by the Government's pleadings is surely "outside the realm of permissible computations." *United States v. Sullivan*, 765 F.3d 712, 716 (7th Cir. 2014). Slides valued at between $8,000 and $12,000 per slide for unclassified, basic, *Blackboard PowerPoint* training, created in large measure by lay persons for use by junior personnel, must constitute Government fraud, waste, and abuse. Such an exceedingly exaggerated amount strikes at Government and prosecutorial overreaching, at the eleventh hour. *Eschman*, 227 F.3d at 890 (prosecutor's obligation of good faith and fair dealing in plea bargaining and defendant's due process right to be sentenced on the basis of reliable information). The late-breaking increasing amounts cannot be reliable and therefore should be disregarded.

Further and finally, with respect to the valuation of the loss to the Government, the amounts the Government claims were not foreseeable to Mr. Madrigal. Mr. Madrigal intended only to delete *one version* of the training module slides, and that version was readily available, and easily-retrievable and easily-replaced in the (nearly) precise form in which it existed prior to Mr. Madrigal's alcohol-infused effort to delete the slides *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006) (loss is foreseeable if it is "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense").

Mr. Madrigal's remarks he recorded during the deletion are important and should be rightfully seen for what they truly are: bloviations made while drinking alcohol in the early morning hours while laboring under the symptoms of various DSM-V diagnoses resulting from multiple traumas. Revealing of Mr. Madrigal's true intent, he was in meetings with recruiters to transition to the National Guard or the Reserve, given his love for the Army and desire to continue service, despite the "drunken ranting."

Ultimately, the Court "need only make a reasonable estimate of the loss." USSG 2B1.1 comment. (n.3(C)). Actual loss, which is often referred to as "but for" loss, is defined in the guideline application notes as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG §2B1.1, comment. (n.3(A)(i)). Mr. Madrigal's intent on the night in question was to make the version of the slides temporarily unavailable on the *Blackboard* online learning platform. As the individual responsible for emailing the slides to supervisors for review, to include subject matter experts in various departments, Mr. Madrigal knew exact copies were stored and available on the shared drive. He also knew exact copies were saved on his work computer and in hard copy in a binder. Mr. Madrigal knew his actions were criminal, but fomented by a childish venting moment, with no irreparable harm intended whatsoever.

Mr. Madrigal respectfully proposes the just and fair approach is to decline to use the troublesome, shifting sands, late-breaking, and unreliable stratospheric valuations that the Government asserts. Rather, a reasonable estimate of the loss is the original stated actual loss of $1,131, repeatedly disclosed to the defense, which is "in excess of $1,000" per the plea agreement, a conclusion which promotes confidence in sentencing fairness and reminds the Government of their sacrosanct duties to conduct plea negotiations in good faith as part of fair dealing and to timely disclose reliable information at a time the defense could use it. If anything, the intended

loss is less than the actual loss here of $ 1,131, especially given that exact copies of the version of the slide deck were available on the shared drive and with various other personnel in their emails.

Accordingly, the Court should disregard the Government's last-minute attempt to exponentially increase that actual amount of loss to a purported intended loss amounting to an astronomical $1.2 million, unfairly, and by what can only be described in charitable terms as an eleventh-hour maneuver.  Indeed, several circuits have found that losses that were impossible or unlikely to occur should be included in intended loss, but that a court may depart downward if the disparity between the resulting intended loss amount and the actual loss indicated the offense level "substantially overstates the seriousness of the offense." *United States v. McBride,* 362 F.3d 360, 374 (6th Cir. 2004).

The result Madrigal proposes – *i.e.*, accepting the (approximate) $1,000 valuation of loss discussed during plea negotiations, is not unprecedented. For example, in *United States v. Edgell*, 914 F.3d 281, 285 (4th Cir. 2019), the parties agreed to limit Edgell's drug conduct to "less than five grams of substances containing a detectable amount of methamphetamine," which corresponded to a sentencing range of between 10 to 16 months. After the parties signed the plea agreement, lab results furnished to the Government revealed actual methamphetamine, which increased the sentencing range to between 30 to 37 months. *Id*. At sentencing, the court acknowledged that the PSR's findings and calculations were "certainly different from … the parties' expectations from the plea agreement. *Id*. at 286. The Court adopted the new sentencing range and sentenced Edgell to 30 months' imprisonment. The Court here should take a similar approach – *i.e.*, it should rely on the representations made during plea negotiations that the estimated loss was much closer to $1,000 as opposed to $1 million. Such an astronomical shift (a 1,000-times increase) should not be countenanced. *See, e.g., Santobello v. New York* , 404 U.S.

257, 262 (1971) (noting that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."). The plea agreement rested primarily on the Government's promise to value Count I as "in excess of $1,000," after having disclosed repeatedly $1,131 and never mentioning an amount beyond that whatsoever. This anticipatory repudiation affects Mr. Madrigal's substantial right to knowingly, voluntarily, and intelligently waive his trial rights and be sentenced on reliable information the result of good faith plea negotiations. An objective member of the public may very well call into question the fairness, integrity, or public reputation of this prosecution and the Justice Department's sly treatment of Mr. Madrigal.

This is a case warranting a downward departure on the basis the actual loss that was incurred amounted to only $1,131, which is far less than the obviously inflated cost asserted by the Government in the amount of $1.2 million, which very clearly overstates the seriousness of the offense (USSG 2B1.1, comment. (n. 21(C)).

**B.      Mr. Madrigal did not Abuse a Public or Private Trust.**

Guideline §3B1.3.2 defines "public or private trust" as a position that receives less supervisory oversight and permits some discretionary decision-making. A bank officer holds such a position, but a teller does not. *See* Application Note 1, Commentary, Guidelines §3B1.3. Bankruptcy or estate trustees hold positions of trust. Application Note 2 to §3B1.3, Commentary, provides that the enhancement applies to a United States postal employee who engages in theft or destruction of mail. "Special skill[s]" refers to skills not possessed by members of the general public and usually requiring substantial training, education, or licensing. Application Note 4, Commentary, Guidelines §3B1.3. Doctors, lawyers, chemists, accountants, and demolition experts all have special skills. *Id.*

14

For the increase to apply, the position of trust or the special skill must contribute significantly to the commission or concealment of the offense. Although a fiduciary relationship is not required, abuse of trust does require more than committing an act the victim trusted the defendant not to commit. Note 4 advises that "special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing

The PSR included a +2 pursuant to USSG 3B1.3 noting that Mr. Madrigal abused a position of special trust. PSR ¶ 56. Indeed, Application Note 4 indicates "lawyer" as a potential position of special trust. However, the Government admits on page 2 of its Objections to the draft Pre-Sentence Report that Mr. Madrigal, at the time of the offense, was serving in a "staff" position, and not as an attorney. (Doc. 187) ("In approximately February 2022, Madrigal was assigned to a staff position at the Judge Advocate General's (JAG) Legal Center and School in the Training Developments Directorate.").

In a staff position, as opposed to an attorney position, the Army assigned Mr. Madrigal not to legal duties, but instead as an "excess administrative officer," likely because the Army put him on "light duty" pending the outcome of the administrative separation proceedings, a common practice in the Army. Mr. Madrigal was not, nor has he ever been, an Instructor, as the Government tacitly posits.

Further weighing against adoption of this enhancement, the conduct to be addressed by the guideline is attorney misconduct in the context of an attorney-client relationship or other fiduciary relationship in which the special trust is the foundation of the relationship abused. Here, Mr. Madrigal had no attorney-client relationship with any victim. Mr. Madrigal had no fiduciary duty to any victim. Nor did Mr. Madrigal abuse a sensitive, privileged, or classified matter entrusted to him for his own personal gain.

Nor did the fact that Mr. Madrigal is an attorney contribute in any way to the deletion of the slide deck. Legal training or skill was not needed. Indeed, the Government admits that junior non-commissioned officers ("NCOs"), not attorneys, and civilian lay persons, not attorneys, also worked on the slide deck. All the skills needed were the ability to use *PowerPoint* on the *Blackboard* online learning platform – **skills that literally millions of people possess**.

Had Mr. Madrigal used his position as an attorney to commit national security crimes, then the "+2" is more reliably applied on the basis USSG 3B1.3 intends to address. Mr. Madrigal respectfully requests the Court decline to adopt this enhancement.

### C.    Mr. Madrigal did not Attempt to Obstruct Justice.

The Probation Officer assessed a +2 for Mr. Madrigal's having willfully engaged in obstructive behavior. PSR ¶ 57. The Government tendered a recording to the defense of an August 2022 phone call shortly after the arrest between Mr. Madrigal and his Father. The Government contends that Mr. Madrigal solicited his Father to reach out to Victim 2 and persuade her to stop providing information to law enforcement authorities. This is simply not the case.

What is the case: Mr. Madrigal asked his Father to "call Jim," referring to Mr. Madrigal's then Arkansas legal counsel, James Shaw. Mr. Madrigal's Father then stated in the phone call, "ok, I'll call Jim….I have my marching orders." (Doc. 187, Digital Ex. F). Asking a parent to contact one's attorney after an arrest is not obstructive conduct, rather, it is legitimate and lawful conduct. Mr. Madrigal knew the call was recorded, vented concerns about Victim 2's misapprehension of the severity of the circumstances surrounding the arrest and asked his Father to call Mr. Madrigal's Arkansas lawyer, Jim Shaw.

To the extent the Government seeks to rely on any other "relevant conduct" for this +2, *e.g.*, unproven activities with Victim 2, such purported conduct is not related to any victim in the

16

case, nor part of any course of conduct, scheme, or plan. The Court should decline to adopt the +2 for alleged obstructive behavior.

## II.      **Multiple Grounds for Downard Departures Per USSG 5K2.0(a)(2).**

There are circumstances that form the basis for a Downward Departure because there exist mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. USSG 5K2.0(a)(2).

Mr. Madrigal's mental conditions, individually and in combination with some of his other characteristics including, but not limited to, his substance abuse history, favorable aspects of his extended military service and current extraordinary and voluntary rehabilitation efforts, are present to an unusual degree and clearly distinguish him from the typical cases covered by the Guidelines and make his case an exceptional one that warrants a reduced sentence by way of Downward Departure.

The authority for such a downward departure is detailed under the following provisions, including but not limited to, Departures Based on Multiple Circumstances (USSG 5K2.0(c)), Mental and Emotional Conditions (USSG 5H1.3), Drug Dependence (USSG 5H1.4), and Military Service (USSG 5H1.11).

Mr. Madrigal's unique circumstances represent just such an extraordinary and exceptional case, and a downward departure is warranted on these multiple bases. Mr. Madrigal's history of mental and emotional conditions and the extraordinary lengths he has voluntarily gone to in seeking to address these mental health conditions represents just one relevant offender characteristic and circumstance.

Mr. Madrigal's history of substance abuse, in which he engaged as an effort to cope with symptoms related to his mental conditions sustained largely from combat service, for which treatment is necessary, is yet another factor that must be taken into consideration.

Mr. Madrigal is a decorated veteran with many years of service and his current offense conduct cannot completely negate those 13 years of service and his many sacrifices on behalf of all citizens of the United States and elsewhere around the world in need of military assistance.

Even if these offender characteristics or other circumstances alone may not be independently sufficient or ordinarily relevant to provide the basis for a departure, in combination, these factors and circumstances most certainly make this case an exceptional one and one that warrants a downward departure pursuant to USSG 5K2.0(c), USSG 5H1.3, and USSG 5H1.4.

As was noted in Madrigal's Objections (10), (11) and (13), the following were included and are relevant to the basis for a downward departure and bears repeating and emphasizing here:

### A.    Mental and Emotional Conditions

Mr. Madrigal is most receptive to mental health treatment, which is key to his successful participation in treatment and a successful treatment outcome. Mr. Madrigal has voluntarily and commendably sought mental health assistance while in custody due to issues associated with PTSD, TBI, anxiety, depression, and AUD. Mr. Madrigal understands now that he previously self-medicated and treated some of these symptoms related to his mental illnesses by consuming alcohol, and he has maintained his sobriety since August 9, 2022. Mr. Madrigal plans to continue taking the medications prescribed by mental health professionals as well as participate in any mental health treatment that is recommended to him, upon his release from custody and transition to Sun Cloud.

Jail records verify Mr. Madrigal's willingness to adhere to the limited mental health treatment that has been made available to him. Mr. Madrigal understands and has gained insight regarding his mental health conditions and the methods by which he can alleviate those symptoms in the community, upon his release from custody. Mr. Madrigal looks forward to receiving assistance, direction, and counseling from mental health professionals. Mr. Madrigal's positive and favorable attitude toward mental health treatment bodes well for his future successes and the benefits that will flow from this absolutely necessary correctional treatment.

On November 19, 2024, Mr. Madrigal was interviewed for acceptance into the Sun Cloud Health Program, an excellent and reputable program that serves individuals with mental health and substance use disorders and is staffed with Medical Doctors, including Psychiatrists, Psychologists, and other mental health professionals. The assessment and letter of admission state

> Psychological History. . . Military: suffered two IED explosions in 2010 and 2013. 'Those are a main focus in my night terrors. Flashbacks, mind racing. I end up remembering things I thought I forgot about and start to re-live it. A close friend of mine had multiple gunshot wounds. We patched him up, got him on helicopter, he died of his wounds. . . [Madrigal] was in a different combat airborne operation. Parachute didn't deploy, used backup. He injured his shoulder, broken ribs. I was part of a Blackhawk mission. . . that was shot down and the smell of burning flesh is horrific. . .
>
> Sun Cloud is recommending an immediate transition of care directly to residential treatment. Since his incarceration, [Madrigal] reports attending AA meetings and working the steps, however; [Madrigal] reports that he has not received mental health, trauma, or substance use therapy and thus, lacks the coping skills to manage triggers and PTSD. . . upon release from prison. Pt presents with complex, co-occurring disorders including PTSD, anxiety, alcohol use disorder, and eating disorder. Pt presents extremely motivated for change, internally and externally. . . Pt is an excellent candidate for services at Sun Cloud as it is imperative that all of pt's diagnoses be addressed and treated concurrently to mitigate risk of relapse, which Sun Cloud is uniquely qualified to do. Pt is still using eating disorder and process addictions (restrict/binge cycle of disordered eating and

exercise addiction) while incarcerated. Pts presenting with untreated PTSD and co-occurring disorders, such as eating disorders, are at a much higher risk for relapse on alcohol or other substances, which is why it's imperative for pt to be admitted as a direct transfer to Sun Cloud from prison.

Sun Cloud Assessment and Letter of Admission, Madrigal's Objections, Ex. D.

Mr. Madrigal will begin his participation in the residential treatment program for a minimum of two months immediately upon his release from custody, to be followed by a minimum of four months of out-patient treatment. Mr. Madrigal looks forward to following the Court's directive regarding any additional treatment that is offered to and is required of him. In the very unlikely event Sun Cloud somehow does not work out, Mr. Madrigal has been accepted, as a fallback, into the VA's residential substance abuse treatment program.

Dr. Richard Benson, Ph.D., P.A., a Licensed Clinical Psychologist, examined Mr. Madrigal five times in November 2024, and conducted various scientifically recognized psychological examinations. Mr. Madrigal has been diagnosed with Major Depression, Moderate, Recurrent, Post-traumatic Stress Disorder, Anxiety Disorder, and Substance Use Disorder. Dr. Benson observes:

> He has a strong genetic history of alcoholism and grew up in a dysfunctional family with addiction. . . Consequently, he has multiple unresolved emotional issues. . . for which he has no coping skills. Deployment experiences exacerbated these underlying issues through the development of post-traumatic stress. This was further complicated by emotional issues associated with a head injury. His pattern of alcohol abuse is viewed as a way to self-medicate multiple traumas as well as cope with anxiety and depression. . . he appears to be genuinely motivated to address his substance abuse and mental health issues. This is viewed as a positive factor. . .

Madrigal's Objections, Ex. E.

In certain cases, like here, a downward departure may be appropriate to accomplish a specific treatment purpose, especially where Mr. Madrigal has already served 28 months of pretrial

20

detention. *See* §5C1.1. Mr. Madrigal is an abuser of alcohol and suffers from significant untreated mental illness, and, Mr. Madrigal's criminality is related to the treatment problem to be addressed. Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; *e.g.*, participation in a mental health program (*see* §5B1.3(d)(5) and §5D1.3(d)(5)). Such is the case here.

### B.    Alcohol Dependence

Over the past 28 months of pretrial detention, Mr. Madrigal has come to clearly understand his past use of alcohol was problematic and he has requested the opportunity to continue to participate in any and all substance abuse education and treatment that is offered to him, during his incarceration and upon his release from custody.

Mr. Madrigal wants to do everything he possibly can to learn how to manage his problems and not exacerbate them by consuming alcohol. Mr. Madrigal also readily acknowledges he could benefit from anger management training. He wants to demonstrate he is no longer the "raging alcoholic" he once was. Mr. Madrigal wants nothing more than to be given the opportunity to show he can maintain the transformations he has already begun and gain more tools necessary to affect certain and permanent changes in this regard. Mr. Madrigal understands in no uncertain terms that any use of alcohol is strictly prohibited and in the past, his abuse of alcohol essentially ruined many areas and relationships he cared about in his life.

Mr. Madrigal seeks supervised release with a requirement that he participate in an appropriate substance abuse program (*see* §5D1.3(d)(4)). Mr. Madrigal's prior abuses of alcohol appear to have been an attempt and effort to self-medicate his serious mental health issues, for which he is now and, in the future, will instead be appropriately treated by mental health professionals. Mr. Madrigal advised he is fully committed to maintaining his sobriety.

### C.    Military Service

Mr. Madrigal offers highlights, not an exhaustive list, of his having received the following decorations, awards, and commendations during his lengthy military career: Presidential Unit Citation; Army Good Conduct Medal with Three Oak Leaf Clusters; Reserve Good Conduct Medal; Army Service Ribbon; Overseas Service Ribbon; Parachutist Badge; Jumpmaster; Expert Marksmanship Badge; Blue Infantryman Cord; Canadian Airborne Wings; German *Schutzenschnur* Badge (marksmanship) – Silver; Military Education includes GRADUATE: Reconnaissance and Surveillance Course; US Army Sniper School; Fort Leonard Wood Chemical, Biological, Radiological, and Nuclear ("CBRN") Course; Certified Javelin Gunner Certified; Combat Life Saver Ranger, First Responder Ranger; Breacher; Modern Army Combative Level Three Army; Direct Commission Course, Judge Advocate General.

During his 13 years of military service, Mr. Madrigal held multiple positions at once. He received an honorable discharge in May 2016 for service from 2009-2016 in the 82nd Airborne Division and 75th Ranger Regiment. Having earned a college degree while on active duty, through three combat deployments to Afghanistan during that period, Mr. Madrigal engaged foreign enemies as a Special Operations Infantryman.

In combat, Mr. Madrigal's very first mission resulted in catastrophic loss of fallen comrades while he personally attempted to rescue British aid worker Linda Norgrove.[3] He subsequently survived two IED detonations on the ground, while dismounted (*i.e.,* out of the vehicle transporting him), which caused a loss of consciousness and TBI. He also survived a crash/hard landing when he was travelling in a V-22 "Osprey" aircraft. And further, two of Mr. Madrigal's 70 airborne parachute jumps resulted in major malfunctions and required Mr. Madrigal

---

[3] https://www.theguardian.com/world/linda-norgrove

to deploy his reserve (or "back-up") parachute, causing rough landings and resulting in loss of consciousness and TBIs (lost helmet during one of the malfunction jumps).

In another close call with death and disfigurement, Mr. Madrigal was working with other Rangers to clear a subterranean "hide" (hole in the ground covered by carpet). While detaining a military aged male pulled from the "hide," a Ranger Medic came by and asked if he could help. Mr. Madrigal replied in the affirmative, so the Medic entered the next uncleared room, stepped on a pressure plate, and detonated a buried IED.

Mercifully, the IED was buried very deeply, such that the Medic was not killed, rather, suffered shrapnel wounds and broken bones. Had Mr. Madrigal not been working in the other room clearing the "hide," Mr. Madrigal would have been the first Ranger into the room and would have surely stepped on the pressure plate himself. Instead, the Medic took the blast that was meant for Mr. Madrigal.

Mr. Madrigal also engaged foreign enemies in Afghanistan as part of *Operation Hammer Down.* This intense combat operation was a seven-day U.S.-led assault offensive in June 2011 designed to eliminate foreign fighters and training camps in the Watapur Valley of Kunar Province in Afghanistan in preparation of an eventual push into the Western Pech area. The operation's primary objective was to destroy suspected training camps at the northern end of the Watapur in order to interdict the flow of insurgents through the valley and forbid the Taliban from increasing their manpower in the western Pech.[4] As reported on open-source media:

> Along with Afghan National Army soldiers, US forces were dropped off on a high ridgeline by helicopter just before midnight on June 24, 2011. With all their gear, the soldiers could not scale down the mountain at first. This was until they found a natural land bridge, only to be intercepted by Taliban forces. The firefight lasted four days, and the US forces became "combat ineffective" with only 15 soldiers. Eventually, it got to the point where evacuation was

---

[4] https://en.wikipedia.org/wiki/Operation_Hammer_Down

necessary. After destroying the sandbags and walls they were using for cover, the US troops were told to go to an evacuation point where friendly forces would evacuate them. However, once they got to the evacuation point, the helicopters designated to pick them up couldn't reach them due to harsh weather conditions, so they had to attempt to fix the sandbags and wait. Ultimately, they were evacuated and left the area.

In the end, Enemy operations in the Pech and Watapur valleys were disrupted, the Taliban fighter training camps were reduced, and the Enemy lines of communication were severely disrupted. So, this operation was partially successful, and the US forces significantly impacted the rest of the offensive in the Pech and Watapur Valleys. In the end, another squad was sent in, and they quickly took the camps due to the disruption caused by *Operation Hammer Down*.

Mr. Madrigal's specific roles during this operation were to provide cover and support for exfiltrating friendly forces while directly engaging the enemy with small arms fires, for 48 hours, with no sleep. During the fighting, re-supplies were needed, (referred to as a "Speedball" containing food, water, ammunitions, and batteries), and airdropped onto Mr. Madrigal's position. However, one Speedball fell outside the security of the American perimeter, and Mr. Madrigal took part in retrieving the much-needed supplies and equipment.

In a singular act of selfless bravery in the face of a violent and deadly enemy, Mr. Madrigal was assigned as a squad automatic weapons ("SAW") gunner. His team leader, Sergeant ("SGT") Joe Bruno and Mr. Madrigal were clearing a courtyard in Afghanistan when SGT Bruno tripped and fell to the ground. Mr. Madrigal jumped in front of SGT Bruno, covering him, then returned fire resulting in two enemies killed in action ("EKIA").

From 2016 – 2020 while in the Kansas Army National Guard and attending law school full time, Mr. Madrigal participated in an unpaid judicial internship for US Magistrate Judge Steven C. Mannion in Newark in the summer of 2017. From September 2017 – August 2019, while attending law school and completing a Master's in Homeland Security, Mr. Madrigal interned as

a legal clerk for US Senator Pat Roberts. Mr. Madrigal was also active in his school's Veterans Law Society. In August 2020, the Kansas Army National Guard honorably separated Mr. Madrigal.

From August 2020 – February 2022, Mr. Madrigal served honorably on active duty and was discharged honorably. His plans were to transition after a mandatory one-year waiting period to the National Guard or the Reserve, even considering returning to his previous enlisted rank as an NCO. More than a passing fancy but a lifelong commitment and desire, Mr. Madrigal had extensive conversations with the Charlottesville, Virginia Reserve recruiting Battalion Commander, his family, other Army friends, and personnel at the US Army JAG School.

Consistent with Mr. Madrigal's service ethic and dedication to his country, he secured a position with the VA to review veterans claims and made recommendations. Mr. Madrigal himself is a 100% disabled veteran. Guideline 5H1.11 states: "Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." Such is the case here. It is hard to imagine an individual with a military and combat service record that is more distinguished than Mr. Madrigal's. He is worthy and deserving of credit based upon his extraordinary combat service.

**III.     Factors that Warrant a Downward Variance.**

These factors form the basis for a Downward Variance, some alone and others in combination, which include but are not limited to, the following:

**A.     Nature and Circumstances of the Offense - 18 U.S.C. 3553(a)(1).**

Mr. Madrigal's unique circumstances represent an extraordinary and exceptional case, and a downward variance is warranted on multiple bases. Important aspects of Mr. Madrigal's behavior

as related to his offense conduct are being addressed through his voluntary participation in psychological and substance abuse treatment, but which has been strictly limited by the policies of the jail in which he is currently housed, not due to any resistance on his part. Mr. Madrigal is most receptive to mental health and substance abuse treatment in the future.

Mr. Madrigal has been accepted into and is receptive to two intensive residential treatment programs to address his co-occurring mental health and substance use disorders, which he will begin immediately upon his release from custody, thereby demonstrating his unwavering and extraordinary commitment toward rehabilitation.

## B.      History and Characteristics of the Defendant – 18 U.S.C. 3553(a)(1).

As a younger person, Mr. Madrigal literally saved the life of his drowning younger brother. Floating in icy waters, Mr. Madrigal did not hesitate to jump into the frozen muck and pull his all but lifeless brother out of the water and back to life. Bravery and selflessness were already established as a bulwark of Mr. Madrigal's service ethic. A talented decades-long hockey player and enthusiast who competed throughout childhood, high school, college, and for an Army team, Mr. Madrigal hopes to coach hockey, start a hockey clinic, and offer tutorial lessons. Teamwork, physical courage, and operating in dangerous conditions were  instilled in Mr. Madrigal as a younger person growing into adulthood.

With these character traits imbued in addition to devotion to the country and protecting and defending others, understandably, Mr. Madrigal sought a career in the military. Today, Mr. Madrigal is a decorated veteran with nearly 13 years of service to include close combat tours, and his current offense conduct cannot completely negate those many years of service. Mr. Madrigal has made numerous sacrifices on behalf of all citizens of the United States and elsewhere around the world in need of military assistance and protection, in the most dangerous places on the globe

against enemies who loathe the American way of life and America's prosperity. The Taliban, for example, were the sworn enemies of the United States and Mr. Madrigal fought them repeatedly in their ancestral home.

These laudable efforts came at a personal cost. Mr. Madrigal has a history of mental and emotional conditions, which are tied to his substance abuse. He has vigorously and voluntarily sought mental health and substance abuse treatment during the more than past two years he has been in custody. Mr. Madrigal's history of substance abuse is related to his efforts to cope with symptoms he experienced in connection with his untreated mental diagnoses, for which correctional treatment is necessary.

Mr. Madrigal for many years attempted to alleviate some of the conditions and symptoms of his mental illness by self-medicating through the use of alcohol. "Alcohol use disorder" is a medical condition characterized by an impaired ability to stop or control alcohol use despite adverse social, occupational, or health consequences.

Alcohol use disorder encompasses the conditions that some people refer to as alcohol abuse, alcohol dependence, alcohol addiction, and the colloquial term, alcoholism. Considered a brain disorder, AUD can be mild, moderate, or severe. Lasting changes in the brain caused by alcohol misuse perpetuate AUD and make individuals vulnerable to relapse. The good news is that no matter how severe the problem may seem, evidence-based treatment with behavioral therapies, mutual-support groups, and/or medications can help people with AUD achieve and maintain recovery. *National Institute on Alcohol Abuse and Alcoholism.*

The relapses Mr. Madrigal has experienced in the past are just that, in the past. He has a promising future ahead of him, with the benefit of correctional substance abuse and mental health treatment.

27

This is simply a story of a deeply distraught, raging, and functional alcoholic whose actions arose from alcoholic despair which were exacerbated by untreated mental illness. Mr. Madrigal, a second generation American whose grandparents emigrated from Mexico in the 1950s is the exact opposite portrait of white privilege as suggested by the Government. Mr. Madrigal actually has been subject to death threats by White Supremacists during his 28 months of detention. This has been well documented with the jailing authorities. Growing up biracial on the southside of Chicago in the 1980s and 90s was also no easy task for this Mexican American. Unfortunately, Mr. Madrigal has been subjected to racist comments and acts his entire life from both of his genetic ethnicities (Mexican and Irish). This is not the story of a white privileged male as the Government suggested in open court in March 2023.

Mr. Madrigal was devastated in early February 2022 when he was notified his lifelong service to the country was coming to an abrupt and premature end due to a DUI that his commanding officer was aware of, the Kansas National Guard (his then chain of command), was aware of, the Defense Counterintelligence and Security Agency was aware of, and after the charge had been dismissed and after he successfully completed the required diversion program.

In Jan 2019, Mr. Madrigal was newly accepted to accession to the Army JAG Corps, a lifelong dream. He had applied over four months prior when he received a DUI in Lawrence, Kansas. Mr. Madrigal's then commanding officer, First Lieutenant ("1LT") Blake Stokes picked Madrigal up from the police station following his arrest and took him to the tow yard to retrieve his vehicle. Mr. Madrigal and 1LT Stokes continued to attend regular drill weekends together, literally carpooling every month for the following 20 months after the DUI arrest. Mr. Madrigal's release papers from the arrest reflect his commanding officer's signature, 1LT Blake Stokes, thus Mr. Madrigal thought he had reported his arrest to the Army.

In June 2020, two months prior to Mr. Madrigal's beginning the Army's Direct Commissioning Course, he began to out process from the Kansas National Guard. As part of this process the security officer, Major ("MAJ") Pope, conducted a routine criminal background check on Mr. Madrigal and came across the January 2019 DUI. Major Pope sent Mr. Madrigal a template "packet" and instructed him to complete it and send it to DCSI. Mr. Madrigal complied with the DCSI disclosure request and sent the arrest record, a statement, and all relevant court papers, to include the May 2020 Kansas state court order of dismissal. To reiterate, Mr. Madrigal considered this arrest fully disclosed to all the necessary points of authority. His commander was immediately aware and continued to be aware, the DCSI was notified, and Mr. Madrigal was out processed from the KSNG with an honorable separation in August 2020.

Mr. Madrigal was shocked to learn in December 2021, two days prior to reporting to Fort Carson, Colorado, that an officer from the KSNG contacted JAG and reported Mr. Madrigal did not inform the Army JAG Corps, as opposed to his commanding officer in the Kansas National Guard, of the January 2019 DUI. At this point Mr. Madrigal allowed his alcoholism, which was already well documented, to run rampant and resulted in the criminal conduct and statement of facts to which he has pleaded guilty.

It is worth noting that the same former commander, now Captain ("CPT") Stokes, in the fall of 2021 was a student of the same Judge Advocate Officer Basic Course Mr. Madrigal completed the previous year. Captain Stokes and Mr. Madrigal spent numerous weekends and evenings together during the 12-week course in Charlottesville. The defense has seen dozens of photos spanning months of Mr. Madrigal and CPT Stokes hiking and fishing with Mr. Madrigal's dog and watching sporting events together. Neither of these prior enlisted Infantryman, Officers, and Judge Advocates thought anything nefarious took place regarding his reporting of the DUI.

Captain Stokes is still a Judge Advocate in the national guard and an immigration attorney for the DOJ in Jena, Louisiana.

### C.    Category I Criminal History.

Mr. Madrigal has not a single criminal history point. The United States Sentencing Commission has undertaken empirical studies that indicate individuals with no criminal history points are at low risk for recidivism.

### IV.    Sentencing Factors Beyond Guidelines.

The sentence Mr. Madrigal proposes satisfies each of the four "purpose" elements within 18 U.S.C. §3553(a)(2), namely, (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed medical care or other correctional treatment in the most effective manner.

The court must apply the relevant § 3553(a) factors to the specific circumstances of the case before it. Such individualized treatment is necessary "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009).

In sentencing Mr. Madrigal, this Court should consider the factors set forth in 18 U.S.C. §3553(a). Section (a)(2)(A) requires judges to consider "the need for the sentence imposed … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

A court should not determine the appropriate sentence simply by the mechanical application of a given sentence to a given category of crime. Rather, a sentencing court has the duty to ensure the sentence imposed is tailored to the individual before the court. The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender. *Williams v. New York*, 337 U.S. 241, 247 (1949); *see also United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (district court "must make an *individualized* assessment based on the facts presented.").

A sentence that focuses only on the offense and not the individual characteristics of the defendant or the other §3553(a) factors is unreasonable. *United States v. Olhovsky*, 562 F.3d 530, 549 (3d Cir. 2009). Indeed, in the watershed decision of *United States v. Booker*, 543 U.S. 220 (2005), the question of whether prison is necessary for a particular individual returns to a place of priority in the sentencing decision. A court must impose the minimum term necessary to comply with the goals of sentencing, which are just punishment, deterrence, protection of the public, and rehabilitation of the defendant. The court must do so while taking into consideration all of the factors set forth in 18 U.S.C. §3553(a). *See* 18 U.S.C. §3553 (a)(2).

The Sentencing Guidelines are merely "the starting point and the initial benchmark" for the Court's sentencing determination. *Gall v. United States*, 522 U.S. 38, 49 (2007). The Court may not presume that the Guidelines range is reasonable. *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007) (citing *Gall*, 552 U.S. at 50). Further, *Booker* permits the Court to tailor the sentence in light of other statutory concerns. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citing *Gall*, 552 U.S. at 46, and quoting *Booker*, 543 U.S. at 245-46).

### A.    Needs for the Sentence Imposed - 3553(a)(2).

This provision addresses the various factors which the Court must balance and determine the weight to be given to each. In this case, the necessity to provide Mr. Madrigal with needed correctional treatment in the most effective manner is the primary consideration, and which is best met in the community in a residential treatment and out-patient treatment program. 18 U.S.C. 3553(a)(2)(D). If this primary goal of sentencing is implemented, the remaining needs of sentencing are assured, which reflect the seriousness of the offense, respect for the law, just punishment for the offense, adequate deterrence to criminal conduct, and protection of the public from further crimes of the defendant.

### B.    The Nature and Circumstances of the Offense and the Defendant's History and Characteristics - 3553(a)(1).

Bearing repetition, at no time did Mr. Madrigal compromise his loyalty to the United States as the Government originally suspected. The deletion of the *PowerPoint* slide deck version is offensive and sanctionable, undoubtedly. The false statements to the Government are equally repugnant. At the same time, each of these incidents was fueled, in part, by untreated psychological disorders masked by false bravado and serious alcohol abuse. The property loss caused Mr. Madrigal caused was minimal. There is no evidence of any physical harm to any victim, the offenses are nonviolent, and Mr. Madrigal fully realizes that alcohol and psychological treatment are critical to rejoining society as a law-abiding, fully productive member.

With a criminal history category of I, Mr. Madrigal's history and characteristics present further mitigating factors for the Court to weigh favoring immediate supervised release. First, Mr. Madrigal has virtually no criminal history resulting in a guideline finding of I in the PSR. Second, Mr. Madrigal has accepted responsibility for his conduct and fully realizes the scope and impact of his bad decisions. Third, Mr. Madrigal has been in pretrial detention since August 9, 2022 and

he has been fully compliant. While in pretrial detention, Mr. Madrigal started and led Bible Study, developed an English class, and taught English to Spanish speakers, and likely would have been a trustee had he not been a Federal pretrial detainee.

He maintained a high degree of physical fitness, encouraged others to exercise and to study, lent shaving gear, food, commissary, and books to newcomers, helped newcomers transition, and engaged in a rigorous self-developed reading program involving such topics as learning Spanish, studying the Bible, anger management, peer support, coaching, promoting self-awareness and self-improvement, and keeping abreast of current events.

Mr. Madrigal has done what the law, corrections authorities, and the American public expect of a contrite, humbled, productive member of society. Mr. Madrigal's history and character reflects a person who has, for the majority of his life, tried to do everything right. He has struggled at times, but he has never backed away from his responsibilities.

C.     **18 U.S.C. §3553(a)(2):  The Need for the Sentence to Reflect the Seriousness of the Offense, Punish the Defendant, Deter Criminal Conduct, and Protect the Public.**

A sentence of time served plus supervised release will address the need for the sentence to reflect the seriousness of the offense. Anyone who learns of Mr. Madrigal's crimes and thus far 28 months he has spent in confinement, four convictions, deprivation of income, reputational stigmata, and the substantial consequences the justice system has applied leave scant doubt that Mr. Madrigal's offenses were serious.

Regarding the need to punish the defendant, deter criminal conduct and protect the public, this Court should consider the massive impact of this case on Mr. Madrigal's life. Prior to his arrest on August 9, 2024, Mr. Madrigal was gainfully employed by the Department of Commerce and then by the VA, earning a self-supporting professional living while caring for other veterans, with

selflessness being a lifelong character trait. To say that spending over 28 months in jail has had an impact on him would be a massive understatement.

Mr. Madrigal raises these points not to exact undue sympathy, but to illustrate that Mr. Madrigal has been sufficiently punished for his conduct. He has punished himself more than anyone else ever could. He has been deterred from any further criminal conduct, and he is not a threat to society. That is who Mr. Madrigal is, and that is why this Court can be assured that he will not be before it again as a named defendant.

### D.    18 U.S.C. 3553(a)(4)&(6): The Sentencing Range and the Need to Avoid Unwarranted Sentencing Disparities.

A sentence of time served plus a period of supervised release would avoid unwarranted sentencing disparities because of the factual circumstances previously addressed, which are dramatically different from other defendants who have received higher sentences and who have more extensive criminal histories. Imposing a sentence beyond the PSR's recommendation, on the facts of this case, is unusually harsh in light of the substantial and numerous mitigating factors and Mr. Madrigal's post-arrest abiding conduct, over punishes, and is not in the interest of justice.

### V.    Relevant Conduct Should be Limited.

The Government relies on overly broad, untimely, unfair, and irrelevant non-criminal conduct as the foundation for a higher sentence. The Government is simply grasping too far.

"[R]elevant conduct under the Guidelines must be criminal conduct." *United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001). The Government bears the burden of proving relevant conduct by a preponderance of the evidence. *United States v. Claybrooks*, 90 F.4th 248, 254 (4th Cir. 2024). Subsection (a)(1)(A) holds a defendant accountable for acts and omissions done or caused by the defendant in connection with the offense of conviction, that is, "all acts and

omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."

Subsection (a)(3) holds a defendant accountable for all harm that resulted from the acts and omissions described above; that is, harm that either "resulted from" or was "the object of" relevant conduct described in subsections (a)(1) and (a)(2). "Harm" is defined to include "bodily injury, monetary loss, property damage and any resulting harm." USSG §1B1.3, comment. (n.6(A)). "[H]arm that is merely risked is not to be treated as the equivalent of harm that occurred." *Id.*, comment. (n.6(B)). *United States v. Ramos-Delgado*, 763 F.3d 398, 401 (5th Cir. 2014) ("[W]e conclude that—unless otherwise specified—the defendant's relevant conduct must be a but-for cause of a harm for that harm to be considered in assigning the guideline range."); *United States v. Lonich*, 23 F.4th 881, 916 (9th Cir. 2022) (stating " '[t]he term 'resulted from' establishes a causation requirement,' which includes both cause-in-fact (but-for causation) and proximate cause"); *United States v. Peppel*, 707 F.3d 627, 644 (6th Cir. 2013) ("[c]ausation includes two distinct principles, cause in fact, or what is commonly known as 'but for' causation, and legal causation"). Courts have held that the phrase "resulted from" establishes a "but-for" causation standard and a "proximate or legal cause" requirements.

Some if not most of the Government's allegations have nothing to do with the crimes of conviction, rather, are based on unreliable information predating the offenses, alleged conduct that is beyond the range of conduct relevant to the crimes of conviction, and legally permissible acts. Certain aspects of the Government's case are also premised largely on allegations that are not criminal, nor part of an ongoing course of conduct, scheme, or plan under the Relevant Conduct Rules. USSG 1B1.3.

The focus is on Mr. Madrigal's "real conduct" and the consequences from the conduct acknowledged in the guilty plea. The Court should additionally carefully consider that the source of some of the information is stale, hearsay evidence, or from former romantic lovers, neither of whom is a victim of any crime of conviction.

**VI.    <u>Additional Grounds for Sentencing Credit.</u>**

While in custody between August 9, 2022 and September 1, 2022, confining authorities required Mr. Madrigal to sleep on the floor, that is, without a bed.

Requiring several prescription medications to control high blood pressure, reduce high cholesterol, manage depression and sleeplessness, jailing authorities provided no medications between August 9, 2022 and Labor Day 2022, shy of one month. Mr. Madrigal did not titrate "off" these medications but was compelled to stop "cold turkey" and risk a stroke or hemorrhage or heart attack for sudden, uncontrolled high blood pressure.

Upon arrival at the ACRJ, authorities took over one month to provide Mr. Madrigal with the complete supply of his various prescription medications. Upon transition to the WVRJ, authorities did not provide Mr. Madrigal with psychological prescriptions for the first 10 days citing no authority to allow psychological medications into the facility and none were on hand.

Mr. Madrigal lived under COVID-19 protocols between August 9, 2022 through July 2023. In February 2023, despite the strict isolation (social distancing) and lock-down COVID protocols, Mr. Madrigal contracted the virus and was further isolated by himself. The standard isolation was 14 days; however, jailing authorities did not observe the 14-day protocol, and Mr. Madrigal spent another six days in strict isolation, having had to repeatedly request to be moved out of isolation.

Between May 2024 and the present, Mr. Madrigal has endured toothache pain daily, for nearly eight months. Three months after reporting the pain, authorities took Mr. Madrigal to Lake

Plaza Dental, where the dentist developed a care plan to begin with a crown, but no treatment has been forthcoming.

Although not eligible for programming as a Federal pretrial detainee, Mr. Madrigal still sought enrollment in Anger Management, Managing PTSD, and Moral Reconation Therapy ("MRT"), but authorities refused his enrollment. Still, Mr. Madrigal borrowed the course books from others and completed the courses on his own initiative and without direction from any third parties.

Completion of Anger Management ordinarily results in 4.5 days sentence credit for each month of coursework. A two-month course, Mr. Madrigal would have earned nine days credit. Similarly, upon completion of PTSD training, a two-month course, Mr. Madrigal would have earned another nine days credit. When finished with the MRT, a 12-week course, Mr. Madrigal would have earned another 13.5 days credit. For just these three courses, Mr. Madrigal, were he not a Federal pretrial detainee, would have earned 31 days sentence credit.

## VII.    **Prohibition Against Double-Counting.**

The PSR hinted there may be ground for an upward departure, presumably based upon the defendant's dishonesty, and tampering during the investigation. However, dishonesty has been previously considered by virtue of Mr. Madrigal's plea of guilty to three counts of False Statement or Representation to a Department or Agency, and should not, therefore, form the basis for an upward departure. Doing so would amount to double counting the same conduct, which is prohibited. If a defendant's accountability for particular conduct is established under one provision of the Guidelines, it is not necessary to review alternative provisions under which such accountability might be established. USSG 1B1.1, comment. (n.2 and n. 4.(A) and (B)).

And, as demonstrated more fully above, the enhancement for obstructive behavior, (PSR ¶ 57), is misplaced and ought not to be considered by the Court.

## CONCLUSION

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon* v. *United States*, 518 U. S. 81, 113 (1996). This is the case where human failings mitigate the punishment and continued confinement is counter effective. For all of the reasons set forth above, this Court should sentence Mr. Madrigal to a term not to exceed 28 months confinement, award Mr. Madrigal 28 months sentence credit, deny the Government's requests for enhancements and upward departures, and direct "detention to inpatient substance abuse treatment" in Illinois. This is a just and fair sentence that fulfills the sentencing factors that this Court must follow.

Respectfully submitted,

MANFREDO M. MADRIGAL, III
*By counsel*

/s/ Jessica F. Phillips
Jessica F. Phillips (VSB #65953)
Royer Caramanis PLC
200-C Garrett Street
Charlottesville, VA  22902
(434) 260-8767 (telephone)
(434) 710-4061 (facsimile)
jphillips@rc.law

/s/ John N. Maher
John N. Maher (Illinois 6237599)
MAHER LEGAL SERVICES PC
17101 71st Avenue
Tinley Park, Illinois 60477
Tel: (708) 781-9212
Fax: (708) 781=9693
john@maherlegalservices.com

38

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

/s/ Jessica F. Phillips
Jessica F. Phillips (VSB #65953)
Royer Caramanis PLC
200-C Garrett Street
Charlottesville, VA  22902
(434) 260-8767 (telephone)
(434) 710-4061 (facsimile)
jphillips@rc.law