## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:22-CR-00019 |
| MANFREDO MARTIN-MICHAEL MADRIGAL, III, | |
| Defendant. | |

## UNITED STATES' SENTENCING MEMORANDUM

### I.    INTRODUCTION

The defendant, Manfredo Martin-Michael Madrigal, III, destroyed U.S. Army property. He contacted a foreign adversary while seeking revenge against the U.S. government. He loaded a gun and threatened suicide in Victim 1's presence, trashed her home, and tried to poison her pet. He threatened Victim 1's life, family members, and career; infiltrated her personal health accounts; monitored her using alias social media personas; and spread lies about her to coworkers. When Madrigal realized he was under investigation, he contacted Victim 2 and coached her to lie on his behalf—coaching that was reinforced by years of Madrigal's violence and threats toward Victim 2, her pets, her career, and her family. Madrigal was eventually arrested when Victim 2 called 911 to report that he held a pistol to her head. And even while in custody, Madrigal continued his manipulation and threats, directing a family member to "enlighten" Victim 2 that she wanted no part in the case against him. Throughout the instant litigation, Madrigal has tried to advance baseless conspiracy theories, punish his victims, and mischaracterize the evidence against him.

Madrigal has achieved many of his goals through lies: he lied to become a U.S. Army officer, to become an attorney, to avoid state criminal prosecution, to get a job, and to increase his

salary. He tried to lie his way out of this case. As illustrated below, it is difficult to recount the extent of Madrigal's misconduct. But the timeline of his misdeeds shows the truth: Madrigal is a volatile and dangerous individual who repeatedly evades accountability through deceit of, and threats of violence against, others. He must now be held responsible. An above-Guidelines sentence of 72 months is needed to reflect the gravity of Madrigal's conduct; deter him from future crimes; protect the public—including his victims, others, and national security; and promote respect for the law.

## II.    PLEA AGREEMENT

Pursuant to a Rule 11(c)(1)(B) plea agreement, Madrigal pleaded guilty to one count of willful destruction of government property, in violation of 18 U.S.C. § 1361, and three counts of false statements, in violation of 18 U.S.C. § 1001(a)(2). *See* Plea Agreement, ECF No. 174; Plea Form, ECF No. 180. The parties agreed that the government shall recommend a sentence of imprisonment no greater than 72 months; that Madrigal shall be prohibited from direct or indirect contact with or harassment toward any of the victims in this case or their family members; and that Madrigal shall proceed directly from incarceration to a substance abuse treatment program upon the completion of his term of imprisonment. Plea Agreement at 3. The plea agreement stated that "all matters pertaining to any of the counts of the charging document(s), including any dismissed counts, are relevant conduct for purposes of sentencing" but contained no agreement as to which guidelines apply, the applicable loss calculation for Madrigal's destruction of government property, and the duration of supervised release. *Id.*

### III.    FACTUAL BACKGROUND[1]

In 2009, Madrigal joined the U.S. Army as an active-duty enlisted service member and was deployed for multiple overseas combat tours.  He obtained a Top Secret/SCI clearance in 2011. Madrigal was discharged from active duty in 2016, then joined the Kansas National Guard and attended law school.

In May 2020, Madrigal became an attorney and gained admittance to the Missouri Bar. Soon thereafter, he was selected for the Officer Basic Course (OBC), a training program for new judge advocate candidates in the JAG Corps, in Charlottesville, Virginia.

### A.    Deletion of NSL-P and Call to the Russian Embassy

While attending OBC at the Judge Advocate General's Legal Center and School ("the JAG School"), the Army determined that Madrigal failed to report an arrest for driving while intoxicated, which occurred after his application to the JAG School but before he started OBC. The Army initiated proceedings to determine whether Madrigal would be involuntarily separated for failing to report the arrest.

Pending its decision, the Army moved Madrigal from a student to staff position in December 2020.  He was assigned to the Training Developments Directorate (TDD), a unit that analyzed training needs and created programs for Army personnel.

At TDD, Madrigal was assigned to review and edit the National Security Law – Paralegal Primer course (the "NSL-P").  The NSL-P was a new course designed for distance learning so paralegals across the United States Army could access the course at their home station and learn

---

[1] Unless otherwise stated, this section draws on facts from the Complaint (ECF No. 3), evidence presented at the Hearing to Revoke the Magistrate Court's Order of Release (ECF No. 100), the Court's Order Revoking the Magistrate Court's Order of Release (ECF No. 107), the Superseding Indictment (ECF No. 142), the Agreed Upon Statement of Facts (ECF No. 181), and the Final PSR (ECF No. 195).

about national security law. To facilitate Madrigal's work on the NSL-P, he was granted instructor-level access rights to the virtual course, which allowed him to edit, modify, or otherwise update the training modules.

Madrigal abused this access authority and took steps to delete the module during the overnight hours between February 6 and 7, 2022 (shortly after the Army's decision to discharge Madrigal). Madrigal filmed the deletion while narrating his thoughts:

> *You guys decide you're going throw me to the wayside, no, I don't think so . . . . You people thought you can fuck me? . . . You thought you could easily remove me? . . . You aren't going to take my knowledge and use it against me . . . .*

Madrigal's desire for vengeance against the United States was further made clear when he proclaimed, "*You people fucked with me one too many times*" and ominously remarked, "*Guess what I can do next.*" PSR, ¶31.

Madrigal's "next" move was to call the Russian Embassy. Toll records show Madrigal placed an approximately two-minute-and-twenty-six-second call to the Russian Embassy in the early hours of February 7, 2022. Madrigal boasted about this contact—while concealing his role in initiating it—and texted a witness, "The Russians in DC reached out to me, they would like to know what I know."

The next morning, the JAG School tried to determine why the NSL-P training modules were gone. Madrigal reported to work and was included on internal email communications about the deletion. Madrigal, however, did not admit his misconduct.

A couple weeks later, Madrigal was discharged from the Army and completed a security out-processing form ("the JAG Form"). Section 5 of the JAG Form included a section entitled, "Foreign Contact Debriefing." It asked, "Have you had any contact with a foreign national while assigned to TJAGLCS?" Madrigal answered, "NO." In Section 6 of the JAG Form, Madrigal signed a statement that he "acknowledge[d] that it is a crime to knowingly make any materially

false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of the Executive Branch of the United States, per 18 U.S.C. 1001." An excerpt of this portion of the form is included below with the pertinent answer circled in red.



Ex. 1 (JAG Form).

As an active-duty Army officer and security clearance holder, Madrigal had an affirmative obligation to report foreign contacts while assigned to the school. He failed to do so.

### i.    *Madrigal's False Statements to FBI*

The FBI interviewed Madrigal twice over the next two months. During those interviews, agents asked Madrigal about any contact with foreign entities and his knowledge regarding the deletion of the NSL-P training materials. Indictment ¶¶ 15–18, ECF No. 142.

During the first interview, Madrigal confirmed his cellphone number, discussed his background, and affirmed he held an active security clearance. Ex. 2 (April Interview). He then proceeded to tell agents a convoluted story about receiving "several" phone calls from a "202

number" that he "did not answer."  *Id.*   Madrigal said he had been "drinking that night" and eventually "decided to call back and have some fun with it."  Madrigal expanded,

> I just remember getting phone calls and thinking it was a scam and them saying it was the Russian Embassy and I said, "oh yea you are," and "what do you guys want?"  And they said, "are you following what is going on with Russia and Ukraine right now?" and "Who isn't'? . . . Sooner or later, I was just toying with them and another drunk person out there scamming me, whatever."

*Id.*

FBI agents directly asked, "But they called you first?"  Madrigal responded, "Yes, yes." Madrigal told the FBI that he only knew the person on the other side of the call was affiliated with the Russian Embassy when he did a Google search *after* the call.

During the second interview, Madrigal tripled down and once again told the FBI that someone from the Russian Embassy called *him* in February 2022.  He added some additional nonsensical details to his story: This time, Madrigal told the FBI that his phone records showed his call with the Russian Embassy as 999-999-9999.  He also said that his Google search results identified the telephone number as associated with the Russian Embassy, but also affiliated with a health care facility for the elderly.  Based on these purported results, Madrigal claimed that he thought these calls were potentially related to a "scam."

Madrigal also lied to the FBI about not knowing how the NSL-P course was altered or deleted.  According to Madrigal, he first learned about the course deletion from a colleague.  The exchange pertinent to these false statements is included below:

| Interviewer: | So when we talked with [the JAG School], they only thing JAG school found in this time period that seemed to be anomalous was that this course module was removed. |
|---|---|
| Madrigal: | Yes, I remember that. |
| Interviewer: | It was like, deleted. |
| Madrigal: | We had to rebuild – we had to reupload them. |
| Interviewer: | They couldn't explain it.  They didn't know why this course was deleted. |

| Madrigal: | Okay. |
|---|---|
| Interviewer: | Do you know why . . . |
| Madrigal: | I was there when this happened.  I just remember [U.S. Army soldier]—one of her responsibilities was to keep track of number of students enrolled at any given time, their progression through the course and completed course.  One Monday morning she said that she got a message from a student that they couldn't access the course.  And, we started working with IT to figure out what was going on and it was just a process—they still had the packets for the course so it was a process of re-uploading it.  There were seven modules and had to upload it, module by module. |
| Interviewer: | That was the only thing out of the ordinary or anomalous that they couldn't explain.  **As an administrator, you don't know anything about how that course was deleted or altered or whatever happened**? |
| Madrigal: | **No, no.** |

Ex. 3 (May Interview) (emphasis added).

Toward the end of the second interview, Madrigal identified Victim 2 (a former romantic partner) as someone with whom Madrigal spoke in the same timeframe as his contacts with the Russian Embassy in January 2022.

### ii.    *Madrigal's Coaching of Victim 2*

After Madrigal provided her name to the FBI, Victim 2 travelled across state lines to meet Madrigal.  Madrigal spent hours instructing Victim 2 on what information to provide and omit during her upcoming interview with the FBI.  For example, Madrigal told Victim 2 what he spoke about with the FBI and had her review his phone toll records to develop a plausible story regarding his foreign contact.  They spent hours talking and walking around outside a nearby mall, placing their cellphones and smart watches in another room in Madrigal's Charlottesville apartment to avoid being monitored.  Madrigal instructed Victim 2 to tell the FBI that Madrigal *received* a call from someone with a foreign accent, but not to describe the individual as Russian.  Madrigal had Victim 2 rehearse her answers until he was satisfied with her responses.

The FBI interviewed Victim 2 in late May 2022.  During that interview, Victim 2 stated

that Madrigal did not tell her what the interview would be about but had mentioned providing her name to the FBI. She told the FBI that Madrigal called her in February 2022 and said that someone with a foreign accent had called him. Victim 2 also stated that Madrigal did not consume alcohol to the point of not recollecting events.

Soon after her interview with the FBI, Victim 2 reported her answers to Madrigal, who was angry with some of her responses. For example, Madrigal told Victim 2 that she should not have said that he did not drink to the point of not recollecting events and expressed that her answer would preclude him from claiming no memory of his contact with the Russian Embassy.

After his arrest in August 2022, Victim 2 was again interviewed by the FBI. Victim 2 told the FBI that she was "coached, for sure" by Madrigal when she visited him in Charlottesville. Prior to her FBI interview, she and Madrigal planned code words to communicate about whether her interview had gone well: the word "Sriracha" or phrase "melons in the garden" would be used to reflect a positive or negative outcome, respectively. PSR, ¶42.

Later—after Madrigal was arrested—Victim 2 admitted to the FBI that she received a call from Madrigal on approximately February 6, 2022, and he told her about calling the "Russians" at the Embassy. Per Victim 2, Madrigal was angry during the call and said, "fuck the Army" and "fuck the government." Victim 2 also told agents that Madrigal told her that he had valuable information, and he called someone and spoke to a Russian.

### B.    Madrigal's Threats Toward and Intimidation of Victim 2

Madrigal's coaching of Victim 2 was not an isolated incident. Indeed, Madrigal waged a years-long campaign of violence and intimidation against Victim 2, whom he repeatedly coerced to lie on his behalf. Over the course of his relationship with Victim 2, Madrigal held a gun to Victim 2's head, threw a case of beer and other objects at her, held a machete to her throat, choked

her and pulled her hair, told her he was going to kill her, told her he was going to kill her brother, killed one of her dogs, threatened to "put down" other pets, and told her he was prepared for a law enforcement response if she contacted the police.

### i.    Threats to Victim 2 and Her Family

Some of Madrigal's threats toward Victim 2 denigrated Victim 2 and disturbingly invoked Victim 2's deceased husband (referred to below as "V2 H"), a soldier in one of Madrigal's former units:



Ex. 4 (Emails to Victim 2).

Madrigal's communications to Victim 2 also included cruel messages about her sexual activity and her deceased husband's fatal encounter with an improvised explosive device (IED) in Afghanistan:

| | |
|---|---|
| **From:** | Manfredo Madrigal |
| **To:** | ████████████ |
| **Subject:** | Re: You did this BITCH |
| **Date:** | Saturday, April 1, 2017 1:07:07 AM |

Fuckn delete me again from everything? What you doing? Sending your tits and pussy out you whore? Still have delted you you fuckn slut. Fuck I would look for an ied to if I was married to you BITCH

Sent from my iPhone

> On Apr 1, 2017, at 00:05, Manfredo Madrigal <manfredo.madrigal@gmail.com> wrote:
>
>
>
> <IMG_2441.MOV>
>
>
>
> Sent from my iPhone

Ex. 5 (IED Email Thread to Victim 2).

            *ii.    January 2020 Incident*

        In January 2020, Victim 2 and her mother called police from a barricaded upstairs bedroom

after Madrigal got into a physical altercation with another household member. Victim 2 told police

that Madrigal had gotten drunk, tried to flood her kitchen, thrown pots and pans, and shoved a

household member. Ex. 6 (Body-Worn Camera Footage). When police tried to speak with him,

Madrigal locked himself in a bedroom and refused to come out for several minutes. When he did,

he told police that Victim 2's mother is a "nightmare" and called the police because she had an

argument with him. Madrigal also stated that blood on the bedroom door was a result of cutting

himself "just very recently" and that "nobody touched me, I didn't touch anybody." *Id.* at 16:08–

31. Fewer than ten minutes later, Madrigal changed his story and told police that his hand was cut

when he was "attacked by [the household member]." *Id.* at 24:48–53.

Victim 2 thereafter sought a temporary protection order against Madrigal. When Madrigal learned about the temporary protection order, he communicated to Victim 2 in no uncertain terms that he would hold a grudge against her if she did not drop her request for a protection order:

> *If I were to get to a point where I got really drunk, I can absolutely guaran-fucking-tee you, I'm . . . will be thinking about this . . . . Just to let you know, maybe I shouldn't even say that, never mind . . . .*

Ex. 7 (Victim 2 Conversation A) at 00:47–6:00. He then tailed off before asking, "What is it you're afraid of, what do you think is going to happen?" When Victim 2 answered "you're going to kill me," he told her:

> *So with that said, just to let you know, if you think, if that's what you're afraid of, a protection order isn't going to stop that. I know that's not probably the best comfort . . . But if that is what I wanted to do, a protection order is not going to stop that. A protection order is going to get me in trouble if I harass you and I call you nonstop. A protection order is going to help you if I harass you and show up at your work without being invited. A protection order is going to help you if show up to your door and keep ringing the doorbell. A protection order is not going to help you if I decide when we get off the phone right now "that's it, I've had it with her." And like I said, that's not the most comforting advice, or the most comforting comment . . . . **If I wanted to get in the car and come to you and do something, a protection order would do jack shit. . . . [Victim 2,] if I wanted to kill you, I would figure out a way to figure out when you're going to be home, and I would come and kill you,** if that's what I wanted to do.*

*Id.* (emphasis added).

After that conversation, Victim 2, her mother, and another household member filed declarations with the court in Boone County and recanted their previous reports that the defendant had gotten into a physical altercation at Victim 2's house. In fact, these false recantations were orchestrated by Madrigal himself. During the FBI's investigation of the instant case, agents discovered an unsigned draft of Victim 2's declaration and copies of the declarations signed by Victim 2's mother and household member on Madrigal's devices. The witnesses later acknowledged to FBI that Madrigal pressured them to sign the false declarations.

In addition to the false declarations, agents found on Madrigal's devices a color-coded script for Victim 2 if she was questioned in connect with the 2020 assault charges:

Charge = creating apprehension of imminent physical injury

Red= say

Blue= only if asked

- I would like to know how I can go about dismissing the charges

- That evening I called the cops because we had a verbal argument and I was hoping they would just come and ask him to take a walk or to leave for the evening, I had no intentions on him being arrested and these charges following

- He never put his hands on me or attacked me in any way (if asked- only time he touched me was to brush my hands off him when I grabbed him)

- I told the officer I observed him throwing some stuff (magnets off fridge and one vase) around downstairs on the **first floor while I was upstairs on the second floor in my mother's room behind a locked door- with my mother and her boyfriend!**

- I **wasn't afraid he would cause me any physical harm**, I was just hoping for the cops to help decompress the situation—they told me to go get a protection order, at the time I didn't really understand what this was

- I became aware of the magnitude of all this when his lawyer contacted me to arrange for a 3rd party to pick-up of some of his clothes

- After realizing the seriousness of the situation, I **immediately** asked his lawyer how to drop the charges and filed a joint motion to dismiss protection order

- I am not interested in being a witness and taking part in a trial because he did not lay hands on me nor did I believe he would

- (If asked about job- currently unemployed, was student. Use to be in Army, now out).

- Please do not volunteer anything about law school bar etc.

Ex. 8 (Script). As the script makes abundantly clear, Madrigal used his training as a lawyer to craft a false and misleading narrative designed to undercut the pending criminal case and protective order against him.

        iii.    *Attempts to Tamper with Victim 2 in the Instant Case*

Madrigal attempted to coach and tamper with Victim 2's statements to law enforcement

regarding the charges in this case on at least two occasions. As detailed above, he coached Victim 2 on what to say if the FBI questioned her about his contact with the Russian Embassy. But his tampering continued even after his arrest—which, notably, was immediately preceded by another one of Madrigal's threats toward Victim 2.

In August 2022, Madrigal was arrested after Victim 2 called law enforcement to report that Madrigal had placed a pistol to her head. Order at 10, ECF No. 107; PSR, ¶45. Victim 2 provided police the following image from her home security camera:



Order at 10, ECF No. 107. As this Court has already found,

> there appears little dispute that Victim 2's account that it was a pistol Madrigal held to her head was relayed in her 911 call as well as to law enforcement when they arrived, and she provided details about the appearance and location of the firearm to law enforcement, which were confirmed when they discovered the firearm. By contrast, Madrigal's account that it was a cell phone was apparently only first conveyed months later. Further still, Madrigal's stance in the image—with his hand and arm outstretched mere inches from Victim 2's face—and Victim 2's frozen stance, are more consistent with Madrigal's holding a pistol to her head than a cell phone.

*Id.* at 10–11.

After being arrested for this threat to Victim 2's life, Madrigal repeatedly discussed with family members ways in which to contact Victim 2. On August 19, 2022, (ten days after holding a pistol to her head), Madrigal communicated about Victim 2 with his father (referred to as "Individual 1"). Indictment ¶ 45; Ex. 9 ("Enlighten Her" Jail Call) at 00:16–02:40. At the start of the call, Madrigal told Individual 1, "I can't be spelling everything out." He referenced Victim 2 as "she" and "her." Ex. 9 ("Enlighten Her" Jail Call). He emphatically stated that "someone" needed to "enlighten" her so she would not be used against him. *Id.* Madrigal also described Victim 2's involvement in this case as a "huge thing with multiple matters." *Id.* Individual 1 agreed and responded that he had his "marching orders." *Id.* Phone records show that Individual 1 then contacted Madrigal's state defense attorney (which Individual 1 further indicated in text messages to Madrigal the next morning). Madrigal's text messages from custody and other calls around that time provide further evidence of his repeated efforts to direct others to contact Victim 2, namely via his father and state defense attorney (referred to below as "Jim"), about Victim 2 dropping charges in Boone County, Arkansas:



Ex. 10 (Jail Message Excerpts); Ex. 10A (August 2022 Video Call A) (in which Madrigal asks if Victim 2 is "open to doing it like we did in January 2020"); Ex. 10B (August 2022 Video Call B) (in which Madrigal and Individual 1 discuss the significance of two people being afraid of Madrigal and what might happen "if one thing goes away").

## All Resident Messages

| Date | Sender | Recipient |
|------|--------|-----------|
| Start of Email Chain | | |
| 08/20/2022 6:55AM | Manny Madrigal | 275460: MANFREDO MADRIGAL |
| Text Message | | |

I talked with Jim last night at 7:35 PM .

He said. Don't worry about Harrison he thinks thst will go fine in the next wk or so.

I am flying into Springfield MO, rent car and cargo trl 5x8 pu your truck/stuff/Zoe, drop off rental car and come home.  I will b going with David.

U were allowed bond in ark and I paid for it.    That's not y u r not getting out, rn.  U r not getting out bc of fed thing and u know whst thst about is I don't.

---- From Amy

The hearing went as planned. They projected 2-3 weeks to move Manny. And I spoke with Manny again today just about the facts of the case to get background.

*Id*.

Relatedly, the FBI interviewed Madrigal's state defense attorney, who represented Madrigal on the aggravated assault charge arising from the August 2022 firearm incident with Victim 2.  During this interview, the attorney acknowledged that—absent his involvement—the Madrigals would have directly contacted Victim 2.

### C.    Madrigal's Cyberstalking of Victim 1

Madrigal's threats were not limited to Victim 2.  He also stalked Victim 1 (another former romantic partner) between late 2021 until June 2022.  During that time, he sent her a barrage of disturbing text messages, voicemails, emails, photographs, and videos, in which he threatened her life, her family, her pet, her career, and her reputation.  As Madrigal's romantic relationship with Victim 1 soured, he became increasingly manipulative and demeaning.  His threating conduct also escalated; when Victim 1 tried to end their relationship, Madrigal loaded a gun and threatened to commit suicide in Victim 1's presence.  Victim 1—fearing that Madrigal would kill her in a murder-suicide—pleaded with him to put down the gun.  He eventually agreed to place the gun in

16

the garage, but he refused to relinquish control of the garage door opener overnight.  The next morning, Victim 1 left for work and refused to return to her home until Madrigal left.  Meanwhile, Madrigal trashed and damaged her property.  He poured water onto the carpet, left the sliding door open mid-winter, ground a bottle of medicine into her cat's food dish, and symbolically stabbed a knife through an image affiliated with her family nickname of "Bear":



Ex. 11 (Bear Threat).

In response to Victim 1's repeated requests and demands that he leave her home, Madrigal taunted her about entries discovered in her diary, derogatorily called her white trash, refused to leave, and baited her to "call the cops."  Ex. 12 (Text Message Excerpts).

On other occasions, Madrigal threatened Victim 1's father, stating that Victim 1 and her father "did this" and "I'm coming after him and then you."  Compl. ¶ 34.

Still other messages to Victim 1 contain thinly veiled threats in the form of purported conversations with Army officials, sexually explicit photographs, and images of weapons.  *See, e.g.*, Ex. 13 (Loaded Pistol Video).  In several communications, Madrigal implied to Victim 1 that he was denigrating her reputation with high-ranking individuals in her chain of command, and she

would suffer professional consequences if she angered him. *See generally* Compl. A small sample of these threatening messages are included below:

- On January 23, 2022, Madrigal texted Victim 1, *"I love you, but you are a liar. You are what I call you. Must I call your father again to get you in line?"* Ex. 12.

- On January 23, 2022, a message in which Madrigal sent the following photo of himself:



Ex. 12. Victim 1 responded to Madrigal, "That's a threat."

- Later, the same day (*Id.* 1383, Text Date 1/23/22), Madrigal sent the below photo of his firearm:



- Madrigal then said, "I probably should not have sent that. Just showing you what I am doing. You haven't called." When Victim 1 did not call, he wrote, "Waiting. It's almost 9 there, I really hope you keep your word. You lied to me."

- On January 24, 2022, Victim 1 texted, "I think we need to talk tonight. This is not working." Madrigal responded, "I will talk to you tonight. But we are not ending." Ex. 12.

Madrigal's disturbing texts to Victim 1 continued the night he deleted the NSL-P. That night, Madrigal sent text messages to Victim 1 describing his motivation to delete the modules: Ex. 12.

- *What made you go from I love you, yes, let's finish the show, to don't talk to me?*

- *You are a joke*

- *You are a coward*

- *I have decided. I am not going to work any further*

- *I am breaking down nsl p*

- *I just deleted everything.*

- *I am taking you all down*

- *I don't think you understand my powder [sic]*

- *There is no longer a NSLP*

- *you people fucked with the wrong guy*

Victim 1 did not immediately respond to the above-shown series of text messages. The absence of a response likely prompted Madrigal's next text message to Victim 1, which was a photograph of her genitals. Victim 1 then responded, "What are you doing?" Madrigal texted, "Now I have your attention." The below exchange followed:

| | |
|---|---|
| Victim 1: | I just woke up to get water. I asked you not to message me. Goodnight. |
| Madrigal: | I am tearing down all of nsl-p |
| Victim 1: | I don't know what that has to do with me. |
| Madrigal: | I am teaching them a lesson |
| Victim 1: | Who is "them" . . . Seems like you're only damaging your reputation. |
| Madrigal: | Actions have consequences |
| Victim 1: | Did something occur? |
| Madrigal: | **I am going to bring their house down on them** |
| Madrigal: | They have no idea what I can do to them |
| Victim 1: | This behavior is really weird. I'm going back to bed. |
| Madrigal: | Ya, **Russia has reached out to me** |

[…]

| | |
|---|---|
| Madrigal: | It is not weird at all. **Your people went to betray me…** |
| Madrigal: | You all are a bunch of tools |
| Madrigal: | It is done |
| Madrigal: | There is not more NSL-p |
| Madrigal: | Do you see the power I have? |
| Madrigal: | I |
| Madrigal: | Own |
| Madrigal: | Everything |
| Madrigal: | I control it all |
| Madrigal: | I say jump you say how high? |

[Madrigal sends video of deleting the module.]

20

Madrigal:     Have run [sic] with nsl-p
Madrigal:     There is no longer a national security law primer
Madrigal:     You people have fucked with me one too many times

[…]

Madrigal:     I just single handily [sic]
Madrigal:     Brought an entire system down
Madrigal:     **Guess what I can do next**

Ex. 12 (emphasis added).

Madrigal also manipulated Victim 1 by lying about her to coworkers, including falsely claiming to JAG School command staff that Victim 1 (a fellow solider and attorney) was his fiancée. When Madrigal showed signs of instability following notification of his discharge, the Army—due to their understanding that Victim 1 was his fiancée—agreed to provide emotional support to Madrigal by arranging a visit from Victim 1. Ex. 14 (Text Excerpt Regarding Victim 1 "Support").

Victim 1 told Madrigal not to contact her. Final PSR ¶ 44, ECF No. 190. She blocked Madrigal's phone number and social media accounts. *Id*. She also made her social media profiles "private" to prevent Madrigal from contacting her. *Id*. Nevertheless, Madrigal continued his attempts to denigrate Victim 1's reputation and deceive high-ranking officials. Multiple military witnesses informed the FBI that Madrigal shared unsolicited screenshots of Victim 1's fertility tracking app activity and information about her sexual activity gleaned therefrom. In these exchanges, Madrigal falsely told the witnesses that Victim 1 forwarded or otherwise pushed update notifications through the application to taunt him. This was untrue. In reality, Madrigal was logging into Victim 1's Modern Fertility App to track her. *See* Ex. 15 (Modern Fertility Decl.)

On June 4, 2022, Madrigal emailed Victim 1 screen shots of information he had accessed from Victim 1's fertility-tracker application, which showed that Victim 1 recently had taken a

negative pregnancy test.  Final PSR ¶ 44.  Madrigal then sent Victim 1 an email deriding her fertility by stating, "sorry to see you are still a failure."  *Id.*

On another occasion, Madrigal sent Victim 1 a series of emails which contained compromising, explicit photos of Victim 1 from previous live video interactions and recorded without her knowledge or consent.  In connection with the photos, the defendant stated, "You tried so hard," and, "Nobody is going to know you like I do.  Don't let them fool you."  Compl. ¶ 46.

These communications are only a small sample of the overwhelming threats and harassment Madrigal has directed toward Victim 1.  He threatened to have "fun" with Victim 1's male coworker and sent threatening messages to a male friend from her phone.  He consistently monitored her social media presence and location, creating alias accounts to view her posts and covertly accessing her health accounts to investigate her sexual activity.  On numerous occasions, Victim 1 was shown that any attempt to contradict Madrigal's wishes would result in threats to her safety, career, friends, pets, and family.

### D.    Madrigal's Other Lies

In addition to the conduct described above, Madrigal also manipulated at least two other entities for personal gain.  He lied to the Department of Veterans Affairs (the "VA") to increase his salary, and—years prior—deceived the Missouri State Bar to become an attorney.

#### i.    Lies to the VA

Following his discharge from the Army, Madrigal sought employment from the VA as an Attorney Advisor.  As part of this process, he falsely claimed to reside in Barrington, Illinois, to gain a higher cost of living adjustment (COLA) atop his base salary.[2]  In reality, Madrigal moved

---

[2] Barrington, Illinois, has a significantly higher COLA compared to Harrison, Arkansas.  In 2022, locality pay in Chicago was 29.18% versus 16.2% in all of Arkansas.  *See* https://www.federalpay.org/gs/locality/chicago     and

into Victim 2's home in Arkansas and began remote work for the VA.  PSR, ¶ 41.  The difference between his true and false address is established through his own paperwork.  On June 9, 2022, Madrigal changed his address with the U.S. Postal Service from Charlottesville to Victim 2's address in Arkansas.  But in his VA appointment affidavit completed on July 20, 2022, Madrigal falsely listed his residence as Barrington, Illinois.

The context of this false residency claim reveals Madrigal's premeditated manipulation. As part his initial communications with the VA's human resources representative, he sought information about COLAs.  He was told that moving to a new state may affect annual salary due to locality pay (i.e., the COLA).  Ex. 16 (Email Exchange with VA).  Next, Madrigal emailed the representative on June 1, 2022, and claimed he was "viewing a townhouse" at 732 Derby Lane in Barrington, Illinois.  *Id.*  He later stated he "signed a lease" at the address, as shown below (emphasis added):

---

https://www.federalpay.org/gs/2022/arkansas#:~:text=Arkansas%20has%20no%20cities%20or,Schedule%20jobs%20in%20the%20state.



*Id.*

In fact, this address is his *family's home* and not some "new" real estate listing. Madrigal's brother confirmed as much. ECF 63-1 (Decl. of David Madrigal ¶ 5 ["I reside with my family at 732 Derby Lane, Barrington, IL"]). In an interview, Madrigal's father told the FBI that Madrigal visited their home prior to June 2022 and no one leased the property (or any portion of the property) from them. This was yet another manipulation of Madrigal's and—once again—it involved his family.

In August 2022, agents interviewed Madrigal's supervisor at the VA, an appeals board judge. The judge reported that he believed Madrigal was working in Barrington, Illinois. In fact, after Madrigal was arrested in Arkansas, the VA—under the impression that Madrigal lived in Illinois—sent police on a welfare check at his purported residence when he did not show up for work. Per jail calls, his family scrambled to cover for Madrigal's absence and explain his presence

in Arkansas.  His father offered to call the VA and Madrigal advised him to say he "went down to Arkansas to try to take care of some personal issues with my girlfriend."  Ex. 17 at 1:47 (Family Jail Call Regarding VA Check-In).  In response, his father affirmed he would convey this story and "just tell them that."  *Id.*

### ii.    Lies to the Missouri State Bar

After passing the bar exam, the Missouri State Bar placed Madrigal in a probationary status due to concerns about his criminal history.  He was placed under a monitoring agreement executed in April 2020.  Ex. 18 (Monitoring Agreement); Ex. 19 (Quarterly Report) (demonstrating reporting obligations).  This monitoring agreement detailed Madrigal's criminal conduct known to the Bar, as excerpted below from page one of the agreement:

> WHEREAS, Applicant submitted an Application for Bar Examination for the July 2018 bar examination and an Application for Character and Fitness Report on May 21, 2019; and,
>
> WHEREAS, the Board, upon carrying out its Character and Fitness investigation, identified concerns relating to Applicant's history of alcohol use.  Specifically, Applicant has the following character and fitness concerns in Applicant's history: criminal damage to property & reckless conduct charges in 2006, driving under the influence charges in 2012, disorderly while intoxicated charges in 2016, driving under the influence and open container charges in 2019; and,
>
> WHEREAS, on its own motion, the Board did call an informal investigative hearing pursuant to Supreme Court Rule 8.12 at which Applicant appeared and gave testimony on January 8, 2020; and,

Ex. 18 (Monitoring Agreement).  Noticeably absent from this list is Madrigal's January 2020 arrest for assault.  Records obtained from the State Bar hold no indication that Madrigal ever reported this arrest.  The terms of the agreement required Madrigal to attend substance abuse program meetings no less than once per week and "remain abstinent from both alcohol and all illicit drugs." *Id.* ¶¶ 3, 5.  Per witnesses (and Madrigal's own statements regarding his alcohol use), Madrigal did not abstain from alcohol consumption and falsified Alcoholics Anonymous attendance records. Madrigal's admittance to the state bar—much like his admittance to the JAG School—was premised on deceit and manipulation.

## IV.    LEGAL STANDARD

As established in *United States v. Booker*, 543 U.S. 220, 220 (2005), the Sentencing Guidelines are advisory. Sentencing proceedings nevertheless begin by determining the applicable Guidelines range. *See Green*, 436 F.3d at 456. In this sense, the Guidelines are "the 'starting point and the initial benchmark,'" *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (*quoting Gall v. United States*, 552 U.S. 38, 49 (2007)), and "are to be kept in mind throughout the process," *Gall*, 552 U.S. at 50 n.6.

As established in the U.S. Probation Office's Final Presentencing Report, ECF No. 190, the base offense level in this case is six (for the violation of 18 U.S.C. § 1361, regarding Madrigal's deletion of the NSL-P course). A fourteen-point offense level increase is appropriate because the financial loss in this case exceeded $550,000. Madrigal's obstruction of justice and abuse of position/special skills add an additional two-level increase apiece. Assuming a three-point reduction for Madrigal's acceptance of responsibility, the total offense level is twenty-one. Because Madrigal's criminal history category is one, the applicable Guidelines range is 37–46 months.

In crafting an appropriate sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). These factors require the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1). The Court must consider the need for a sentence

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

The Court must also consider the kinds of sentences available, the Sentencing Guidelines range, any pertinent policy statement issued by the Sentencing Commission, the need to avoid unwarranted sentence disparities, and the need to provide restitution to victims. 18 U.S.C. § 3553(a)(3)–(7). The sentencing court must next implement any applicable mandatory statutory limitations and conclude by articulating on the record the reasons for selecting the sentence it imposes. A sentencing court which does not apply a properly calculated Guidelines range must base that decision on the factors listed in Section 3553(a). *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006).

District courts may impose sentences above the Guidelines range through either a "departure" or a "variance." *United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021). "A departure is a deviation from the Guidelines range computed by examining the provisions of the Guidelines themselves, while a variance is a deviation from the Guidelines range based on application of the other statutory factors in 18 U.S.C. § 3553(a)." *Id.* (internal quotation marks and citation omitted). "District courts may impose an upward variance from a defendant's Guidelines range if it is justified by the § 3553(a) factors, as considered under the totality of the circumstances." *Id.* (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

District courts "have extremely broad discretion when determining the weight to be given each of the § 3553(a) factors, and the fact that a variance sentence deviates, even significantly, from the Guidelines range does not alone render it presumptively unreasonable." *United States v. Nance*, 957 F.3d 204, 215 (4th Cir. 2020) (internal quotation marks and citations omitted). "[V]ariant sentences are generally reasonable when the reasons justifying the variance are tied to § 3553(a) factors and are plausible." *McKinnie*, 21 F.4th at 292 (internal quotation marks and

citation omitted).

## V.    ARGUMENT

Over the course of several years, Madrigal manipulated, threatened, and punished to get what he wanted.  Before his arrest in this case, he manipulated the government by hiding his prior DWI arrest; mischaracterized the circumstances of his January 2020 arrest; and lied about his contact with the Russian Embassy.  He lied to the Missouri State Bar to become an attorney.  He pressured Victim 2 to lie to courts and law enforcement, and he lied to Army higher-ups to intimidate and manipulate Victim 1 after she tried to end their relationship.  After his arrest in this case, Madrigal tried to "enlighten" Victim 2 that she did not want to be involved and provided "marching orders" to his family to contact and/or monitor Victim 1 and Victim 2.  Even in this litigation, Madrigal has continued his attempts to punish his victims for their involvement in this case; proffered implausible explanations for his call to the Russian Embassy; and advanced baseless conspiracy theories about the prosecution of the case.  *See, e.g.*, ECF No. 55 (revealing victim identities); ECF No. 82 (purporting Madrigal's call to the Russian Embassy was an attempted call to a restaurant about borscht); ECF No. 128.

Madrigal's most egregious behavior is, unfortunately, not captured by the Guidelines.  A significant, above-Guidelines sentence of 72 months is necessary to reflect the seriousness of his offenses, provide adequate deterrence, and protect the public.  A significant term of supervised release would further address the seriousness of this case.

### A.    Seriousness of the Offenses

The conduct underpinning Madrigal's destruction of government property and false statements is significantly more serious than typical conduct charged under those statutes.  Madrigal's destruction of the NSL-P course and call to the Russian Embassy were motivated by a

desire to exact revenge on the U.S. government and to damage national security interests.  In his role at TDD, Madrigal was given special access permissions, which he abused to delete the NSL-P course and render it unavailable to JAG School students.  Madrigal then contacted a foreign adversary and took extensive steps—including lying to government agencies and coaching Victim 2 to lie on his behalf—to cover his desire to engage in treasonous conduct by sharing "what [he] know[s]."  PSR, ¶¶33, 39-40.

Madrigal has, through counsel, claimed that his call to the Russian Embassy was an attempt to call a restaurant about borscht (a Russian stew).  But his statements at the time of the call prove otherwise.  Madrigal reached out to the Russian Embassy because he wanted revenge against the United States for, in his view, trying to "throw [him] to the wayside."  He bragged that "[t]he Russians in DC reached out to me, they would like to know what I know."  PSR ¶ 31.

Later, Madrigal tried to cover his tracks.  First, he denied any contact with foreign nationals on his out-processing paperwork with the Army.  Soon thereafter, he concocted convoluted explanations for his call records during interviews with the FBI.  In the first interview, Madrigal stated that he received (but did not make) a phone call from a 202 number.  He claimed that he believed it was a scam and that he discovered that the number was associated with the Russian Embassy by Googling the 202 number *after* the call.  When asked whether there was "any reason" Madrigal could have been contacted by a Russian agent, such as any prior contact with the Russian Embassy or another one of its diplomatic establishments elsewhere, Madrigal again claimed that he had "no prior contact."  When *specifically asked* whether he had initiated anything that could have prompted a response from the Russians, he said, "No."

The next time Madrigal spoke with the FBI, he had reviewed his cellphone toll records from February 6, 2022, and made changes to his story: This time Madrigal said the

communications with the Russian Embassy appeared as 999-999-9999.  (This statement appears designed by Madrigal to address the lack of incoming calls from the Embassy in his tolls.)  Madrigal again stated that Google search results for the phone number identified the telephone number as associated with the Russian Embassy, but also affiliated with a health care facility for the elderly.  (Once again, these statements appear designed by Madrigal to create confusion about who called him and avoid the obvious implications that he should have reported the contact.)

As demonstrated by his attempts to hide the call, Madrigal knew that contacting a foreign adversary was a serious offense.  After all, Madrigal had access to classified and sensitive information during his time overseas and was previously assigned to the 75th Ranger Regiment during three combat tours in Afghanistan.  Ex. 20 (Decl. of P. Winnert [Director of Operations, USACIC].)  During this time, the U.S. Army Counterintelligence Command (USACIC) "declares with high confidence that Madrigal would have had access to at least one U.S. military classified Alternative Compensatory Control Measure and would have knowledge of classified JSOC [Joint Special Operations Command] operations that occurred during his deployments to Afghanistan."  *Id*.  Due to these assignments, Madrigal also knows "details of sensitive operations; capabilities of intelligence collection platforms and Human Intelligence sources providing information in support of such operations; and the tactics, techniques, and procedures of the 75th Ranger Regiment and other JSOC units."  *Id*.  Madrigal himself noted the potential value of his knowledge when he bragged that "the Russians in DC . . . would like to know what I know."  PSR ¶ 33.

When Madrigal needed to bolster his lies to the FBI, he directed agents to an individual whom he could threaten and intimidate into lying on his behalf.  He coached Victim 2—a woman he terrorized for years with violence and threats to her, her family, her associates, her career, and her pets—to lie to the FBI in an attempt to thwart the federal investigation into his conduct.  He

selected Victim 2 intentionally, knowing he was previously successful in pressuring Victim 2 to provide a false declaration to dismiss an assault charge and protection order in Boone County.

### B.    Protecting the Public

Madrigal poses a grave threat to the victims in this case and to national security.

#### i.    Danger to Victims 1 and 2

Madrigal has repeatedly threatened Victims 1 and 2 over the course of several years. His arrest in the instant matter was precipitated by an incident in which Madrigal held a gun to Victim 2's head and threatened to put her down. Even after his arrest, he has continued to punish his victims for their involvement in this investigation.

During his relationship with Victim 1, Madrigal threatened Victim 1 and her father, tried to poison Victim 1's cat, and tried to sabotage her professional reputation with the U.S. Army. He engaged in a disturbing pattern of monitoring Victim 1 through alias accounts and accessing Victim 1's accounts without her permission. On multiple occasions when Madrigal's messages did not get a quick response from Victim 1, Madrigal sent pictures firearms or explicit photographs of Victim 1 he had captured without her knowledge or consent. These messages contained implicit—but obvious—threats: If you don't talk to me, I will hurt you. If you don't talk to me, I will send these photographs to the people at work.

Madrigal's threats and violence toward Victim 2 span an even longer time. Over the course of their multi-year relationship, Madrigal has thrown a case of beer and other objects at her, held a machete to her throat, choked her and pulled her hair, told her he is going to kill her, told her he is going to kill her brother, killed one of her dogs, and threatened to "put down" other pets. Madrigal's death threats merely stopped shy of pulling the trigger when he held a gun to Victim 2's head, as captured on home security footage.

Madrigal has shown no remorse for his violence toward Victim 1 and 2. He tried to tamper with Victim 2 and "enlighten her" *from jail*. He has tried to intimidate his victims by exposing their identities in public filings (prompting an emergency motion to seal by the government and order from this Court), filed a lawsuit under the Freedom of Information Act in another district to promote baseless conspiracy theories about a member of Victim 1's family, and filed a motion to compel regarding that civil suit in this case.

Madrigal's continued attempts to intimidate the victims in this case, and his disdain for the justice system as a whole, are apparent in three calls since the detention proceedings in this case. In a jail call in late 2023, Madrigal told a family member, "I want to get [Victims 1 and 2] on the stand and I'm going to fucking fry them on the stand. I am done waiting. I cannot wait any longer to show these morons how wrong that they have been and that they have been bamboozled by a fucking whore." Ex. 21 (December 2023 Jail Call). The victims' fears of Madrigal are real, serious, and corroborated. *See* Final PSR ¶ 49; ECF No. 105 at 24–31. His motives for retribution now are also greater than ever before. The victims deserve the protection of a lengthy sentence and the subsequent security of supervised release conditions prohibiting Madrigal from contacting them.

### ii.    *Danger to the Public*

Victims 1 and 2 are not the only individuals with a credible fear of Madrigal. At least two Army officers have reported concern about their personal safety when meeting with Madrigal, and one former male colleague has indicated that he would consider moving if Madrigal was released. Madrigal's conduct also raises serious concerns about the safety of law enforcement and other government officials who might be required to confront him in the future. In Madrigal's jail calls, he repeatedly expresses anger and denigrates the investigators, prosecutors, and the Court.

Madrigal also poses a danger to national security. His experience overseas dovetails with concerns about his call to the Russian Embassy, which is staffed by "[i]ntelligence officers" who are "often assigned to diplomatic establishments under both civilian and military cover." Ex. 24 (Decl. of SA S. Jett) ¶ 3. Madrigal "contacted a location from where [. . .] Russian Intelligence Officers target the United States." *Id.* Per toll records, Madrigal engaged in a two-minute-and-twenty-six-second call, which is "indicative of a substantive conversation occurring with a representative of the Russian Government." *Id.* ¶ 5. The number Madrigal dialed is the main line for the Russian Embassy, as indicated by Google search results. *See* Ex. 25 (Google search result).

Madrigal possesses information of potential value to U.S. adversaries, and has shown his willingness to contact a foreign adversary. He called the Russian Embassy the same night he expressed his anger toward the U.S. Army and bragged that, "The Russians in DC reached out to me, they would like to know what I know." Madrigal's expertise as a trained member of the U.S. Special Operations community and knowledge of sensitive information may become less valuable over time, but it will not dissipate to benign levels for many years. A lengthy prison sentence is necessary to protect national security interests, as well as the general public.

### C.    Providing Deterrence and Needed Care and Treatment

Madrigal has told Victim 2 that a protection order wouldn't stop him if he wanted to kill her and that, "If I wanted to get in the car and come to you and do something, a protection order would do jack shit . . . ." Ex. 7 (Victim 2 Conversation A). On at least one other occasion, he has told Victim 2 that a protection order is "only a piece of paper."

Time and time again, Madrigal mocked both Victim 1's and Victim 2's attempts to turn to law enforcement or the courts for help. He taunted Victim 2 to "go ahead and call your backwoods, hillbilly motherfucking cops and see what the fuck they do, bitch." Ex. 26 (Victim 2 Conversation

B) at 2:54–3:04.  When Victim 1 pled with him to leave her apartment after he brandished a loaded gun and threatened suicide, he texted her, "Call the cops."  From jail, he called grand jury indictments a "fucking joke."  Ex. 27 (Jail Call Regarding Indictments) at 07:25–36.  He has coerced Victim 2, her family, and a family member's romantic partner falsely to submit affidavits so that charges against him are dropped.  Madrigal has no respect for law enforcement or the courts.

To the extent Madrigal needs mental health and substance abuse care and treatment, such treatment should also be incorporated into a significant term of incarcerated.  Madrigal has already demonstrated that he will not abide by outpatient treatment plans; when required to undergo substance abuse treatment to be admitted to the Missouri State Bar, he falsely attested that he was complying with such treatment.  A significant sentence is warranted to provide deterrence and ensure that Madrigal complies with necessary mental health and substance abuse treatment.  To the extent the defendant attempts to blame his substance use for his misconduct, there are many instances where his deceit occurred under sober calculation—including during his interviews with the FBI and his witness tampering efforts while incarcerated.

### D.    History and Characteristics of the Defendant

Although Madrigal attempts to wrap himself in the flag, he has demonstrated that he is a risk to national security; disrespects the court system (despite being a lawyer); and manipulates romantic partners, family, coworkers, agencies, and the government to evade accountability and achieve his selfish ends.  When Madrigal can benefit from highlighting injuries and purported PTSD symptoms related to his service (such as when claiming disability, moving for release in this case, or seeking a lesser sentence), he claims that he is severely impacted by his overseas tours.  But on other occasions, he claims to be perfectly functioning—such as when he sought admission to the JAG School.  Madrigal pretends to care about others, but then mocks Victim 2 for the death

of her late spouse. Indeed, one must question how tormented Madrigal is by the IED death of a squad member when he used the same situation to torment the widow of a servicemember who suffered the same death.

At various points in this litigation, Madrigal has argued that his misconduct is the result of substance abuse. To be sure, Madrigal's misdeeds involve certain occasions when he was under the influence of alcohol. But they also involve numerous occasions when he was not. Madrigal was not drunk when he threatened suicide in Victim 1's presence, trashed her apartment, and tried to kill her pet. He was not drunk when he lied to the U.S. Army and FBI about his contact with the Russian Embassy. He was not drunk when he walked with Victim 2 for hours to concoct a story about that contact. And he was not drunk in jail, when he directed family members to "enlighten" Victim 2 and sought to resolve this case "like in [J]an[uary] 2020." In short, Madrigal's alcohol abuse cannot excuse his misconduct.

Madrigal has no respect for law enforcement or the courts and has demonstrated his animosity toward the U.S. government. His conversations from jail demonstrate that he continues to minimize his conduct. His acceptance of responsibility is not sincere, but a mechanical calculation to resolve his pending case.

As demonstrated in the Final PSR, Madrigal has previously faced numerous arrests but faced few (if any) legal consequences. His history and characteristics support the need for a significant sentence and an upward variance is merited.

## VI.    SUPERVISED RELEASE

In light of Madrigal's significant history of misconduct, pattern of abuse toward others, and repeated manipulation of the justice system, the Court should impose consecutive sentences of supervised release, for a total of twelve years of supervised release.[3]

District Courts "have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose . . . ." *Seter v. United States*, 566 U.S. 231, 236 (2012), and 18 U.S.C. § 3584(a). In exercising this discretion, "the court must consider the 18 U.S.C. § 3553(a) sentencing factors." 18 U.S.C. § 3584(a). In *United States v. Marsh*, the Fourth Circuit upheld the imposition of consecutive sentences because of the seriousness of the defendant's past crimes, the defendant's repeated pattern of misconduct, and the need to protect the public from the defendant. *United States v. Marsh*, 716 Fed. Appx. 200, 201 (4th Cir. 2018). Considering Madrigal's history of violence and threats of violence, his documented lies and deception, his manipulation of and disregard for the criminal justice system, and the ongoing threat he poses to the public, the Court should impose a twelve-year term of supervised release.

## VII.    SENTENCING HEARING

At the sentencing hearing scheduled for December 19, 2024, the United States expects to present the evidence referenced in this Memorandum. The United States reserves the right to present other witnesses and evidence to rebut any arguments raised by the Defense.

---

[3] Madrigal has pleaded guilty to violating three counts of 18 U.S.C. § 1001(a)(2) and one count of 18 U.S.C. § 1361. Each count carries a statutory maximum of three years of supervised release. 18 U.S.C. §§ 1001(a)(2), 1361, 3583, 3559.

## VIII.  CONCLUSION

Madrigal's conduct in this case involves an extended pattern of lies, threats, and manipulation to evade responsibility and get what he wants.  It is a pattern he has repeated for many years.  An above-Guidelines sentence of 72 months is needed to reflect the gravity of Madrigal's conduct; deter him from future crimes; protect the public—including his victims, others, and national security; and promote respect for the law.

Respectfully submitted,

Christopher Kavanaugh
United States Attorney

/s/ *Vito A. Iaia*
Assistant United States Attorney
Illinois Bar No. 6327072

/s/ *Jessica Joyce*
Special Assistant United States
Attorney
Virginia Bar No. 96153

United States Attorney's
Office 255 West Main Street
Charlottesville, VA 22902
Phone: 434 293-4283
vito.iaia@usdoj.gov
jessica.joyce@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

/s/ *Vito A. Iaia*

Assistant United States Attorney